Misión Industrial de Puerto Rico, Inc. y otros, recurridos, *v.* Junta de Planificación de Puerto Rico y Autoridad de Acueductos y Alcantarillados, peticionarias.

*Número:* CC-97-335 *Resuelto:* 30 de junio de 1998

*John M. García* y *Enrique R. Adames Soto*, de *García & Fernández*, abogados de la Autoridad de Acueductos y Alcantarillados, peticionaria; *Carlos Lugo Fiol, Procurador General*, abogado de la Junta de Planificación, peticionaria, y del Secretario de Justicia, en informe; *Pedro J. Saadé Lloréns, Juan Santiago Nieves*, de *Nazario & Santiago, Federico Lora López* y *Pedro J. Varela Fernández*, abogados de Misión Industrial de Puerto Rico, Inc. y otros, recurridos.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

Nos corresponde considerar, en primer lugar, la constitucionalidad de la Ley Núm. 19 de 12 de junio de 1997 (22 L.P.R.A. sec. 451 *et seq.*), la cual autorizó a la Autoridad de Acueductos y Alcantarillados a continuar con la construcción del Superacueducto de la Costa Norte, luego de

que el Tribunal de Circuito de Apelaciones dictara una sentencia el 20 de mayo de 1997 para revocar la resolución de la Junta de Planificación de Puerto Rico de 5 de julio de 1996, mediante la cual aprobó la consulta de ubicación del proyecto. En segundo lugar, debemos examinar la corrección de la referida sentencia del Tribunal de Circuito de Apelaciones.

Resolvemos que la Ley Núm. 19, *supra*, es inconstitucional, en cuanto viola el principio de la separación de poderes contenido en la Constitución del Estado Libre Asociado de Puerto Rico, y revocamos la sentencia del Tribunal de Circuito de Apelaciones.

I

El 21 de junio de 1995, la Autoridad de Acueductos y Alcantarillados (en adelante la Autoridad), peticionaria aquí, sometió ante la consideración de la Junta de Planificación de Puerto Rico (en adelante la Junta) la consulta Núm. 95-06-0682-JGE sobre la ubicación del sistema de acueductos conocido como el Superacueducto de la Costa Norte (S.A.N.).[1]

---

[1] El Superacueducto de la Costa Norte (S.A.N.) es un proyecto compuesto de siete (7) elementos principales.

"... Su primer componente es una laguna de retención de aguas crudas (sin tratar) cerca de la confluencia del Río Grande de Arecibo y del Río Tanamá. El segundo componente es una estación de bombeo de aguas crudas hacia la planta al este sureste de la mencionada laguna. El tercer elemento es la tubería de conducción de aguas crudas que va desde la estación de bombeo hasta la planta de filtración propuesta. El cuarto elemento es la Planta de Filtración en el Barrio Miraflores de Arecibo con una capacidad de producción inicial de 100 MGD [millones de galones diarios]. Como quinto elemento está la tubería de agua potable desde Arecibo hasta la zona este de Bayamón con un total de doce (12) puntos de conexión de servicio para los municipios a servirse .... El lugar seleccionado para la planta es un punto alto que permite llevar las aguas por gravedad, sin bombeo, desde Arecibo hasta Bayamón. El sexto componente serán dos tanques de almacenaje de 10 MGD cada uno y serán instalados al oeste de la ciudad de Bayamón. Dos líneas de transmi[s]ión [e]léctricas serán el último componente del sistema. Una de las líneas va a suplir la estación de bombas cerca del Río Grande de Arecibo y la otra la Planta de Tratamiento a ubicarse en el Barrio Miraflores." Resolución de la Junta de Planificación de Puerto Rico de 5 de julio de 1996 para aprobar la consulta Núm. 95-06-0682-JGE, determinación de hecho Núm. 1 (en la Resolución de la Junta).

La Junta celebró audiencias públicas el 18, 19, 22 y 26 de diciembre de 1995, y el 5 de julio de 1996 aprobó la consulta mediante una resolución que les fue notificada a las partes el 18 de julio. Varios interventores le solicitaron a la Junta que reconsiderara su determinación, a lo cual ésta se negó mediante una resolución notificada a las partes el 30 de agosto de 1996.

El 27 de septiembre de 1996 Misión Industrial de Puerto Rico, Inc. y otros —recurridos aquí— presentaron un recurso de revisión ante el Tribunal de Circuito de Apelaciones. Tanto la Junta como la Autoridad se opusieron a la expedición del auto. El 20 de diciembre de 1996, pendiente la consideración del recurso ante el Tribunal de Circuito de Apelaciones, los recurridos presentaron una moción en auxilio de jurisdicción ante ese foro para solicitar que se paralizara la construcción del S.A.N.

El 28 de febrero de 1997 el Tribunal de Circuito de Apelaciones emitió una resolución en la cual expidió el auto de revisión, la cual tuvo el efecto de paralizar automáticamente la construcción del proyecto. De esta resolución recurrieron la peticionaria y la Junta el 7 de marzo de 1997, mediante sendas peticiones de *certiorari,* ante esta Corte. Ambas señalaron que el Tribunal de Circuito de Apelaciones había incidido al expedir el auto de revisión e impugnaron su determinación de mantener el efecto de la expedición en cuanto a la paralización del proyecto. Atendidos los planteamientos de las partes, expedimos los autos solicitados y confirmamos la resolución del Tribunal de Circuito de Apelaciones en cuanto a la expedición del auto de revisión. Dictamos, no obstante, una orden de remedio provisional en la cual autorizamos a la peticionaria a continuar parcialmente con la construcción del proyecto. Véase *Misión Ind. P.R. v. J.P. y A.A.A.,* 142 D.P.R. 656 (1997).

Devuelto el recurso, y luego de varios incidentes, el Tribunal de Circuito de Apelaciones procedió a revisar la decisión de la Junta, y el 20 de mayo de 1997 dictó una sen-

tencia en la cual revocó la resolución que aprobó la consulta de ubicación del proyecto.(²) Concluyó ese foro que la actuación administrativa fue ilegal y contraria a derecho por los fundamentos siguientes.

Primero, la Junta "carece de facultad para autorizar, mediante consulta de ubicación, un proyecto cuyo propósito es extraer cantidades significativas de agua del cauce natural del Río Grande de Arecibo, en ausencia de una determinación inicial del Departamento de Recursos Naturales, a quien la Ley de Aguas de Puerto Rico facultó para determinar todo lo relativo al uso y aprovechamiento de las aguas de Puerto Rico". Sentencia del Tribunal de Circuito de Apelaciones, págs. 212–213.

Segundo, "en el proceso decisional de aprobación de la consulta de ubicación, la Junta no cumplió con los requisitos de ley esenciales a la aprobación de una consulta de ubicación de terrenos, aprobándose unos usos de terrenos antes de que se identificaran en su totalidad los terrenos para los que se estaba autorizando el uso". Sentencia del Tribunal de Circuito de Apelaciones, pág. 213.

Tercero, la Junta "no cumplió con el requisito de notificación adecuada a los propietarios afectados por la acción administrativa, requisito indispensable para la validez del procedimiento adjudicativo ante la Junta, violentándose el imperativo constitucional del debido proceso de ley que incluye el derecho a ser oído". Sentencia del Tribunal de Circuito de Apelaciones, pág. 213.

Cuarto, la Junta aprobó "la construcción de un elemento o componente del Superacueducto, la laguna de retención, en una Zona 1 susceptible a inundaciones, sin un estudio hidrológico-hidráulico y sin siquiera considerar la condición de inundabilidad de los terrenos, en violación a las normas legales contenidas en sus propias leyes y regla-

---

(²) La copia de la notificación de esta sentencia fue archivada en autos el mismo 20 de mayo de 1997.

mentos sobre zonas inundables". Sentencia del Tribunal de Circuito de Apelaciones, págs. 213–214.

Quinto, la Junta aprobó implícitamente "el uso de terrenos agrícolas de alta productividad en una actividad no agrícola sin prueba ni determinación alguna que justifique el cambio de uso de los terrenos afectados, según se requiere por la ley y la reglamentación propia[s] de la ... [agencia]". Sentencia del Tribunal de Circuito de Apelaciones, pág. 214.

Sexto, la Junta no resolvió "las controversias sobre posibles impactos ambientales del proyecto, planteadas por la Declaración de Impacto Ambiental Final, por agencias estatales y federales y por la ciudadanía, según se requiere por las disposiciones de la Ley sobre Política Pública Ambiental". Sentencia del Tribunal de Circuito de Apelaciones, pág. 214.

Consecuentemente, el tribunal ordenó la paralización total de las obras iniciadas al amparo de la resolución revocada, hasta tanto se cumpliera a cabalidad con la legislación y la reglamentación aplicables.

Así las cosas, el 12 de junio de 1997 la Legislatura aprobó, y el Gobernador firmó, la Ley Núm. 19, *supra*, de vigencia inmediata, para ordenarle a la peticionaria continuar con la construcción del proyecto del S.A.N.; eximirla del cumplimiento de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, y establecer el procedimiento y los requisitos para la autorización del proyecto y para la revisión judicial. En síntesis, la Ley Núm. 19, *supra*, le autorizó y ordenó a la peticionaria continuar con la construcción del S.A.N., luego de cumplir con los requisitos y trámites establecidos en el estatuto. Al día siguiente de la aprobación de esta ley, la Autoridad reinició la construcción del proyecto.(³)

El 19 de junio de 1997 la Junta y la peticionaria presen-

---

(³) Véase J. Ghigliotty, "A golpe de permisos el supertubo", *El Nuevo Día*, 14 de junio de 1997, pág. 6.

taron sendos recursos de *certiorari* ante esta Corte para solicitarnos la revocación de la sentencia del Tribunal de Circuito de Apelaciones. Mediante una resolución emitida el 30 de junio de 1997 en el Caso Núm. CC-97-336, desestimamos el recurso de la Junta por ésta haberlo presentado fuera del término correspondiente.[4] Véase *Misión Ind. P.R. v. J.P. y A.A.A. II*, 143 D.P.R. 811 (1997). La sentencia recurrida, por lo tanto, advino final y firme en cuanto a ella. En cuanto a la peticionaria, debemos señalar que ésta no se refiere en su alegato a la Ley Núm. 19, *supra*.

El 26 de junio de 1997 los recurridos presentaron una moción en auxilio de nuestra jurisdicción, en la que nos solicitaron una orden para detener la construcción del S.A.N., reiniciada al amparo de la nueva legislación. Nos solicitaron, además, que pospusiéramos la decisión en cuanto a la expedición del auto de *certiorari* solicitado por la peticionaria, hasta tanto hubiéramos considerado la validez constitucional de la Ley Núm. 19, *supra*, la cual ellos impugnan.

El 30 junio de 1997 dictamos una resolución mediante la cual les concedimos un término a las partes para que se expresaran en torno a la validez constitucional de la Ley Núm. 19, *supra*, y la posible academicidad del recurso de autos. Igual término le concedimos al Secretario de Justicia del Estado Libre Asociado de Puerto Rico, según lo exige la Regla 21.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Véase *Misión Ind. P.R. v. J.P. y A.A.A. I*, 143 D.P.R. 804 (1997).

Las partes han comparecido. Estando en posición para ello, expedimos el auto solicitado y, sin procedimientos ulteriores, procedemos a resolver las controversias planteadas. Véanse: Regla 50 del Reglamento de Tribunal

---

[4] El 17 de julio de 1997 la Junta de Planificación (la Junta) compareció en una moción de reconsideración, la cual denegamos mediante una resolución de 24 de julio siguiente.

Supremo, 4 L.P.R.A. Ap. XXI-A; *Bacardí Corp. v. Congreso Uniones Inds.*, 141 D.P.R. 100 (1996); *Nieves Vélez v. Bansander Leasing Corp.*, 136 D.P.R. 827 (1994); *Rivera Pérez v. Carlo Aymat*, 104 D.P.R. 693, 694 (1976).

Por tratarse de una cuestión de justiciabilidad, atendemos primero lo relativo a la posible academicidad de este recurso. Véanse: *C.E.E. v. Depto. de Estado,* 134 D.P.R. 927 (1993); *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994).

## II

A. La doctrina de academicidad forma parte del concepto amplio de justiciabilidad(5) que circunscribe la revisión judicial. Véanse, *e.g.*: *Pueblo v. Ramos Santos*, 138 D.P.R. 810 (1995); *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994); *Noriega v. Hernández Colón*, supra, págs. 437–438; *C.E.E. v. Depto. de Estado*, supra, pág. 934; *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 720, 724–728 (1980); *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387, 392 (1980); *E.L.A. v. Aguayo*, 80 D.P.R. 552, 597 (1958).

Un caso se convierte en académico cuando pierde su carácter adversativo, creando una circunstancia en la que el dictamen judicial constituiría una opinión consultiva.(6) *Cf., P.P.D. v. Gobernador I*, 139 D.P.R. 643

---

(5) Según acuñado por el Tribunal Supremo de Estados Unidos, "justiciabilidad" es el término con el que convencionalmente se le denomina a la doble limitación que el requisito de caso o controversia les impone a las cortes en la jurisdicción federal. Véase *Flast v. Cohen*, 392 U.S. 83, 95 (1968). La dualidad de esta limitación consiste, por un lado, en restringir el ejercicio del Poder Judicial a controversias presentadas en un "contexto adversativo ... susceptibles de resolución en un proceso judicial" y, por otro, en "asegurar que las cortes federales no interfieran con las áreas reservadas a las otras ramas de gobierno". (Traducción nuestra.) Íd. Estos principios los hemos acogido también en nuestra jurisdicción. Véanse, *e.g.*: *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994); *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 720 (1980).

(6) Al adoptar esta definición no estamos rechazando el concepto más flexible y abarcador de academicidad que en *Asoc. de Periodistas v. González*, 127 D.P.R. 704, 719 (1991), reconocimos haber acogido en *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958). Nuestro propósito, al contrario, es precisar este concepto desasociándolo de los con-

(1995); *Pueblo v. Ramos Santos*, supra, págs. 824–825; *Pueblo en interés menor M.A.G.O.*, 138 D.P.R. 20 (1995); *Noriega v. Hernández Colón*, supra, pág. 437; *C.E.E. v. Depto. de Estado*, supra, pág. 935. Por lo tanto, cuando un tribunal determina que un caso es académico, su deber es abstenerse de considerar sus méritos. Véanse: *C.E.E. v. Depto. de Estado*, supra, pág. 935; *El Vocero v. Junta de Planificación*, 121 D.P.R. 115, 124–125 (1988). Una controversia se puede tornar académica, entre otras razones, por cambios en el derecho aplicable ocurridos durante el trámite judicial. Véanse, *e.g.*: *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531–532 (1972); *A.D. de A. v. Srio. de Hacienda*, 100 D.P.R. 995, 1000–1001 (1972); *Carle Santiago v. Adm. de Estabilización Econ.*, 91 D.P.R. 65, 67–68 (1964); *P.P.D. v. Gobernador I*, supra, págs. 675–676; *Pueblo en interés menor M.A.G.O.*, supra, pág. 25; *Noriega v. Hernández Colón*, supra, pág. 438; *Berberena v. Echegoyen*, 128 D.P.R. 864, 872 (1991).

■ La Ley Núm. 19, *supra*, autorizó la continuación de la construcción del S.A.N. —sujeto al cumplimiento de ciertos requisitos— luego de que el Tribunal de Circuito de Apelaciones revocara la resolución de la Junta y ordenara la paralización de las obras. Algunas de sus disposiciones son de carácter retroactivo(7) debido a su relación directa

---

ceptos *colusión* y *madurez*, implicados en la definición de *academicidad* propuesta en *E.L.A. v. Aguayo*, supra, pág. 584 (citando a *Ex parte Steele*, 162 Fed. 694, 701 (1908)): "[U]n caso académico ... es 'uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes que éste haya sido reclamado, o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente'." Respecto a este problema, véase J.J. Álvarez González, *Derecho constitucional*, 61 Rev. Jur. U.P.R. 637, 663 (1992), "[d]e poco vale una definición 'abarcadora' [de academicidad], si no ayuda a distinguir entre conceptos distintos [de justiciabilidad, tales como colusión y madurez], que son producto de factores distintos y que muy bien pueden acarrear consecuencias distintas". Véase, además, H.N. Padilla Martínez, *El poder judicial en Puerto Rico: su estructura, funciones y limitaciones*, 50 Rev. Jur. U.P.R. 357, 434 (1981), comentando la inclusión de los conceptos *colusión* y *madurez* en la definición de *academicidad* adoptada en *E.L.A. v. Aguayo*, supra.

(7) Otras (Art. 6 de la Ley Núm. 19 de 12 de junio de 1997 (22 L.P.R.A. sec. 454) en parte), sin embargo, son de carácter prospectivo.

(Arts. 2 y 6 de la ley, 22 L.P.R.A. secs. 451 n. y 454) o indirecta (Arts. 3, 4 y 5 de la ley, 22 L.P.R.A. secs. 451–453) con el trámite administrativo que fue objeto de revisión por parte del Tribunal de Circuito. de Apelaciones. De ser válida, la referida Ley Núm. 19 eliminaría las controversias adjudicadas en la sentencia cuya revisión se nos solicita y haría innecesario nuestro dictamen, ya que, como se sabe, "[u]n estatuto es y se presume constitucional hasta que resolvamos lo contrario". *Cerame-Vivas v. Srio. de Salud*, 99 D.P.R. 45, 51 (1970).

Los recurridos argumentan, sin embargo, que la Ley Núm. 19 es inconstitucional, entre otras razones, porque contraviene el principio de la separación de poderes y, por lo tanto, no se debe aplicar en la solución del recurso del epígrafe. Ante esta circunstancia debemos determinar primero, como cuestión de umbral, si el recurso ante nuestra consideración es justiciable. Véanse: *C.E.E. v. Depto. de Estado*, supra, pág. 934; *Asoc. de Periodistas v. González*, 127 D.P.R. 704, 717 (1991); *E.L.A. v. Aguayo*, supra, págs. 558–559.

■ Al emprender esta tarea, reafirmamos nuestra obligación de esforzarnos por lograr una interpretación congruente y compatible con el mantenimiento de la constitucionalidad de una ley, por deferencia a la interpretación inicial que de la Constitución hacen las ramas políticas del Gobierno. Véanse: *P.P.D. v. Gobernador I*, supra, págs. 678–680; *Pueblo v. Santiago Feliciano*, 139 D.P.R. 361 (1995); *Pueblo v. Rivera Morales*, 133 D.P.R. 444 (1993); *Nogueras v. Hernández Colón*, 127 D.P.R. 405, 412 (1990) (en adelante *Nogueras v. Hernández Colón I*); *Banco Popular v. Mun. de Mayagüez*, 126 D.P.R. 653, 661 (1990); *Silva v. Hernández Agosto*, 118 D.P.R. 45, 55 (1986); *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 619 (1981).

B. La Asamblea Legislativa aprobó la Ley Núm. 19, *supra*, amparándose en su poder de reglamentación y en

virtud de la facultad que le confiere la Sec. 19 del Art. II de la Constitución para legislar "en protección de la vida, la salud y el bienestar del pueblo". Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 332. Su actuación respondió, de acuerdo con la exposición de motivos y la declaración de propósitos contenida en el Art. 2 de la Ley Núm. 19, *supra*, a la obligación de atender la falta apremiante de un abasto de agua suficiente en Puerto Rico.

La Exposición de Motivos de la Ley Núm. 19, *supra*, 1997 (Parte 1) Leyes de Puerto Rico 50, asevera efectivamente que existe un estado de emergencia en relación con los abastos de agua potable en la costa norte del país y afirma que el S.A.N. es la alternativa más sensata para remediarlo. Declara, además, que "[l]a tramitación de este proyecto en su fase administrativa fue correcta, habiéndose cumplido cabalmente con la política pública, las leyes y los reglamentos vigentes". Íd., pág. 52. Consigna, por último, que la Ley Núm. 19, *supra*, pretende establecer "un mecanismo ágil y expedito" que permita completar e implantar el proyecto del S.A.N., a la vez que "provee los mecanismos efectivos" para que aquellas personas, cuyos intereses pudieran ser afectados por el proyecto, puedan reclamar sus derechos en los tribunales.

El Art. 1 de la Ley Núm. 19, *supra*, establece que la exposición de motivos de la ley "constituye la expresión exclusiva de la intención legislativa, a los fines de la interpretación de la misma". Leyes de Puerto Rico, *supra*, pág. 55.

El Art. 2 de la Ley Núm. 19, *supra*, contiene una declaración de propósitos que reitera lo expresado en la exposición de motivos y declara, de nuevo, que la tramitación administrativa del proyecto fue correcta. Afirma, además, que la Ley Núm. 19, *supra*, "está a tono y cumple con el mandato constitucional esbozado en la Sección 19 del Artículo VI de la Constitución de conservar nuestros recursos naturales". Leyes de Puerto Rico, *supra*, pág. 56.

El Art. 3 de la citada ley le "autoriza y ordena a la [peticionaria] a que, una vez cumpla con los requisitos y trámites establecidos en el Artículo 4 ... y se emita la autorización de obra, continúe de forma ininterrumpida y diligente con el diseño y la construcción del [S.A.N.] hasta la culminación de la obra". Leyes de Puerto Rico, *supra*, pág. 56.

El citado Art. 4 de la ley le exige a la peticionaria presentar los siguientes documentos ante la Administración de Reglamentos y Permisos (A.R.Pe.):

a. Permiso del Cuerpo de Ingenieros de los Estados Unidos para cumplir con la Sección 404 del "Clean Water Act"[, 33 U.S.C. sec. 1344] ...

. . . . . . . .

b. Certificado de calidad del agua que emite la Junta de Calidad Ambiental;
c. Certificación de cumplimiento con el Artículo 4(C) de la [Ley sobre Política Pública Ambiental,] Ley Núm. 9 de 18 de junio de 1970, según enmendada, [12 L.P.R.A. sec. 1124(c)];
d. Permiso de construcción de la toma de agua emitido por el Departamento de Recursos Naturales y Ambientales el 18 de septiembre de 1996 conforme a la [Ley para la Conservación, el Desarrollo y Uso de los Recursos de Agua de Puerto Rico,] Ley Núm. 136 de 3 de junio de 1976, según enmendada, [12 L.P.R.A. secs. 1501–1560], independientemente de que éste no sea final y firme. Leyes de Puerto Rico, *supra*, pág. 57.

Este artículo le ordena también a A.R.Pe. expedir la autorización de la obra correspondiente inmediatamente después de que la peticionaria presente los documentos mencionados.

El Art. 5 de la ley, *supra*, le ordena al Departamento de Recursos Naturales y Ambientales (D.R.N.A.) "continuar con el trámite administrativo que determine necesario para [el otorgamiento] final de la franquicia de agua dentro del cual verificará el cumplimiento con los términos y condiciones del permiso de construcción [de toma de agua] otorgado". Leyes de Puerto Rico, *supra*, pág. 57. Establece,

además, que la revisión judicial de la determinación administrativa con respecto a estos permisos, así como de la autorización de obra de A.R.Pᴇ., se deberá solicitar de acuerdo con el mecanismo establecido en el Art. 7 de la Ley Núm. 19, *supra*, 22 L.P.R.A. sec. 455. Por último, le ordena a la peticionaria cumplir con las condiciones establecidas en el permiso de construcción de toma de agua y la franquicia final de agua, documentos que, según la Ley Núm. 19, *supra*, "están en armonía con la conservación y protección de los recursos naturales y el medio ambiente". Íd.

El Art. 6 de esta ley, *supra*, exime las determinaciones administrativas respecto a los documentos relacionados en el Art. 4, *supra*, de las disposiciones de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, con excepción de los términos que hubieran expirado antes de la vigencia de la citada Ley Núm. 19. Este artículo declara, además, que "[t]odos aquellos permisos, endosos, certificaciones, contratos, subastas y los procedimientos administrativos, incluyendo los de notificación, consultas públicas y de ubicación, que hayan sido obtenidos o realizados administrativamente para el desarrollo del [S.A.N.] con anterioridad a la vigencia de [la Ley Núm. 19, *supra*], se entenderán vigentes y conformes a la política pública por la presente adoptada, por la urgente necesidad de agua potable en aras de garantizar la vida, la salud y el bienestar general". Leyes de Puerto Rico, *supra*, pág. 58.

El Art. 7 de la Ley Núm. 19, *supra*, 22 L.P.R.A. sec. 455, establece un mecanismo particular para la revisión judicial de las decisiones administrativas relacionadas con los documentos detallados en los Arts. 4 y 5 de la Ley Núm. 19, *supra*. Establece que la expedición de un auto de revisión no tendrá el efecto de paralizar trámite alguno relacionado con la construcción del proyecto del S.A.N., a menos que medie una orden expresa del tribunal para evitar un daño irreparable. También consigna los requisitos que debe sa-

tisfacer la parte recurrente para que el tribunal pueda emitir una orden de paralización. Establece, sin embargo, que una orden a tales efectos sólo "podrá afectar aquel componente o componentes del proyecto que sean objeto de controversia en el caso y en donde esté envuelto un daño sustancial". Leyes de Puerto Rico, *supra*, pág. 59. El citado Art. 7 preceptúa que "[n]o procederá ningún otro tipo de demanda, acción, procedimiento o recurso en ningún tribunal que no sean los dispuestos en este Artículo, excepto aquellos que configuren un reclamo por daños y perjuicios conforme a la Ley Núm. 104 de 29 de junio de 1955, según enmendada, conocida como 'Ley de Pleitos contra el Estado', o procedimientos de expropiación forzosa". Íd.

El Art. 8 (Leyes de Puerto Rico, *supra*, pág. 59) establece que las disposiciones de la Ley Núm. 19, *supra*, "prevalecerán sobre cualquier disposición de ley o reglamento inconsistente con las mismas".

El Art. 9 (Leyes de Puerto Rico, *supra*, pág. 59) establece la separabilidad de las disposiciones de la ley y limita la declaración de inconstitucionalidad de cualesquiera de ellas, disponiendo que la decisión judicial correspondiente no "proveerá para que se detenga la construcción del [S.A.N.] o ninguno de sus componentes".

El Art. 10 (22 L.P.R.A. sec. 459) le ordena al Concilio de Infraestructura divulgar el contenido de la ley.

El Art. 11, por último, establece la vigencia inmediata de la ley. Leyes de Puerto Rico, *supra*, pág. 59.

Así pues, a partir de 12 de junio de 1997, fecha cuando comenzó la vigencia de la Ley Núm. 19, *supra*, entró en vigor un procedimiento particular para la tramitación del S.A.N.

■ C. El principio constitucional de la separación de poderes representa la expresión jurídica de la teoría de gobierno que pretende evitar la tiranía —la concentración indebida del poder en una misma fuente— mediante la distribución tripartita del poder estatal. Véase *P.P.D. v. Ferré,*

*Gobernador*, 98 D.P.R. 338, 453 (1970), opinión del Hon. Juez Rigau. En el ordenamiento jurídico puertorriqueño, el principio de la separación de poderes emana de la Sec. 2 del Art. I de la Constitución, L.P.R.A., Tomo 1, la cual establece la forma republicana de gobierno para el Estado Libre Asociado.

La división de los Poderes Legislativo, Ejecutivo y Judicial que establece la Constitución, sin embargo, no significa la independencia absoluta entre éstos. Véanse: *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 619 (1983); 3 Diario de sesiones de la Convención Constituyente 1918 (1952) (rechazo de una propuesta de enmienda para disponer que los poderes fueran "ejercidos con independencia absoluta el uno del otro"). Por el contrario, la interacción que la Constitución establece entre las funciones de las ramas de gobierno crea un sistema de pesos y contrapesos con el propósito de generar un equilibrio dinámico[8] entre poderes coordinados y de igual rango, y evitar así que ninguno de éstos amplíe su autoridad a expensas de otro.[9] Véanse: *Nogueras v. Hernández Colón I*, supra, pág. 426; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 427–428 (1982). Conscientes de la relación dinámica que debe existir entre los poderes públicos, hemos adoptado un criterio flexible y pragmático de la doctrina de la separación de poderes.

En efecto, en *González v. Tribunal Superior*, 75 D.P.R. 585 (1953), apenas un (1) año después que entrara

---

[8] El equilibrio entre los poderes públicos debe ser, además, según expresó el delegado Víctor Gutiérrez Franqui en la Convención Constituyente, "sensato y justo". 2 Diario de Sesiones de la Convención Constituyente 1043 (1951). Según entendía el delegado Gutiérrez Franqui, "[s]eparación de poderes es que cada rama del gobierno se ajuste a bregar con aquellos aspectos de la organización política que son de su incumbencia". Diario de Sesiones, *supra*, Vol. 1, pág. 591.

[9] Según expresó el delegado Virgilio Brunet Maldonado en la Convención Constituyente: "[T]enemos en mente la separación de poderes para que exista una forma republicana de gobierno auténtica, y al separar los poderes, debemos rodear, a cada uno de éstos, de aquellas protecciones que permitan su ejercicio, su funcionamiento, sin que esté ello supeditado a la intromisión de otras de las ramas". Diario de Sesiones, *supra*, Vol. 3, págs. 1800–1801.

en vigor la Constitución, tuvimos que enfrentar una interesante controversia relacionada con una disposición transitoria de la anterior Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley Núm. 11 de 24 de julio de 1952 (4 L.P.R.A. sec. 1 *et seq.*), la cual nos autorizó a adoptar ciertas reglas procesales complementarias sin tener que remitirlas a la Asamblea Legislativa, no obstante lo preceptuado en la Sec. 6 del Art. V de la Constitución, L.P.R.A., Tomo 1. La actuación legislativa respondió a la necesidad de atemperar el funcionamiento de las cortes a la nueva estructura del poder judicial que estableció el Art. V de la Constitución, *supra*. Luego de un riguroso análisis de la Constitución y de la legislación pertinente, así como de los debates en la Convención Constituyente y las circunstancias históricas prevalecientes, resolvimos que la delegación de esa facultad transitoria era válida.[10]

Al analizar específicamente el problema de la división entre las ramas de gobierno, rechazamos la aplicación rígida de la doctrina de la separación de poderes, reiterando nuestros pronunciamientos en *Banco Popular, Liquidador v. Corte*, 63 D.P.R. 66 (1944). Reconocimos así la plena vigencia de esta decisión al amparo del ordenamiento constitucional actual.[11] *González v. Tribunal Superior*, supra, pág. 600 esc. 12.

En *Banco Popular, Liquidador v. Corte*, supra, págs. 73–74, declaramos que "no es suficiente que se

[10] Nuestra conclusión se apoyó esencialmente en tres (3) fundamentos. Primero, la Asamblea Legislativa no violó el principio de la separación de poderes, delegándonos indebidamente parte de su poder inherente, ya que el poder de adoptar reglas procesales y de evidencia la Rama Legislativa lo comparte con la Judicial, de acuerdo con la Sec. 6 del Art. V de la Constitución, L.P.R.A., Tomo 1. *González v. Tribunal Superior*, 75 D.P.R. 585, 590–607 (1953). Segundo, la actuación de la Asamblea Legislativa estuvo justificada ante las circunstancias históricas particulares del momento. Íd., págs. 608–616. Tercero, la Sec. 7 del Art. IX de la Constitución, L.P.R.A., Tomo 1, le confirió a la Asamblea Legislativa la facultad para adoptar medidas transitorias hasta que la Constitución hubiera adquirido plena vigencia. *González v. Tribunal Superior*, supra, págs. 622–625.

[11] Así lo hicimos también recientemente en *Noriega v. Hernández Colón*, supra, págs. 459–460 esc. 66.

conozca el limitado grado de separación envuelto en la separación ... [de los] poder[es] legislativo, ejecutivo y judicial". Es imprescindible conocer, además, la naturaleza de estos poderes. Íd., pág. 74. "El Poder Legislativo", planteamos como ejemplo, "no es una frase hecha ni un concepto que se define por sí mismo. Una demostración obvia es el poder de una de las cámaras de la Legislatura, en ayuda de sus funciones para hacer las leyes, bajo ciertas circunstancias, de procesar y castigar por desacato. A primera vista parece que tal poder es sin duda uno de naturaleza judicial". Íd. Advertimos, sin embargo, que "decir que un poder de la legislatura es judicial sólo conduce a confusión.([12]) Después de todo, caracterizar tal poder es sólo declarar el resultado y deja inarticulado el razonamiento necesario para llegar a tal resultado". Íd. Propusimos, por lo tanto, "echar a un lado la descripción y examinar cada situación, determinando en un caso específico (1) si la función específica ha sido expresamente asignada por la Constitución a la rama gubernamental que trata de ejercitarla, o (2) si su ejecución por tal rama es un incidente necesario para otras funciones [que le han sido] expresamente confer[idas]". Íd. Al determinar esta última cuestión es irrelevante el hecho de que una rama pueda usar los métodos, la técnica y el equipo tradicionalmente usados por otra. Íd. Hoy reiteramos estos pronunciamientos, reconociendo que al interpretar los contornos de la Constitución debemos garantizar su vigorosidad y relevancia ante los problemas sociales, económicos y políticos actuales. Véanse: *Nogueras v. Hernández Colón I*, supra, pág. 411; *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 613 (1988); *López Vives v. Policía de P.R.*, 118 D.P.R. 219, 227 (1987).

Así pues, al adjudicar controversias sobre la separación de poderes debemos reconocer que "[l]a relación entre las

---

([12]) Esta preocupación la reiteramos en *González v. Tribunal Superior*, supra, pág. 607 esc. 20, señalando que es inútil "establecer clasificaciones inflexibles bajo la doctrina de separación de poderes".

ramas está sujeta a alteraciones que dependen de las necesidades de los tiempos y la índole del poder de que se trate". *In re Rodríguez Torres*, 106 D.P.R. 698, 709 (1978), opinión particular del Juez Presidente Señor Trías Monge. Debemos distinguir "entre 'facultades que integran la entraña misma del sistema y poderes trasladables, por razones de peso, a otras ramas' ", y "a la luz de las circunstancias históricas prevalecientes, delimitar los contornos de los poderes públicos para evitar la concentración indebida de poderes y promover el más eficiente funcionamiento del sistema". *Nogueras v. Hernández Colón I*, supra, págs. 426–427.

Nuestra jurisprudencia sobre la separación de poderes refleja esa preocupación por mantener un equilibrio adecuado entre las ramas que integran nuestro Sistema de Gobierno. En unos casos hemos atendido la situación en la que una rama interfiere con otra, debilitando su autoridad o independencia.

Así, por ejemplo, en *Nogueras v. Hernández Colón*, 127 D.P.R. 638, 651 (1991) (en adelante *Nogueras v. Hernández Colón II*) resolvimos que mantener indefinidamente en sus puestos a jueces con nombramientos vencidos, que continuaban su incumbencia en virtud de la cláusula de continuidad contenida en las anteriores leyes Núm. 11, *supra*, (Ley de la Judicatura del Estado Libre Asociado de Puerto Rico) y Núm. 7 de 8 de agosto de 1974 (Ley sobre Jueces Municipales), 4 L.P.R.A. sec. 211 *et seq.*, violaba "el equilibrio que intenta mantener la Constitución en lo que respecta al ejercicio de nombramiento compartido entre la Rama Ejecutiva y la Legislativa". En *Pueblo v. González Malavé*, 116 D.P.R. 578, 587–588 (1985), le negamos al Senado de Puerto Rico intervenir como amigo de la corte en un recurso sobre la procedencia de ciertas denuncias por perjurio presentadas por el Fiscal Especial Independiente contra varias personas que testificaron ante la Comisión de lo Jurídico del Senado en la investigación de los hechos

ocurridos en el Cerro Maravilla el 25 de julio de 1978. Nuestra decisión se fundamentó, en parte, en que la comparecencia del Senado, de ser admitida, habría interferido con el ejercicio de nuestra discreción. En *Hernández Agosto v. López Nieves*, supra, pág. 620, resolvimos que los cargos que requieren el consejo y consentimiento del Senado no pueden ser ocupados interinamente de forma indefinida, pues de lo contrario "podría evadirse con facilidad el poder de confirmación del Senado, inclinarse pesadamente la balanza del lado de la Rama Ejecutiva y romperse el equilibrio que persigue la cláusula de separación de poderes".

No obstante, en *Nogueras v. Hernández Colón I*, supra, pág. 427, resolvimos que la creación de una doble sesión ordinaria por parte de la Legislatura no interfiere indebidamente con el Poder Ejecutivo, ya que el Gobernador aún conserva sus facultades constitucionales para convocar a la Asamblea Legislativa a sesión extraordinaria, hacer nombramientos de receso y efectuar vetos de bolsillo. Además, en *Hernández Agosto v. Romero Barceló*, supra, pág. 428, resolvimos que un gobernador reelecto no interfiere con la función constitucional del Senado de impartirles su consejo y consentimiento a los nombramientos de los secretarios de Gobierno, al no enviar a ese Cuerpo las nominaciones de aquellos secretarios nombrados en un cuatrienio anterior que desee retener en sus cargos durante el nuevo cuatrienio.

En otros casos hemos considerado la situación en la que una rama de gobierno asume una función que le ha sido atribuida a otra. En *Noriega v. Hernández Colón*, supra, por ejemplo, declaramos inconstitucionales ciertas resoluciones de la Asamblea Legislativa que le asignaban una cantidad global de fondos públicos a la Administración de Servicios Municipales para que ésta los distribuyera en cada distrito de acuerdo con el juicio particular de su respectivo Senador o Representante. Concluimos que tales resoluciones, por carecer de guías específicas para la distri-

bución de los fondos asignados, les concedían a los legisladores la "autoridad última" para disponer de fondos públicos, permitiéndoles ejercer la función de hacer cumplir las leyes. Íd., págs. 428–429. En *Pueblo v. González Malavé*, supra, además de resolver —como comentamos anteriormente— que autorizar la intervención del Senado como amigo de la corte en el recurso sobre la procedencia de las denuncias por perjurio presentadas por el Fiscal Especial Independiente podía interferir con el ejercicio de nuestra función, resolvimos que admitir esa comparecencia le permitiría al Poder Legislativo ejercer la función acusatoria que le corresponde propiamente al Poder Ejecutivo en su función de hacer cumplir las leyes. Íd., págs. 582–583.

En *Pueblo v. Santiago Feliciano*, supra, sin embargo, resolvimos que no viola el principio de la separación de poderes la determinación preliminar de causa probable que hace el Secretario de Justicia en una petición para grabar una comunicación oral no telefónica en virtud de la Sec. 6 de la Ley contra el Crimen Organizado y Lavado de Dinero del Estado Libre Asociado de Puerto Rico, Ley Núm. 33 de 13 de julio de 1978, según enmendada, 25 L.P.R.A. sec. 971q. Concluimos que esta determinación preliminar no implica el ejercicio de la facultad constitucional que le compete exclusivamente al Poder Judicial para expedir órdenes de registro o allanamiento.

D. La Ley Núm. 19, *supra,* plantea la situación específica de una intromisión de la Asamblea Legislativa, en su función de legislar, con el ejercicio de la función judicial. Nuestras decisiones han señalado hasta ahora varios tipos de legislación que interfieren indebidamente con el Poder Judicial.

En *P.R. Tobacco Corp. v. Buscaglia, Tes.*, 62 D.P.R. 811, 822 (1944), declaramos inconstitucional una ley aprobada con el fin único de ordenarle a un funcionario que

se negara a cumplir con una sentencia judicial.([13]) Hemos resuelto asimismo que "una sentencia judicial [no puede estar] sujeta y condicionada en su valor a que otra rama del gobierno le imparta su aprobación". *Torres v. Castillo Alicea,* 111 D.P.R. 792, 803 (1981). En este caso declaramos inconstitucionales los anteriores incisos (a) y (c) del Art. 2 y el Art. 7 de la Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. secs. 3077(a) y (c) y 3082, entre otras razones, porque promovían una intervención indebida del Poder Legislativo con la función adjudicativa de los tribunales.([14]) Específicamente, el Art. 7 de la Ley Núm. 104, *supra,* le permitía a una parte obtener una autorización legislativa para que se le pagara el exceso de una sentencia sobre los límites de compensación establecidos en el estatuto, de acuerdo con la determinación que el tribunal de instancia hubiera hecho a base de la prueba desfilada. Véase *Torres v. Castillo Alicea,* supra, pág. 802. En *Vélez Ruiz v. E.L.A.,* 111 D.P.R. 752 (1981), se nos cuestionó acerca de la constitucionalidad del procedimiento de arbitraje compulsorio establecido en los anteriores Arts. 41.010 al 41.110, Cap. 41 del Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, enmendada por la Ley de Responsabilidad Profesional Médico-Hospitalaria, Ley Núm. 4 de 30 de mayo de 1976 (26 L.P.R.A. secs. 4101–4107),([15]) para atender toda reclamación de daños y

---

([13]) El estatuto en cuestión le ordenaba expresamente al Tesorero de Puerto Rico negarse a cumplir con varias sentencias del tribunal de instancia al declarar ilegal el cobro de ciertas contribuciones y ordenar la devolución de las sumas pagadas bajo protesta. Véanse: *P.R. Tobacco Corp. v. Buscaglia, Tes.,* 62 D.P.R. 811, 822 (1994); Art. 4 de la Ley Núm. 22 de 3 de diciembre de 1942, Leyes de Puerto Rico, págs. 115 y 119.

([14]) Nuestro dictamen se fundamentó, además, en que las disposiciones en controversia violaban la igual protección de las leyes. Véase *Torres v. Castillo Alicea,* 111 D.P.R. 792, 798–801 (1981).

([15]) El Cap. 41 del Código de Seguros de Puerto Rico, según enmendado por la Ley de Responsabilidad Profesional Médico-Hospitalaria, fue derogado y sustituido por un nuevo Capítulo 41, de acuerdo con las disposiciones de la Ley Núm. 4 de 30 de diciembre de 1986 (26 L.P.R.A. secs. 4101–4107).

perjuicios por impericia médica. Resolvimos que la implantación del procedimiento contravenía el Art. V de la Constitución, *supra*, porque usurpaba la función del Sistema Judicial, atentando contra su integridad.[16] En *Ramírez v. Registrador*, 116 D.P.R. 541, 548 (1985), por último, reafirmamos el principio de un Sistema Judicial unificado establecido en la Sec. 2 del Art. V de la Constitución, L.P.R.A., Tomo 1, al declarar inconstitucional el Art. 202 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2702, en cuanto a la concesión de jurisdicción exclusiva a una sección del Tribunal de Primera Instancia, sin disponer la sumisión de las partes y la anuencia del foro judicial.

La Ley Núm. 19, *supra*, sin embargo, no contraviene las normas establecidas en la jurisprudencia citada. No fue aprobada con el único propósito de ordenar el incumplimiento de una sentencia judicial, *P.R. Tobacco Corp. v. Buscaglia, Tes.*, supra; no sujeta el valor de una sentencia a la determinación de otra rama, *Torres v. Castillo Alicea*, supra, y no contraviene el principio de jurisdicción unificada, *Ramírez v. Registrador*, supra. Tampoco presenta una controversia comparable con la adjudicada en *Vélez Ruiz v. E.L.A.*, supra. Hasta ahora, sólo en dos (2) ocasiones hemos considerado *específicamente* si el Poder Legislativo interfiere indebidamente con la función judicial al aprobar una legislación que afecte un pleito pendiente.

En *Suárez v. Tugwell, Gobernador*, 67 D.P.R. 180 (1947), sostuvimos la validez de la Ley Núm. 2 de 25 de

---

[16] Primero, la encomienda del asunto a un panel, luego de instada la acción judicial y realizado el descubrimiento de prueba, era mandatoria. No se le permitía al tribunal retener los casos que, a su juicio, no se debían referir. *Vélez Ruiz v. E.L.A.*, 111 D.P.R. 752, 760 (1981). Segundo, las decisiones del panel eran finales y obligatorias tanto para las partes como para el tribunal. Aun cuando el tribunal tenía cierta discreción para modificar el laudo, las partes no podían optar por no quedar vinculadas inicialmente. Además, las causas por las cuales se podía modificar el laudo restringían indebidamente la intervención judicial en cuanto a la adjudicación original de hechos y de derecho del panel. Íd., págs. 760–762. Tercero, la ley le autorizaba al panel, constituido en parte por legos, a interpretar y aplicar el derecho en la solución de las disputas. Íd., pág. 762.

febrero de 1946, vigente aún, según enmendada, 32 L.P.R.A. secs. 3074–3076, la cual prohibió la acción del contribuyente y privó a los tribunales de Puerto Rico de "jurisdicción para conocer, o continuar conociendo si se hubiera ya iniciado", cualquier acción sobre la constitucionalidad de una ley, resolución o actuación ejecutiva autorizada por ley, cuando el demandante base su legitimación únicamente en su carácter de contribuyente, según aplicada a un pleito pendiente en el que el tribunal de instancia ya había dictado un *injunction* preliminar. Nuestra decisión se basó en dos (2) fundamentos. Primero, la Ley Jones le confería en aquel momento a la Asamblea Legislativa la facultad de limitar o eliminar la jurisdicción de los tribunales. Véanse: *Suárez v. Tugwell, Gobernador*, supra, pág. 184; Ley Jones, 39 Stat. 951, Documentos Históricos, Sec. 40, L.P.R.A., Tomo 1, derogada por la Ley Púb. Núm. 600 de julio de 1950 (64 Stat. 319 y 320), Documentos Históricos, L.P.R.A., Tomo 1.([17]) Segundo, la aplicación de la Ley Núm. 2, *supra*, al pleito pendiente, aun cuando fue aprobada con el "fin inmediato" de privar al demandante del derecho a obtener un remedio en su caso —véase *Suárez v. Tugwell, Gobernador*, supra, pág. 188— no le privó de un derecho individual adquirido, por cuanto no hay tal derecho en el remedio de *injunction*, y aun presumiendo que lo hubiera, éste no le habría pertenecido individualmente, ya que las acciones de contribuyentes no son de

---

([17]) Nuestra determinación, que sanciona en este caso la facultad de la Legislatura para eliminar la jurisdicción de los tribunales, se debe entender modificada tanto por la Sec. 5(2) de la Ley Púb. 600 de 3 de julio de 1950 (64 Stat. 319, 320) Documentos Históricos, L.P.R.A., Tomo 1, el cual derogó la Sec. 40 de la Ley Jones, 39 Stat. 951, Documentos Históricos, L.P.R.A., Tomo 1, como por la Sec. 2 del Art. V de la Constitución, L.P.R.A., Tomo 1. En la actualidad, la Asamblea Legislativa sólo tiene la facultad de determinar la competencia y organización de los tribunales. Debemos señalar, no obstante, que aun cuando la Legislatura pueda ejercer válidamente esta facultad, un tribunal retiene la autoridad para considerar la validez de una ley que le pretende privar de su competencia en un caso pendiente. En tal situación, el tribunal les debe dar a las partes la oportunidad de ser oídas respecto a la validez y aplicabilidad de la legislación de que se trate. *Cf., Suárez v. Tugwell, Gobernador*, 67 D.P.R. 180, 187–189 (1947).

naturaleza privada, sino pública.[18] *Suárez v. Tugwell, Gobernador,* supra, págs. 184–186.

En *Sunland Biscuit Co. v. Junta Salario Mínimo,* 68 D.P.R. 371 (1948) (en reconsideración), resolvimos una controversia relacionada con una legislación que tuvo el efecto de convalidar un decreto mandatorio de la Junta de Salario Mínimo. En revisión, la recurrente, Sunland Biscuit Co., argumentó ante este Tribunal que la Junta había actuado sin autoridad y en exceso de sus poderes al promulgar el decreto, en esencia, por que éste tenía un efecto discriminatorio sobre su negocio. Antes de que emitiéramos nuestra decisión, la Legislatura aprobó la Ley Núm. 451 de 14 de mayo de 1947 (en adelante Ley Núm. 451), 29 L.P.R.A. sec. 211n, la cual tuvo el efecto de convalidar el decreto impugnado. El 25 de junio de 1947 emitimos una sentencia en la cual anulamos el decreto mandatorio. En reconsideración, sin embargo, dejamos sin efecto nuestra sentencia al resolver que la Ley Núm. 451, *supra,* la cual entró en vigor el 1ro de julio de 1947, había convalidado y ratificado las actuaciones de la Junta de Salario Mínimo al emitir el decreto en controversia. En *Sunland Biscuit Co. v. Junta Salario Mímino,* supra, pág. 379, concluimos que

> ... [a pesar de que] nuestra sentencia se dictó en 25 de junio de 1947 ... la misma no había creado aún ningún derecho a favor de la recurrente. Además, ... la Ley [Núm. 451] ... específicamente hac[ía] referencia a decretos emitidos con anterioridad a ... [su] aprobación ... y ésta lo fu[e] en 14 de mayo de 1947, ... fecha anterior a aquélla en que se dictó la sentencia de este Tribunal. Bajo estas condiciones el estatuto curativo resultó completamente válido y constitucional.

Cabe señalar, no obstante, que la citada Ley Núm. 451 no se aprobó para atender específicamente la controversia pendiente. Al contrario, se aprobó para enmendar sustan-

---

[18] Reconocimos, sin embargo, que la Legislatura no le puede privar a un litigante de un derecho *individual* adquirido en virtud de una sentencia final a su favor. Véanse: *Suárez v. Tugwell, Gobernador,* supra, pág. 186; *P.R. Tobacco Corp. v. Buscaglia, Tes.,* supra, págs. 821–822.

cialmente la Ley Núm. 8 de 5 de abril de 1941, Leyes de Puerto Rico, págs. 302–331, la cual creó la Junta de Salario Mínimo.[19] La disposición de la Ley Núm. 451, *supra*, que convalidó las actuaciones anteriores de la Junta de Salario Mínimo de Puerto Rico, se estableció para darles continuidad, *en forma general*, a todos los actos realizados por los funcionarios de la Junta de Salario Mínimo al amparo de la Ley Núm. 8, *supra*, 29 L.P.R.A. sec. 211 *et seq.*, no sólo al decreto impugnado y a las actuaciones relacionadas con su aprobación. Véase Art. 2 de la Ley Núm. 451 en *Sunland Biscuit Co. v. Junta Salario Mínimo*, supra, pág. 378. La Ley Núm. 451, *supra*, por otro lado, tampoco hizo determinaciones de hecho ni dictó conclusiones de derecho con respecto a las actuaciones ratificadas. En estas circunstancias sostuvimos la validez del decreto en controversia no porque la Ley Núm. 451, *supra*, así lo dictara, sino porque era lo que procedía en derecho de acuerdo con la Sec. 24(b) de la Ley Núm. 8, 1941 Leyes de Puerto Rico 323, el cual establecía que las conclusiones de hecho de la Junta de Salario Mínimo debían tomarse como concluyentes en ausencia de fraude.[20] Véase *Sunland Biscuit Co. v. Junta Salario Mínimo*, supra, págs. 376–378.

Es pertinente consignar, por último, que en *Banco Popular, Liquidador v. Corte*, supra, pág. 82, en el contexto de una controversia relacionada con la presentación de un informe de una comisión legislativa en un tribunal en el que se celebraba un procedimiento de liquidación de cierta entidad bancaria, expresamos que "el permitir que la legislatura o una comisión de una de sus

---

[19] Anterior a la Ley Núm. 451 de 14 de mayo de 1947 (29 L.P.R.A. sec. 211n) se había aprobado la Ley Núm. 217 de 11 de mayo de 1945 (29 L.P.R.A. sec. 211n) con el propósito de reorganizar esta agencia. Véanse: *Sunland Biscuit Co. v. Junta Salario Mínimo*, 68 D.P.R. 371, 384–385 (1948), opinión disidente del Juez Presidente Travieso; Ley Núm. 217 de 11 de mayo de 1945, Leyes de Puerto Rico, págs. 681–701.

[20] La actual Ley de Salario Mínimo contiene una disposición similar. Véase la Sec. 29(a) de la Ley Núm. 96 de 26 de junio de 1956, según enmendada, 29 L.P.R.A. sec. 246a(a).

cámaras dicte a una corte el resultado a que deba llegar al decidir cuestiones específicas ante la corte en cualquier etapa de la liquidación ... sería permitir a la legislatura usurpar una función que ha sido otorgada a las cortes".

E. En Estados Unidos, el Tribunal Supremo federal ha tenido en varias ocasiones la oportunidad de considerar si la aplicación de una ley a una controversia pendiente contraviene el principio de la separación de poderes.

Así, por ejemplo, en *United States v. The Schooner Peggy*, 5 U.S. 102, 110 (1801), la Corte resolvió que, en ausencia de algún impedimento constitucional, un tribunal apelativo debe aplicar la ley según vigente al momento de resolver, aun cuando ello tenga el efecto de anular el fallo del tribunal recurrido.

En *State of Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. 421 (1855) (en adelante *State of Pennsylvania v. Wheeling and Belmont Bridge Co. II*), la controversia giró en torno a la constitucionalidad de una ley del Congreso que tuvo el efecto de anular una decisión del Tribunal Supremo. En este caso, el estado de Pennsylvania instó una acción en el Tribunal Supremo de Estados Unidos, en la cual solicitó un interdicto contra la compañía Wheeling and Belmont Bridge. Alegó que la compañía había construido un puente cuya elevación obstruía la navegación del Río Ohio, causándole daños irreparables.

En 1789 el estado de Virginia había consentido el establecimiento del estado de Kentucky en una parte de su territorio. Ambos estados acordaron mantener libres el uso y la navegación del Río Ohio. El Congreso sancionó este acuerdo al admitir a Kentucky en la Unión. Véase *State of Pennsylvania v. Wheeling & Belmont Bridge Co. et al.*, 54 U.S. 518, 561 (1852) (en adelante *State of Pennsylvania v. Wheeling and Belmont Bridge Co. I*).

Posteriormente, Virginia aprobó una ley para autorizar la construcción del puente que provocó la controversia, sujeto al ejercicio del poder del Congreso para reglamentar el

comercio. El estatuto dispuso que la estructura no debía obstruir la navegación del río y que, si lo hacía, sería considerada un estorbo público. La compañía demandada argumentó que había construido el puente en virtud de la facultad que le fue conferida por esta ley. Argumentó, además, que debido a la ausencia de reglamentación congresional con respecto a la navegación del Río Ohio, el estado de Virginia tenía completa discreción para autorizar la construcción del puente. Véase *State of Pennsylvania v. Wheeling and Belmont Bridge Co. I*, supra, pág. 564.

La corte entendió, sin embargo, que el acuerdo entre Virginia y Kentucky, por haber sido sancionado por el Congreso, se había convertido en ley para toda la Nación. Determinó, además, que el Congreso sí había reglamentado la navegación del río mediante el licenciamiento de embarcaciones, el establecimiento de puertos de entrada y otros actos similares. Por lo tanto, la facultad conferida por la legislación de Virginia para la construcción del puente no podía contravenir el derecho de libre navegación reconocido por el acuerdo entre Virginia y Kentucky, según sancionado por el Congreso. Tampoco podía menoscabar el uso de las licencias concedidas por el Congreso. *State of Pennsylvania v. Wheeling and Belmont Bridge Co. I*, supra, pág. 565.

La evidencia presentada demostró que la elevación del puente obstruía el paso de cierto tipo de embarcaciones. Consecuentemente, la Corte resolvió que el puente constituía un estorbo y que Pennsylvania tenía derecho a que se liberara la navegación del río mediante el cese del estorbo: removiendo o alterando la estructura. La corte le ordenó a la demandada que realizara ciertas modificaciones en el puente y le impuso el pago de las costas del litigio. *Pennsylvania v. Wheeling and Belmont Bridge Co. I*, supra, págs. 625–628. Esta decisión fue dictada en 1852.

La compañía, sin embargo, en lugar de cumplir la orden, recabó la intervención del Congreso, *State of Pennsyl-*

*vania v. Wheeling and Belmont Bridge Co. II*, supra, págs. 421 y 439, opinión disidente del Juez McLeau, quien ese mismo año aprobó una ley que declaraba el puente como una estructura legal, según su construcción y elevación originales, e instituyéndolo como una vía de correos. Íd., pág. 429.

En 1854 una tormenta destruyó el puente y la compañía comenzó a reconstruirlo según el diseño original. Ante esta situación, Pennsylvania solicitó y obtuvo de uno de los Jueces del Tribunal Supremo federal un interdicto para ordenar a la compañía detener la construcción en virtud de la decisión de 1852. No obstante, la compañía continuó con la construcción hasta completar la obra. Pennsylvania solicitó entonces, entre otros remedios, una orden de embargo contra la compañía y sus oficiales por éstos haber desacatado la orden de interdicto. Solicitó, además, el cobro de las costas concedidas en el litigio anterior. *State of Pennsylvania v. Wheeling and Belmont Bridge Co. II*, supra, págs. 421–427. La compañía apoyó su actuación en la legislación posterior. Argumentó que la ley del Congreso había autorizado la construcción del puente según el diseño original, anulando así la decisión emitida en 1852. Pennsylvania, por su parte, planteó que el estatuto era inconstitucional. Íd., pág. 429.

La corte delimitó la controversia en términos del poder del Congreso para reglamentar el comercio. Para ello se refirió a su decisión anterior. Según la corte:

> Luego de dictada ... [la sentencia de 1852], se aprobó la ... legislación del congreso, que estableció en el puente una vía de correos para el paso del correo de Estados Unidos, en la que autorizó a la demandada a mantenerlo en su ubicación y elevación actuales, y requirió regular la navegación de todas las personas que navegan por el río, para que no interfieran con el puente.
>
> Por lo tanto, en la medida en que el puente constituía un estorbo para la libre navegación del río, de acuerdo con la legislación anterior del congreso, ésta se debe entender como modificada por la legislación posterior y, no obstante el puente

pueda ser aún un estorbo desde un punto de vista fáctico, no lo es desde la perspectiva del derecho. ... La ley de Virginia autorizó la construcción del puente, sujeto al ejercicio del poder del Congreso para reglamentar la navegación del río. Ese cuerpo, en el ejercicio de ese poder ..., reglamentó la navegación del río, por lo que la autoridad para mantenerla parecería absoluta. (Traducción nuestra.)

La Corte reconoció —en efecto— que la ley que legalizó el puente había anulado la sentencia de 1852 en cuanto al cese del estorbo, no así en cuanto a las costas concedidas. Según explicó la Corte:

... [S]e argumenta que la ley del Congreso no puede tener el efecto de anular ni la sentencia ya dictada por la corte ni los derechos determinados en ésta a favor de la parte demandante. Ello, como norma general, no se puede negar, especialmente tratándose de la adjudicación de derechos privados. Éstos, una vez adjudicados, devienen absolutos y es el deber de la corte hacerlos valer.

El caso ante nos, sin embargo, es distinguible de ese tipo de casos, en cuanto a la parte de la sentencia que ordena el cese del estorbo. La interferencia de éste con la libre navegación del río constituía el estorbo de un derecho público garantizado por la intervención del Congreso.

[Los remedios disponibles en este caso derivan] de la interferencia ilegal con el disfrute de un derecho público, el cual, como hemos visto, está reglamentado por el Congreso. Ahora bien, coincidimos con que si el remedio en este caso hubiera derivado de una acción en derecho (*action at law*), y se hubiera dictado una sentencia concediéndole daños a la parte demandante, el derecho a éstos estaría fuera del alcance del poder del Congreso. La sentencia ante nos, en cuanto a las costas concedidas, se rige por estos principios, y no se afecta por la legislación posterior. Pero aquella parte de la sentencia que ordena el cese del estorbo es ... una orden continua, la cual requiere no sólo la remoción del puente, sino que les prohíbe a los demandados toda reconstrucción o prolongación de éste. Ahora, la determinación de si [el puente] constituye aún o seguirá constituyendo una obstrucción depende de si éste interfiere con el derecho de navegación. Si en el ínterin, desde que se dictó la sentencia, este derecho ha sido modificado por la autoridad competente, de forma tal que el puente no constituye ya una obstrucción ilegal, está claro que la sentencia de la corte no se puede hacer valer. (Traducción nuestra.) *State of Pennsylvania v. Wheeling and Belmont Bridge Co. II*, supra, págs. 431–432.

Con estos precedentes, la corte resolvió *United States v. Klein*, 13 Wall. (80 U.S.) 128 (1872). Durante la guerra civil el Congreso de Estados Unidos aprobó varios estatutos relacionados con las propiedades de los enemigos no combatientes. Uno de estos estatutos, el *Abandoned and Captured Property Act*, 12 Stat. 820 (1863), les autorizó a ciertos agentes del Tesoro de Estados Unidos vender toda propiedad abandonada o capturada que hubieran recibido o recaudado en cualquier estado o territorio insurrecto, y a depositar el producto de la venta en el Tesoro federal. El estatuto creó, además, una causa de acción para permitirles a ciertas personas reclamar el producto de la venta de sus propiedades. Para poder ejercer esta acción, los propietarios debían demostrar que habían mantenido su lealtad hacia el Gobierno, mediante prueba de que no habían coadyuvado en la rebelión. Posteriormente, el Presidente Lincoln emitió una proclama para declarar la concesión de un perdón, con el restablecimiento de derechos propietarios, a quienes hubieran participado en la rebelión, con la condición de hacer y mantener un juramento de fidelidad al Gobierno de Estados Unidos.

Un tal V.F. Wilson obtuvo este perdón. Luego de su muerte, Klein, su albacea, instó una acción para reclamar el producto de la venta de cierta propiedad de Wilson. La corte de reclamaciones —establecida para conocer estos casos— adjudicó la reclamación a favor de Klein. El Gobierno apeló ante el Tribunal Supremo federal.

Poco antes del caso de Klein, la corte de reclamaciones había resuelto otro muy similar. La decisión en ese caso fue confirmada por el Tribunal Supremo federal, al resolver que la concesión de un perdón purgaba las ofensas de una persona que hubiera participado en la rebelión, liberándola de toda penalidad. Así pues, la persona concesionaria del perdón era considerada como si nunca hubiera participado en la rebelión. Véase *United States v. Padelford*, 9 Wall. (76 U.S.) 531, 543 (1870).

Luego de la decisión en *United States v. Padelford*, supra, y estando pendiente ante el Tribunal Supremo el caso de Klein, el Congreso aprobó una legislación que establecía que ningún perdón o amnistía concedida por el Presidente sería admisible en evidencia en favor de un reclamante para probar el requisito de lealtad exigido por el *Abandoned and Captured Property Act*. La cláusula, además, eliminaba la jurisdicción apelativa del Tribunal Supremo sobre cualquier sentencia de la corte de reclamaciones a favor de un reclamante que hubiera establecido su lealtad mediante un perdón presidencial. En estos casos se le ordenaba al Tribunal Supremo desestimar por falta de jurisdicción. Por último, la cláusula establecía que en cualquier reclamación en virtud del *Abandoned and Captured Property Act* ante la corte de reclamaciones, la aceptación sin reserva de un perdón presidencial por parte del reclamante debía tenerse como prueba definitiva de la participación del reclamante en la rebelión, así como de su falta de fidelidad hacia el Gobierno de Estados Unidos. Admitida esta prueba, la corte de reclamaciones tenía que desestimar la reclamación por falta de jurisdicción. La ley se aprobó el 12 de julio de 1870. El Gobierno, apoyándose en ella, solicitó la desestimación del caso de Klein.

La controversia ante la Corte exigía, pues, determinar si la disposición aprobada le impedía a Klein recobrar las cantidades reclamadas. La Corte resolvió que la disposición era inconstitucional porque violaba el principio de la separación de poderes. Primero, la cláusula interfería con el Poder Judicial al dictarle la norma decisoria en un caso pendiente y, segundo, incidía sobre el Poder Ejecutivo menoscabando el efecto de un perdón presidencial. Véase *Unites States v. Klein*, supra, págs. 146–148.

En cuanto al primer fundamento, la Corte reconoció que si la disposición hubiera eliminado el derecho de apelar en una clase particular de casos, la actuación del Congreso hubiera estado justificada en su poder constitucional para

establecer excepciones a la jurisdicción apelativa del Tribunal Supremo.([21]) La Corte entendió, sin embargo, que el lenguaje de la disposición demostraba claramente la intención de eliminar la jurisdicción apelativa en casos como el de Klein, sólo como un medio para conseguir un fin. Véase *United States v. Klein*, supra, pág. 145. Su propósito era negar el efecto que la Corte había resuelto que tenía un perdón otorgado por el Presidente. Íd. En efecto, la consecuencia de la aplicación de la disposición era que tanto la corte de reclamaciones como el Tribunal Supremo tendrían jurisdicción para conocer la causa de acción sólo para determinar si el reclamante podía establecer su lealtad mediante una prueba distinta de la concesión de un perdón. Pero, si la corte determinaba que la única prueba del reclamante para apoyar su causa de acción era el perdón, entonces perdía su jurisdicción. Ante esta situación, sancionar la actuación del Congreso hubiera significado reconocerle al Poder Legislativo la facultad de dictar el resultado en un caso pendiente. El efecto específico sobre el caso de Klein era obligar a la Corte a desestimar si determinaba que procedía confirmar la decisión de la corte de reclamaciones por razón del perdón otorgado. Sancionar este resultado, entendió la Corte, le hubiera permitido al Gobierno, quien era parte en el pleito, decidir la controversia en su favor.([22])

La Corte distinguió la situación ante su consideración de la adjudicada en *State of Pennsylvania v. Wheeling and Belmont Brige Co. II*, supra, precisando que, en ese caso, la legislación en controversia no pautó una norma decisoria

---

([21]) Véase el Art. III, Sec. 2, Const. EE.UU. Compárese esta disposición con lo dispuesto en la Sec. 3 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico, que dispone, en lo pertinente, que "[e]l Tribunal Supremo será el tribunal de última instancia en Puerto Rico". Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 356.

([22]) La importancia de este aspecto de la controversia en *United States v. Klein*, 13 Wall. (80 U.S.) 128 (1872), ha sido reconocida posteriormente por el Tribunal Supremo. Véase *United States v. Sioux Nation of Indians*, 448 U.S. 371, 405 (1980): "El hecho de que el Congreso intentara decidir la controversia a favor del Gobierno tuvo una importancia evidente en Klein." (Traducción nuestra.)

arbitraria, sino que le permitió a la Corte aplicar con libertad sus normas a las circunstancias creadas por el nuevo estatuto. En el caso ante su consideración, sin embargo, la disposición impugnada no había creado circunstancias nuevas. Aun así, le prohibía a la Corte darle a cierta prueba —el perdón presidencial— el efecto evidenciario que a su juicio debía tener, ordenándole que le diera un efecto contrario. Véase *United States v. Klein*, supra, págs. 146–147.

En casos posteriores, el Tribunal Supremo ha interpretado la decisión en *United States v. Klein*, supra, en el sentido de que el Poder Legislativo no le puede dictar normas de adjudicación al Poder Judicial en un caso pendiente sin enmendar el derecho aplicable. Véanse: *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 441 (1992); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995).[23]

En *Robertson v. Seattle Audubon Soc.*, supra, el Tribunal Supremo federal examinó la validez de una legislación que afectó directamente varios litigios pendientes relacionados con la siembra y tala de bosques habitados por cierta especie de búho en extinción. Tanto el Jefe del Servicio Forestal de Estados Unidos (*United States Forest Service*) como el Secretario del Negociado de la Administración de Terrenos (*Bureau of Land Management*) tomaron medidas específicas para reglamentar la explotación forestal y, a la vez, proteger las aves. Varios grupos ambientales argumentaron que las medidas adoptadas no ofrecían protección suficiente y que el uso de los bosques violaba varios estatutos. La industria maderera local, por su parte, argu-

---

[23] En *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), el Tribunal Supremo federal resolvió que el Congreso no tiene autoridad para revisar una sentencia final *y firme* de un tribunal y, por lo tanto, no es pertinente aquí. Reiteró, además, la norma establecida en *United States v. The Schoonner Peggy*, 5 U.S. 102 (1801), respecto a que los tribunales apelativos tienen la obligación de aplicar el derecho según vigente al momento de resolver, aun cuando ello tenga el efecto de anular el fallo del tribunal recurrido. Véase *Plaut v. Spendthrift Farm, Inc.*, supra, pág. 226.

mentó que las medidas administrativas eran demasiado restrictivas y afectarían adversamente la economía de la región. Respondiendo a la litigación pendiente, el Congreso aprobó la Sec. 318 del Presupuesto del Departamento del Interior para el Año Fiscal 1990, 103 Stat. 701, 745–750 (1990). Esta sección estableció unas guías para reglamentar el uso de los bosques en cuestión. Dispuso también que el cumplimiento con esas guías debía entenderse suficiente para satisfacer los requisitos estatutarios en controversia en los pleitos pendientes.[24] Varios grupos ambientales impugnaron la citada Sec. 318, argumentando que ésta contravenía el principio de la separación de poderes. El tribunal de distrito concluyó que era válida. La Corte de Apelaciones del Noveno Circuito, sin embargo, revocó al resolver que la disposición violaba el principio de la separación de poderes en la medida en que ordenaba que el cumplimiento de las guías establecidas se tuviera como suficiente para satisfacer los requisitos estatutarios en controversia en los pleitos pendientes. Ese foro apelativo entendió que ello significaba dictar el resultado de las controversias pendientes sin enmendar el derecho aplicable. Véase *Seattle Audubon Soc. v. Robertson*, 914 F.2d 1311, 1317 (9no Cir. 1990).

Ante el Tribunal Supremo federal, la controversia se centró en determinar si la legislación aprobada había enmendado el derecho aplicable o si, al contrario, ésta sólo dictaba conclusiones o resultados al amparo de la legisla-

---

[24] La parte pertinente de la Sec. 318(b)(6)(A) establecía lo siguiente:
" '... [T]he Congress hereby determines and directs that management areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned Seattle Audubon Society *et al.*, v. F. Dale Robertson, ... and Washington Contract Loggers Assoc. *et al.*, v. F. Dale Robertson ..., and the case Portland Audubon Society et al., v. Manuel Lujan, Jr. ....' " *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 435 esc. 2 (1992).

ción anterior.([25]) Distinto de la corte de apelaciones, el Tribunal Supremo concluyó que la referida Sec. 318 sí había alterado el derecho aplicable. Véase *Robertson v. Seattle Audubon Soc.*, supra, pág. 438. Señaló, además, que la disposición no pretendió hacer determinaciones de hecho ni dictar conclusiones de derecho particulares.([26]) Íd. El Tribunal hizo énfasis en que al aprobar la citada Sec. 318, el Congreso se abstuvo expresamente de pasar juicio sobre si las medidas administrativas tomadas por el Servicio Forestal y el Negociado de la Administración de Terrenos habían sido adecuadas desde el punto de vista fáctico y jurídico. Íd. Es decir, el Congreso se abstuvo de adjudicar los méritos de la controversia ante la consideración judicial.

F. Tanto la peticionaria como el Procurador se apoyan en la jurisprudencia federal comentada para argumentar en favor de la constitucionalidad de la Ley Núm. 19, *supra.*([27]) En particular, la peticionaria afirma que:

---

([25]) En este sentido, *Robertson v. Seattle Audubon Soc.*, supra, pág. 441, es un caso de interpretación estatutaria. En efecto, el Tribunal rechazó considerar la corrección del análisis de la separación de poderes que hizo la corte de apelaciones.

([26]) El texto de la opinión, en lo pertinente, es el siguiente:

"Concluimos que la subsección (b)(6)(A) [de la Sec. 318] no ordenó determinaciones o resultados al amparo de la legislación anterior, sino que implicó forzosamente un cambio de ley. Antes de que entrara en vigor la subsección (b)(6)(A), la reclamación original no hubiera procedido sólo si la tala impugnada no hubiera contravenido ninguna de las cinco disposiciones anteriores. Según la subsección (b)(6)(A), en cambio, las mismas reclamaciones no hubieran procedido si la tala no hubiera contravenido ninguna de dos nuevas disposiciones. Su operación, entendemos, modificó las disposiciones anteriores. Aún más, no encontramos nada en la subsección (b)(6)(A) que pretenda ordenar determinaciones de hecho particulares o aplicaciones del derecho, viejo o nuevo, a los hechos." (Traducción nuestra.) *Robertson v. Seattle Audubon Soc.*, supra, pág. 438.

([27]) Ambas partes citan, además, a *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240 (1975). Este caso, sin embargo, no es pertinente aquí. Si bien los hechos que originaron esa decisión son similares a los presentes en el recurso ante nuestra consideración, véanse: *Wilderness Society v. Hickel*, 325 F. Supp. 422 (D. D.C. 1970); *Wilderness Society v. Morton*, 479 F.2d 842 (D.C. Cir. 1973), *cert.* denegado, 411 U.S. 917 (1973); *Wilderness Society v. Morton*, 495 F.2d 1026 (D.C. Cir. 1974), la controversia ante el Tribunal Supremo federal giró en torno a la concesión de honorarios de abogado. Ambas hacen gran énfasis en el hecho de que los litigios subyacentes a la decisión en *Alyeska Pipeline Co. v. Wilderness Society*, supra, fueron terminados

[l]a Ley ... 19 no "revisa" la decisión del Tribunal de Circuito de Apelaciones, porque lo que hizo fue alterar el estado de derecho que permite a la A.A.A. obtener el permiso para realizar el S.A.N., en vez de rechazar la conclusión sobre el estado de derecho al momento en que se resolvió la sentencia. La Ley ... 19 ... establece un nuevo esquema tanto sustantivo como procesal que permitió a la A.A.A. obtener la debida autorización para la construcción del S.A.N. Dicho esquema no existía al momento en que el Tribunal de Circuito de Apelaciones dictó sentencia. Moción en cumplimiento de orden, pág. 7.

Los recurridos admiten que la Legislatura, en el ejercicio de su poder inherente, puede afectar litigios pendientes sin contravenir el principio de la separación de poderes, "siempre que lo haga en el marco de la enunciación de una nueva norma de derecho y no meramente de la adjudicación de una controversia específica". (Énfasis suprimido.) Réplica a memorando de Derecho de las partes recurrentes, pág. 7. Éstos argumentan, no obstante, que la Ley Núm. 19, *supra*, no creó un estado de derecho para la construcción del S.A.N. distinto del vigente cuando el Tribunal de Circuito de Apelaciones adjudicó las controversias en su sentencia. Véanse: Memorando de Derecho de la parte recurrida, págs. 37–38; Réplica a memorandos de derecho de las partes recurrentes, págs. 2 y 11.

 Coincidimos con los recurridos en que la Ley Núm. 19, *supra*, no modificó la legislación, según la cual surgieron las controversias adjudicadas por el Tribunal de Circuito de Apelaciones. Pudiera aducirse, sin embargo, que al aprobar la Ley Núm. 19, *supra*, la Asamblea Legislativa alteró el derecho aplicable en la medida que estableció un nuevo procedimiento para la tramitación del S.A.N.; pero no es así. *Todos* los requisitos establecidos en el Art. 4 de la Ley Núm. 19, *supra*, para la continuación de las obras del S.A.N. no significan cambio alguno en los requi-

---

mediante legislación congresional. No obstante, la referencia a este dato en la relación de hechos que hace el Tribunal Supremo en su opinión —íd., págs. 244–245— no tiene valor de precedente alguno.

sitos que el ordenamiento jurídico exigía antes de que la Legislatura aprobara esta ley. Aún más, todos los permisos que el referido Art. 4 de la Ley Núm. 19, *supra*, exige para la aprobación del proyecto —el permiso del Cuerpo de Ingenieros de Estados Unidos, el certificado de calidad de agua emitido por la Junta de Calidad Ambiental; la certificación de cumplimiento con el Art. 4(c) de la Ley Núm. 19, *supra*, de acuerdo con la Ley sobre Política Pública Ambiental y el permiso de construcción de toma de agua emitido por el D.R.N.A.— fueron obtenidos por la peticionaria *antes* de la vigencia de la Ley Núm. 19, *supra*, e incluso antes de que el Tribunal de Circuito de Apelaciones dictara su sentencia.([28])

La Ley Núm. 19, *supra*, es en realidad una adjudicación de la validez de esos permisos, así como de la validez de la resolución de la Junta que aprobó la consulta de ubicación del S.A.N. El antepenúltimo párrafo del Art. 2 de la ley, *supra*, declara efectivamente que "[l]a tramitación del proyecto ... en la fase administrativa fue correcta, cumpliéndose con las leyes, los reglamentos y la política pública vigentes".([29]) La segunda oración del citado Art. 6 de la Ley Núm. 19, *supra*, por su parte, ordena que "[t]odos aquellos permisos ... y procedimientos administrativos, incluyendo los de ... consultas públicas y de ubicación, que hayan sido obtenidos o realizados administrativamente para el desa-

---

([28]) Los documentos fueron expedidos en las fechas siguientes: el permiso de construcción de toma de agua del Departamento de Recursos Naturales y Ambientales (D.R.N.A.), el 18 de septiembre de 1996; el permiso del Cuerpo de Ingenieros de Estados Unidos, el 3 de septiembre de 1996; el certificado de calidad de agua de la Junta de Calidad Ambiental, el 13 de agosto de 1996, y la certificación de cumplimiento con el Art. 4(c) de la Ley Núm. 19, *supra*, 22 L.P.R.A. sec. 452(c), de acuerdo con la Ley sobre Política Pública Ambiental —es decir, la Resolución de la Junta de Calidad Ambiental en el caso Núm. DIA JCA 95-009(AAA), la cual aprobó la declaración de impacto ambiental preparada por la peticionaria— el 20 de mayo de 1996. El Tribunal de Circuito de Apelaciones dictó su sentencia el 20 de mayo de 1997 y la Ley Núm. 19, *supra*, comenzó a regir el 12 de junio siguiente.

([29]) Al calificar de "vigentes" las leyes, la reglamentación y la política pública según las cuales se llevó a cabo la tramitación administrativa del proyecto, la Ley Núm. 19, *supra*, reconoce que esas leyes, esa reglamentación y esa política pública *no han cambiado*.

rrollo del ... SAN con anterioridad a la vigencia de ... [la Ley 19], se entenderán vigentes".

La controversia que el Tribunal de Circuito de Apelaciones resolvió en la sentencia que nos corresponde revisar a través de este recurso fue precisamente si la consulta de ubicación se otorgó conforme a derecho. La Ley Núm. 19, *supra*, pretende ejercer indirectamente esa función revisora sobre la sentencia recurrida, dictando así el resultado del caso ante nuestra consideración, sin modificar en forma alguna el derecho aplicable.

 El poder de revisar una sentencia le corresponde a la Rama Judicial. Es una facultad que integra la entraña misma del poder que la Sec. 1 del Art. V de la Constitución, *supra*, les asigna exclusivamente a los tribunales. No es una facultad compartida con el Poder Legislativo, ni trasladable a éste por razón alguna. Si bien es cierto que el principio de la separación de poderes debe ser aplicado flexiblemente, esa flexibilidad "no significa que lo que es la esencia de la función judicial pueda ser destru[i]do, convirtiendo el poder para decidir en una débil oportunidad para consultar y recomendar". *Banco Popular, Liquidador v. Corte*, supra, pág. 76.

Resolvemos, por lo tanto, que los párrafos antepenúltimo y segundo de los Arts. 2 y 6, respectivamente, de la Ley Núm. 19, *supra*, son inconstitucionales, porque contravienen el principio de la separación de poderes al interferir de manera no permisible con el ejercicio del Poder Judicial.

Nos corresponde determinar ahora si se deben mantener los restantes artículos del estatuto impugnado, o si lo declaramos nulo en su totalidad.

 G. En *Tugwell, Gobernador v. Corte*, 64 D.P.R. 220, 226 (1944), adoptamos una fórmula bipartita para solucionar problemas relacionados con la nulidad total o parcial de una ley. La primera parte de esta fórmula consiste en determinar si la ley es capaz de ser separada y, la segunda, en auscultar si la Legislatura tuvo en mente la

separabilidad de las distintas disposiciones de la ley. Recientemente reiteramos la vigencia de esta fórmula en *Berríos Martínez v. Gobernador II*, 137 D.P.R. 195, 224 (1994), al establecer que es necesario, en primer lugar, "determinar si la ley es susceptible de mantenerse en vigor una vez se eliminan las cláusulas inconstitucionales". En segundo lugar, "se debe evaluar si la Legislatura hubiera aprobado la ley sin tales disposiciones". Íd., pág. 224. No obstante, cuando una ley preceptúa la separabilidad de sus disposiciones, el análisis debe comenzar presumiendo que la Asamblea Legislativa interesaba que el resto de la ley se mantuviera en vigor si un tribunal llegara a declararla parcialmente inconstitucional. Íd. Véase, además, *Asoc. Maestros P.R. v. Srio. Educación*, 137 D.P.R. 528, 532 esc. 2 (1994). En este caso, partimos de tal presunción en virtud de la cláusula de separabilidad que establece el Art. 9 de la Ley Núm. 19, *supra*. Leyes de Puerto Rico, *supra*, pág. 59. Al hacer la primera parte del análisis, sin embargo, resulta que las restantes disposiciones de la Ley Núm. 19, *supra*, dependen de las declaradas inconstitucionales; todas están íntimamente relacionadas entre sí. No es necesario, pues, hacer la segunda parte del análisis y procede, por lo tanto, declarar el estatuto nulo en su totalidad. Véase *P.R. Tobacco Corp. v. Buscaglia, Tes.*, supra, pág. 829.

Reconocemos que la Legislatura aprobó la Ley Núm. 19, *supra*, respondiendo a la preocupación legítima de atender la falta apremiante de un abasto de agua suficiente en el país. No importa, sin embargo, el grado de legitimidad de dicha preocupación o que el motivo de la Asamblea Legislativa haya sido laudable; ello no es suficiente para sostener la constitucionalidad de una ley. Véanse: *Alicea v. Córdova*, 117 D.P.R. 676, 693–694 esc. 13 (1986); *Torres v. Castillo Alicea*, supra, pág. 801; *Durand v. Sancho Bonet, Tesorero*, 50 D.P.R. 940, 943 (1937). Como expresó el delegado Miguel Ángel García Méndez en la Convención Constituyente, citando a James Madison, so-

bre el principio de la separación de poderes: "[E]l peligro en la [Asamblea] Legislativa está cuando se le dan excesivos poderes, precisamente en que, porque est[á] sostenid[a] por la defensa de que ... [es la] representant[e directa] del pueblo, el propio concepto se confunde". 2 Diario de Sesiones, *supra*, pág. 1043.

Por último, los recurridos argumentan que la Ley Núm. 19, *supra*, es inconstitucional, además, porque viola el debido procedimiento de ley, la igual protección de las leyes y la Sec. 19 de los Arts. II y VI de la Constitución del Estado Libre Asociado, *supra*. Por cuanto nos limitamos a resolver que la Ley Núm. 19, *supra*, viola el principio de la separación de poderes, no expresamos opinión alguna con respecto a estos planteamientos.

█ Habiendo resuelto que la Ley Núm. 19, *supra*, es inconstitucional, ésta no hace académica la consideración del recurso presentado por la peticionaria. Pasamos, por lo tanto, a considerar sus planteamientos.

### III

La peticionaria hace siete (7) señalamientos de error en su escrito. En el primero plantea que el Tribunal de Circuito de Apelaciones incidió al dictar la sentencia sin tener jurisdicción para ello, debido a que el recurso de revisión se presentó fuera del término correspondiente. En el tercero le atribuye al Tribunal de Circuito de Apelaciones haber aplicado un estándar de revisión incorrecto. Los demás señalamientos de error cuestionan, en esencia, la determinación del Tribunal de Circuito de Apelaciones de revocar la decisión de la Junta.[30]

---

[30] Estos señalamientos de error son, en lo pertinente, los siguientes:

"Erró el Tribunal de Circuito de Apelaciones al resolver que la Junta de Planificación carece de facultad para emitir una consulta de ubicación en ausencia de una determinación inicial del Departamento de Recursos Naturales.

A. En cuanto al primer señalamiento de error, la peticionaria alega que el Tribunal de Circuito de Apelaciones incidió al dictar la sentencia sin tener jurisdicción para ello, pues entiende que los recurridos presentaron el recurso de revisión luego de haber transcurrido el término de treinta (30) días que establece la Sec. 4.2 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, según enmendada, 3 L.P.R.A. sec. 2172 (en adelante L.P.A.U.), para la revisión judicial de las decisiones finales de las agencias administrativas.

La Junta emitió su resolución en la que aprobó la consulta de ubicación del S.A.N. el 5 de julio de 1996 y la notificó a las partes el 18 de julio siguiente. Los recurridos presentaron oportunamente una solicitud de reconsideración, la cual fue denegada por la Junta mediante su Resolución de 7 y 13 de agosto de 1996. La copia de la notificación de esta resolución fue archivada en autos el 30 de agosto siguiente. El 27 de septiembre de 1996 los recurridos acudieron en revisión ante el Tribunal de Circuito de Apelaciones.

La Sec. 4.2 de la L.P.A.U., *supra*, establece un término de treinta (30) días para solicitar la revisión judicial de una decisión final de una agencia. Este plazo comienza a contar a partir de la fecha de archivo en autos de la notificación de la decisión administrativa o a partir

"Erró el Tribunal de Circuito de Apelaciones al exceder el ámbito de su función revisora al adjudicar 'sua sponte' controversias fácticas y de derecho que no fueron levantadas durante el proceso administrativo ante la Junta de Planificación.

"Erró el Tribunal de Circuito de Apelaciones al resolver en su proceso evaluativo que la Junta de Planificación no se sujetó a las normas y los requisitos consignados en la ley y los reglamentos para la disposición de la consulta de ubicación.

"Erró el Tribunal de Circuito de Apelaciones al resolver que la actuación de la Junta de Planificación es, además, ilegal y *ultra vires* porque no resuelve las controversias sobre posibles impactos ambientales del proyecto, planteadas por la declaración de impacto ambiental final, por agencias estatales y federales y por la ciudadanía, según se requiere por las disposiciones de la Ley sobre Política Pública Ambiental.

"Erró el Tribunal de Circuito de Apelaciones al resolver que la JPE-14 y sus extensiones no gozan del privilegio de sucesión que concede la Ley Orgánica de la Junta de Planificación." Petición de *certiorari*, págs. 4–5.

de la fecha aplicable preceptuada en la Sec. 3.15 de la L.P.A.U., 3 L.P.R.A. sec. 2165, cuando el término es interrumpido mediante la presentación oportuna de una moción de reconsideración. De acuerdo con la citada Sec. 3.15, cuando se presenta una moción de reconsideración la agencia tiene un término de quince (15) días para tomar alguna determinación en su consideración, en cuyo caso el término para solicitar la revisión judicial comienza a contar a partir de la fecha en que se archiva en autos una copia de la notificación de la decisión de la agencia que resuelve definitivamente la moción de reconsideración. Sin embargo, cuando la agencia rechaza de plano la moción de reconsideración —es decir, la deniega sumariamente— o no actúa dentro de los quince (15) días estatutarios, el término para recurrir judicialmente comienza a contarse desde que se notifica la denegación o desde que expira el plazo de quince (15) días sin que la agencia haya actuado, según sea el caso. Íd.

Mediante una resolución y sentencia en *Rivera v. Mun. de Carolina*, 140 D.P.R. 131 (1996), una mayoría de este Tribunal interpretó la Sec. 3.15 de la L.P.A.U., *supra*, en el sentido de que si dentro del plazo de quince (15) días la agencia rechaza de plano la moción de reconsideración, el término para solicitar la revisión judicial comienza a contar a partir de la fecha de la notificación de la decisión administrativa, no a partir de la expiración del plazo de quince (15) días. Esa mayoría interpretó, además, que es sólo cuando la agencia no actúa en forma alguna con respecto a la moción de reconsideración que el término para recurrir judicialmente se comienza a contar a partir de la expiración del referido plazo de quince (15) días, rechazando así la interpretación de que la Sec. 3.15 de la L.P.A.U., *supra*, exige el archivo en autos, dentro del término de quince (15) días, de una copia de la notificación de la decisión administrativa en la cual se deniega la moción

de reconsideración, para interrumpir el término para solicitar la revisión judicial.

En el caso de autos la Junta resolvió definitivamente la solicitud de reconsideración presentada por los recurridos dentro del término de quince (15) días que establece la Sec. 3.15 de la L.P.A.U., *supra*, aunque no fue sino hasta después de que hubiera expirado este plazo que se archivó en autos una copia de la notificación de la decisión. Adoptando la interpretación intimada en *Rivera v. Mun. de Carolina*, supra, resolvemos que el término de treinta (30) días para recurrir judicialmente de la resolución de la Junta que aprobaba la consulta de ubicación del proyecto no había expirado aun cuando los recurridos presentaron su recurso de revisión ante el Tribunal de Circuito de Apelaciones el 27 de septiembre de 1996. El primer error, por lo tanto, no fue cometido.

La adecuada dilucidación de los demás señalamientos de error requiere precisar primero la naturaleza de la consulta de ubicación y las disposiciones estatutarias y reglamentarias que la gobiernan.

▪ B. La consulta de ubicación es el instrumento mediante el cual la Junta autoriza el uso particular de un terreno. Este procedimiento está gobernado específicamente por la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975, según enmendada, 23 L.P.R.A. sec. 62 *et seq.*, y el Reglamento Núm. 5244 para Procedimientos Adjudicativos de la Junta de Planificación de 31 de mayo de 1995 (23 R.P.R. secs. 650.221–650.243 (1997)) (en adelante Reglamento de Adjudicación).[31] La Sec. 2.00(6) del Reglamento de Adjudicación define genéricamente "consulta de ubicación" como el "[t]rámite mediante el cual la Junta de Planificación evalúa y decide[,] según estime pertinente, sobre pro-

---

[31] Estas siglas hacen referencia a la colección *Reglamentos del Estado Libre Asociado de Puerto Rico*, publicada por la compañía Michie Butterworth.

puestos usos de terrenos que no son permitidos ministe-rialmente por la reglamentación aplicable en áreas zonificadas[,] pero que por las disposiciones reglamenta-rias proveen para que se consideren". 23 R.P.R. sec. 650.225(6) (1997). En áreas no zonificadas, la consulta in-cluye "propuestos usos de terrenos que por su naturaleza, complejidad, magnitud, impacto físico, económico, ambien-tal y social pudiesen afectar significativamente el desarro-llo de un sector". Íd. Una consulta se identifica como pú-blica o privada, dependiendo de quién la origine, o como especial o de transacción, dependiendo de las implicaciones particulares del uso propuesto. 23 R.P.R. secs. 650.225(7), 650.227 y 650.232 (1997).

Todo proyecto para la realización de una me-jora pública, tanto en área zonificada como no zonificada, que no haya sido exento expresamente mediante resolu-ción de la Junta, requiere la presentación de una consulta. 23 R.P.R. secs. 650.228 y 650.231 (1997). Constituye una mejora pública "[t]oda mejora permanente, toda nueva construcción ... de obra pública autorizada, pagada, super-visada, dirigida, emprendida o controlada por cualquier or-ganismo gubernamental". 23 R.P.R. sec. 650.225(14) (1997). La Junta clasificó el S.A.N. como una mejora pública. Conclusión de derecho Núm. 1 de la Resolución de la Junta, *supra.*

El Art. 21 de la Ley Orgánica de la Junta de Planifica-ción de Puerto Rico, 23 L.P.R.A. sec. 62t, dispone, por su parte, que no se podrá autorizar, ayudar o emprender nin-guna mejora o cambio en los usos de terrenos que esté en conflicto con el Plan de Desarrollo Integral, el Programa de Inversiones de Cuatro Años o los planes de usos de terre-nos de Puerto Rico. Este artículo preceptúa, además y en lo pertinente, que "no se hará o se ordenará que se hagan planos de construcción o de emplazamiento por ningún funcionario del Gobierno del Estado Libre Asociado de

Puerto Rico sin antes haber sido autorizada su preparación por la Junta, mediante la radicación de una consulta". Íd.

 Una consulta de ubicación no se considera presentada hasta que la parte proponente haya cumplido con los requisitos siguientes que establecen las Secs. 4.01 y 4.03 del Reglamento de Adjudicación, 23 R.P.R. secs. 650.229 y 650.231 (1997). En primer lugar, tiene que completar el formulario correspondiente y presentarlo en la oficina del Secretario de la Junta. Si la consulta conlleva una variación de las disposiciones reglamentarias vigentes, tiene que presentar una solicitud de variación debidamente fundamentada. Si la consulta se somete para la consideración de una excepción, debe evidenciar que cumple con las condiciones reglamentarias establecidas por la Junta para el uso propuesto. Íd. El proponente de una mejora pública en un terreno de propiedad pública debe presentar evidencia de que es el titular del predio o de que está autorizado a desarrollarlo. Si el terreno es de propiedad privada, debe entonces presentar evidencia de que notificó al titular. Además, para cumplir con la Ley sobre Política Pública Ambiental, la parte proponente debe evidenciar que presentó la documentación correspondiente ante la Junta de Calidad Ambiental o que el proyecto no tiene que cumplir con este requisito. Íd. Por último, el proponente debe asegurarse de que el proyecto se ha preparado conforme con la política pública vigente, según expresada en los instrumentos de la planificación de la Junta.[32] Íd.

El Reglamento de Adjudicación establece también los elementos que la Junta debe considerar en la disposición

---

[32] Estos son: los planes de usos de terrenos, el Programa de Inversiones de Cuatro Años, el Plan de Desarrollo Integral de Puerto Rico, los mapas de zonificación o de zonas susceptibles a inundaciones, los planes de ordenación territorial, los planes regionales y demás reglamentos aplicables. Véase la Sec. 4.03 del Reglamento Núm. 5244 para Procedimientos Adjudicativos de la Junta de Planificación de 31 de mayo de 1995 (en adelante Reglamento de Adjudicación), 23 R.P.R. sec. 650.231 (1997).

de una consulta de ubicación. Su Sec. 7.01 establece, en la parte pertinente, que:

La Junta de Planificación estudiará, tramitará y resolverá las consultas de ubicación tomando en consideración, entre otros, los siguientes documentos y elementos de juicio: Ley Orgánica de la Junta de Planificación ..., Ley de Municipios Autónomos ..., Plan de Desarrollo Integral ..., Objetivos y Políticas del Plan de Usos de Terrenos de Puerto Rico ..., Planes de Usos de Terrenos de Puerto Rico ..., Mapas de Zonificación ..., Mapas de Zonas Susceptibles a Inundaciones ..., Planes de Ordenación Territorial ..., Planes Regionales adoptados por la Junta de Planificación y aprobados por el Gobernador, Planos Regionales adoptados por la Junta, Reglamentos de Planificación y otra reglamentación aplicable, Programa de Inversiones de Cuatro Años, localización específica del proyecto, usos existentes en el sector, situación de la infraestructura física y social en el lugar ..., rasgos topográficos, condición de inundabilidad, condición del subsuelo, densidad poblacional, grado de contaminación del ambiente, distancia entre los terrenos y las áreas construidas, importancia agrícola, ambiental o turística de los terrenos, y otras condiciones sociales, económicas y físicas análogas.

Además de lo anterior, en las consultas públicas se tomará en consideración, entre otros, el costo del proyecto, la disponibilidad y procedencia de fondos, programación de la obra, posibles conflictos con obras de otros organismos gubernamentales. Si se tratare de una transacción, también considerará la necesidad de la misma, si la propiedad fue ofrecida a otros organismos gubernamentales, conveniencia de que la propiedad pase de pública a privada, y otras leyes aplicables al tipo de transacción.

La aprobación de una consulta pública no implica en forma alguna la aprobación del proyecto de transacción o de construcción en sí, el cual deberá regirse por lo establecido en este [Reglamento] y por cualquier resolución de la Junta eximiendo de la presentación a tal proyecto de transacción o de construcción.

La Junta de Planificación consultará, cuando lo considere necesario, a cualesquiera de los organismos gubernamentales, comisiones locales de planificación y otras entidades públicas y privadas que de alguna manera tengan relación con los proyectos bajo estudio. ...

Cuando la Junta lo estime necesario para el análisis de una consulta, se requerirá del proponente la información adicional o aclaratoria pertinente. ... Esta información podrá incluir, entre otras, estudios técnicos más abarcadores tales como, pero sin

limitarse a, estudios hidrológicos-hidráulicos, estudios de nivel de ruido, análisis de tránsito, Evaluaciones Ambientales (EA) y Declaraciones de Impacto Ambiental (DIA). ...

La Junta podrá ordenar la celebración de vistas administrativas a iniciativa propia o a petición de partes, o vistas públicas en cualquier caso en que entienda que merecen seguir ese procedimiento cuando así lo establezca la reglamentación o legislación vigente. 23 R.P.R. sec. 650.234 (1997).

Es discreción del Gobernador autorizar el desarrollo de una mejora permanente que no esté considerada en el Programa de Inversiones de Cuatro Años. 23 R.P.R. sec. 650.231 (1997); Art. 15 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62n. Luego de que la consulta aprobada por la Junta advenga final y firme, le corresponde a la parte proponente presentarla ante A.R.Pe. para que esta agencia continúe con los trámites correspondientes. Véanse las Secs. 4.3 y 10.00 del Reglamento de Adjudicación, 23 R.P.R. secs. 650.231 y 650.238 (1997).

Si fuera necesario hacer cambios al proyecto que alteren la consulta según fue aprobada, la parte proponente deberá presentar una solicitud de enmienda debidamente fundamentada y documentada. La Junta podrá exigir la presentación de una nueva consulta dependiendo de la naturaleza y magnitud de los cambios propuestos en relación con la consulta original. La presentación de una solicitud de enmienda, antes de que la Junta resuelva la consulta original, pudiera tener el efecto de reiniciar cualquier trámite interagencial. Sec. 7.02 del Reglamento de Adjudicación, 23 R.P.R. sec. 650.235 (1997).

C. En el caso de autos hay que considerar, además, la Resolución de la Junta de Planificación Núm. JPE-14 de 28 de octubre de 1966 (en adelante Resolución JPE-14) y sus extensiones correspondientes. Mediante esta resolución, la Junta eximió a la Autoridad de Acueductos y Alcantarillados de tener que presentar los planos de construcción de acueductos rurales y los proyectos de adquisición de los

terrenos necesarios para la construcción de tales proyectos, sujeto al cumplimiento de ciertas condiciones. La Junta eximió asimismo a la Autoridad de cumplir con el reglamento sobre lotificación y urbanización, en cuanto a las segregaciones correspondientes. Resolución JPE-14.

El 30 de agosto de 1973, la Junta acordó extender esta exención, sujeto a ciertas condiciones, a otros tipos de proyectos. Véase la Primera Extensión a Resolución JPE-14 de 30 de agosto de 1973.

El 2 de marzo de 1983 la Junta aprobó, al amparo de la vigente ley orgánica, una segunda extensión, en la cual reiteró las exenciones anteriores y aclaró que la Autoridad no tiene que obtener la aprobación de las segregaciones correspondientes, "bastando con someter únicamente el plano de mensura para su presentación al Registrador de la Propiedad ... para que [éste] ... pueda inscribir las lotificaciones resultantes". Segunda Extensión a la Resolución JPE-14 de 2 de marzo de 1983, Apéndice, pág. 2145. El plano de mensura "no tiene que ser certificado por [A.R.Pe.] para tener entrada al Registro de la Propiedad[,] y las segregaciones que se efectúen para estos proyectos tampoco requerirán la previa aprobación de dicha agencia". Íd.

El 29 de octubre de 1993, por último, la Junta aprobó una tercera extensión en la cual reiteró sus actuaciones anteriores. Aclaró, sin embargo, que las exenciones concedidas no liberan a la Autoridad de tener que presentar ante la Junta una consulta de ubicación en los casos en que ello es requerido. Véase Tercera Extensión a Resolución JPE-14 de 29 de octubre de 1993, Apéndice, pág. 2146.([33])

---

([33]) Al comentar las declaraciones preliminar y final de impacto ambiental, la Autoridad de Reglamentos y Permisos (A.R.Pe.) reconoció efectivamente la vigencia de estas exenciones y su aplicabilidad al proyecto del S.A.N. Véanse: la Carta de Ramón A. Maíz, Administrador de A.R.Pe., a Emilio Colón, Director Ejecutivo de la Autoridad de Acueductos y Alcantarillados, 3 de julio de 1995; la Carta de Ramón A. Maíz, Administrador de A.R.Pe., a Benjamín Pomales, Director Ejecutivo de la Autoridad de Acueductos y Alcantarillados, de 6 de junio de 1996. La Junta, por su parte, dispuso en la resolución que aprobaba la consulta de ubicación del S.A.N. que

El Tribunal de Circuito de Apelaciones, sin embargo, resolvió que la Resolución JPE-14 y sus extensiones no están vigentes porque no gozan del privilegio de sucesión que establece el Art. 33 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 63e. El inciso (d) de este artículo, 23 L.P.R.A. sec. 63e(d), confirma la vigencia de, entre otras actuaciones, aquellas resoluciones adoptadas por la Junta al amparo de la Ley Orgánica de 1942 que sean compatibles con la nueva ley orgánica, hasta tanto sean enmendadas o derogadas. Según el Tribunal de Circuito de Apelaciones, la Resolución JPE-14 y sus extensiones no se ajustan a los criterios, que rigen la facultad de la Junta para conceder exenciones, establecidos en su vigente ley orgánica. El Art. 21 de la Ley Orgánica de la Junta de la Junta de Planificación, 23 L.P.R.A. sec. 71t, dispone que la Junta debe considerar el costo, la magnitud o tamaño y el impacto de una obra al establecer normas de exención *respecto a las obras públicas municipales*. Véase Art. 21 de la Ley Orgánica de la Junta de Planificación, *supra*. Estos criterios, según concluyó el Tribunal de Circuito de Apelaciones, representan el mínimo necesario para evitar que la Junta actúe irrazonable o arbitrariamente al hacer cualquier determinación sobre la concesión de una exención, en ausencia de normas generales aplicables a la consideración de exenciones *en casos de obras estatales*. Véase la Sentencia del Tribunal de Circuito de Apelaciones, págs. 134–137.

Aun cuando la Junta no haya adoptado normas generales aplicables a la concesión de exenciones según su vigente ley orgánica, un examen de la Resolución JPE-14 y sus extensiones demuestra que esa agencia consideró varios criterios al conferir y ratificar las exenciones conferidas a la peticionaria. Tales criterios nos convencen de que las exenciones concedidas no son incompatibles con las dis-

---

la tramitación subsiguiente del proyecto debía realizarse conforme con la Resolución JPE-14 y sus extensiones.

posiciones de la vigente Ley Orgánica de la Junta de Planificación de Puerto Rico.[34] Por otro lado, esas exenciones no han sido derogadas; al contrario, han sido ratificadas en tres (3) ocasiones. Concluimos, por lo tanto, que el Tribunal de Circuito de Apelaciones erró al resolver que la Resolución JPE-14 y sus extensiones no gozan del privilegio de sucesión que establece el Art. 33 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 72e.

El Tribunal de Circuito de Apelaciones determinó, no obstante, que aun bajo el supuesto de que las exenciones concedidas fueran válidas, éstas no comprenden proyectos como la laguna de retención que forma parte del proyecto del S.A.N. El texto de la Primera Extensión a la Resolución JPE-14, *supra*, contradice esta conclusión. Refiriéndose a otros tipos de proyectos, adicionales a los acueductos rurales a los cuales extender la aplicación de la Resolución JPE-14, la Junta consignó que "[e]*ntre otros* figuran los siguientes: plantas de filtración, presas, líneas de transmisión, descargas sanitarias, estaciones de bombas y eyectores neumáticos". (Énfasis suplido.) Primera Extensión, *supra*, pág. 2142. Como se puede apreciar, la lista de proyectos mencionados no pretende ser exhaustiva, sino demostrativa.

D. El Tribunal de Circuito de Apelaciones resolvió en su sentencia que la Junta actuó en forma ilegal y *ultra*

---

[34] Entre los criterios que consideró la Junta están: (1) el mejor aprovechamiento de los recursos (Resolución Núm. JPE-14 de la Junta de Planificación de 28 de octubre de 1966, Apéndice, pág. 2140); (2) la pericia de la peticionaria en el diseño de los proyectos exentos (Primera Extensión de la Resolución Núm. JPE-14, *supra*); (3) la necesidad de esos proyectos para la provisión de servicios adecuados a la ciudadanía (íd.); (4) el interés en agilizar la tramitación de esos proyectos (Segunda Extensión de la Resolución Núm. JPE-14, *supra*); (5) el cumplimiento adecuado por parte de la peticionaria de las condiciones establecidas por la Junta al conceder las exenciones (Primera Extensión de la Resolución Núm. JPE-14, *supra*). Entre las condiciones impuestas por la Junta están: (1) informar acerca de la disponibilidad y procedencia de los fondos para la construcción de la obra propuesta (Resolución JPE-14, *supra*; Primera Extensión de la Resolución Núm. JPE-14, *supra*); (2) obtener una consulta de ubicación debidamente aprobada por la Junta, y (3) cumplir con la legislación ambiental aplicable (Primera y Tercera Extensiones de la Resolución Núm. JEP-14, *supra*).

*vires* al emitir la resolución en la que se aprobó el S.A.N., debido a que esa agencia no está facultada para aprobar, mediante una consulta de ubicación, un proyecto cuyo propósito principal es el aprovechamiento de cantidades significativas de agua, antes de que el D.R.N.A. apruebe preliminarmente la franquicia correspondiente. Según concluyó ese foro, la determinación preliminar con respecto a la franquicia que debe hacer el secretario del D.R.N.A. "no es una superficial ni *pro forma* y[,] ... como 'determinación' sujeta a la posibilidad de vista administrativa ..., debe constar por escrito, previo a la concesión del permiso de construcción [de toma de agua]". Sentencia del Tribunal de Circuito de Apelaciones, Apéndice, pág. 77.

No hay duda de que en la estructura administrativa vigente, el D.R.N.A. es la agencia responsable de todo lo relacionado con la conservación, el desarrollo y el uso de los recursos de agua en Puerto Rico. Véase Ley de Aguas, 12 L.P.R.A. secs. 1501–1523, en particular, los Arts. 5 (funciones del secretario del D.R.N.A.) y 9 (permisos y franquicias), 12 L.P.R.A. secs. 1505 y 1509;[35] véanse, además, *Paoli Méndez v. Rodríguez*, 138 D.P.R. 449 (1995); *Colón Ventura v. Méndez, Depto. Recursos Naturales*, 130 D.P.R. 433 (1992). La función de la Junta en relación con la planificación del recurso agua se limita a formar parte de un comité asesor del Secretario del D.R.N.A. para el diseño de un plan integral de uso, conservación y desarrollo de los recursos de agua. Véanse los Arts. 6 y 7 de la Ley de Aguas, 12 L.P.R.A. secs. 1506 y 1507; Art. 13(3) y (6) de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 621(3) y (6).

La Ley de Aguas dispone en su Art. 8 que "[n]inguna persona podrá construir, establecer u operar un

---

[35] Al ejercer esta autoridad, por supuesto, el D.R.N.A. debe observar las normas y recomendaciones de otras agencias como, por ejemplo, la Junta de Calidad Ambiental (en relación con la calidad de las aguas) y el Departamento de Salud (en relación con la potabilidad). Art. 7 de la Ley de Aguas, 12 L.P.R.A. sec. 1507.

sistema de toma de agua, ni usar o aprovechar las aguas y los cuerpos de agua de Puerto Rico sin el correspondiente permiso o franquicia expedido por el Secretario" del D.R.N.A. 12 L.P.R.A. sec. 1508. El Art. 9 (12 L.P.R.A. sec. 1509) establece algunos de los factores que debe considerar el Secretario al evaluar una propuesta de uso o de aprovechamiento particular de los recursos de agua, así como las exigencias y características mínimas relacionadas con los permisos y las franquicias correspondientes.

■ Por su parte, el Reglamento Núm. 4859 para el Aprovechamiento, Uso, Conservación y Administración del Agua en Puerto Rico de 30 de diciembre de 1992, según enmendado (en adelante Reglamento de Aguas), 12 R.P.R. sec. 330.1001 *et seq.* (1996), gobierna todo lo relativo a los permisos de construcción de toma de agua y franquicias. Este reglamento prohíbe la construcción, el establecimiento o la operación de una toma de agua sin el correspondiente permiso del secretario del D.R.N.A. Véase 12 R.P.R. secs. 330.1002 y 330.1082 (1996). Prohíbe, asimismo, la extracción o el aprovechamiento de las aguas o de los cuerpos de agua sin antes obtener la franquicia correspondiente. Véase 12 R.P.R. secs. 330.1002 y 330.1102 (1996). Cuando la solicitud de un permiso de construcción de toma de agua conlleva una franquicia nueva, hay que presentar conjuntamente ambas solicitudes.[36] Véase 12 R.P.R. secs. 330.1084 y 330.1085(F) (1996). En este caso, le corresponde al Secretario del D.R.N.A. hacer una determi-

---

[36] El permiso de construcción de toma de agua fue solicitado por la peticionaria el 3 de julio de 1996. En esa fecha, la peticionaria presentó, además, una solicitud de franquicia de agua. Los recurridos intervinieron en ambos procedimientos. El 18 de septiembre de 1996 —más de una semana antes de que los recurridos acudieran en revisión ante el Tribunal de Circuito de Apelaciones— el D.R.N.A. emitió una resolución mediante la cual le otorgó a la peticionaria el permiso Núm. PTR-7-124-96 para construir una toma de agua en el Río Grande de Arecibo. Los recurridos solicitaron la reconsideración de esta determinación. Tanto la resolución de la moción de reconsideración sobre el permiso de toma de agua como la concesión de la franquicia de agua estaban aún bajo la consideración del D.R.N.A. cuando el Tribunal de Circuito de Apelaciones dictó la sentencia.

nación preliminar sobre la solicitud de franquicia.[37] Véase 12 R.P.R. sec. 330.1091(B) (1996). El tenedor de un permiso de toma de agua tiene la obligación de someter un informe de terminación de obras, el cual consiste "del plano de la obra terminada indicando la localización de la toma y los canales o tubos, el registro de flujo y otros componentes principales". 12 R.P.R. sec. 330.1093 (1996). Una vez aceptado este informe, le corresponde al Secretario del D.R.N.A. evaluar de nuevo la solicitud de franquicia para determinar si la expide. Véase 12 R.P.R. sec. 330.1108 (1996). La aprobación final de la franquicia, pues, ocurre luego de haber sido construida la obra.

Este curso procesal preocupó, comprensiblemente, al Tribunal de Circuito de Apelaciones desde una perspectiva de la política pública, por la posibilidad de que el D.R.N.A. no autorizara el proyecto según concebido, con la consecuente pérdida de los fondos públicos invertidos en su construcción y el menoscabo de su viabilidad y utilidad. Véase la Sentencia, pág. 50.

■ La realidad es, sin embargo, que no existe disposición alguna en la Ley o el Reglamento de Aguas que exija obtener un permiso de construcción de toma de agua o una franquicia como requisito previo a la adjudicación de una consulta de ubicación. La Ley Orgánica de la Junta de Planificación y el Reglamento de Adjudicación tampoco lo exigen. Al contrario, la Sec. 7.01 del Reglamento de Adjudicación, *supra*, establece que, al evaluar una consulta de ubicación, "[l]a Junta ... consultará, *cuando lo considere necesario*, a cualquiera de los organismos gubernamenta-

---

[37] Los Arts. 7.10(B) y 8.7 del Reglamento Núm. 4859 para el Aprovechamiento, Uso, Conservación y Administración de las Aguas en Puerto Rico de 30 de diciembre de 1992 (en adelante Reglamento de Aguas), 12 R.P.R. secs. 330.1091(B) y 330.1107 (1996), le ordenan al Secretario del D.R.N.A. evaluar preliminarmente la solicitud de franquicia, constatando que el uso de las aguas propuesto se ajusta a los criterios de uso y beneficio razonable y uso óptimo establecidos en el Art. 5 de dicho Reglamento, 12 R.P.R. secs. 330.1051–330.1054 (1996).

les ... que de alguna manera tengan relación con los proyectos bajo estudio". (Énfasis suplido.)[38]

■ La Junta, por otro lado, no se extralimitó en el ejercicio de sus poderes delegados al invadir la jurisdicción del D.R.N.A. cuando aprobó la consulta de ubicación del S.A.N. La aprobación de la consulta de ubicación no constituye una adjudicación sobre el uso o aprovechamiento de los recursos de agua, sino una autorización para el uso de unos terrenos.

El Tribunal de Circuito de Apelaciones, por lo tanto, incidió al resolver que la Junta actuó ilegalmente y en exceso de sus facultades al emitir la resolución aprobando el S.A.N. antes de que el D.R.N.A. hubiera aprobado preliminarmente la franquicia de agua. Consecuentemente, es innecesario resolver si la determinación preliminar con respecto a la franquicia que debe hacer el Secretario del D.R.N.A. debe constar por escrito.

■ E. Al considerar y resolver una consulta de ubicación, según se puede inferir de su ley orgánica y del Reglamento de Adjudicación, la Junta ejerce una función de naturaleza adjudicativa. Véanse, *e.g.*: Arts. 27 y 32(c) de la Ley Orgánica de la Junta de Planificación, 23 L.P.R.A. secs. 62z y 63d(c); Secs. 1.04, 2.00(1), (6) y (27), y 9.00 del Reglamento de Adjudicación, 23 R.P.R. secs. 650.221, 650.225(1), (6) y (27), y 650.237 (1997). En efecto, así lo hemos resuelto anteriormente. Véanse: *Montalvo v. Mun. de Sabana Grande*, 138 D.P.R. 483 (1995); 95 J.T.S. 60, en la pág. 489; *Luan Investment Corp. v. Román*, 125 D.P.R. 533, 547 esc. 2 (1990).

De acuerdo con la Sec. 9.00 del Reglamento de Adjudicación, 23 R.P.R. sec. 650. 237 (1997), la Junta debe decidir

---

[38] Cabe señalar que el D.R.N.A. comentó en varias ocasiones la declaración preliminar de impacto ambiental. Véanse *e.g.*: Carta de Pedro A. Gelabert, Secretario del D.R.N.A., a Emilio Colón, Director Ejecutivo de la Autoridad de Acueductos y Alcantarillados, 8 de mayo de 1995; Carta de Pedro A. Gelabert, Secretario del D.R.N.A., a Emilio Colón, Director Ejecutivo de la Autoridad de Acueductos y Alcantarillados, 21 de mayo de 1995 (ambas con sus respectivos anejos).

una consulta de ubicación fundamentándose en la totalidad del expediente, mediante una resolución que incluya las determinaciones de hecho y las conclusiones de derecho en las cuales se fundamente. Iguales requisitos imponen, en forma general, las Secs. 3.1(d) y 3.14 de la L.P.A.U., 3 L.P.R.A. secs. 2151(d) y 2164, para la adjudicación formal de controversias. La revisión de una resolución sobre consulta de ubicación está delimitada por la Sec. 4.5 de la L.P.A.U., 3 L.P.R.A. sec. 2175, la cual establece el alcance de la revisión judicial de las decisiones de los organismos administrativos. Véanse: *Metropolitana S.E. v. A.R.Pe.*, 138 D.P.R. 200 (1995); *Hernández v. Golden Tower Dev. Corp.*, 125 D.P.R. 744, 748 (1990).

La revisión judicial de las decisiones administrativas comprende tres (3) aspectos: (1) la concesión del remedio apropiado, (2) las determinaciones de hecho y (3) las conclusiones de derecho del organismo administrativo. Véanse: Sec. 4.5 de la L.P.A.U., 3 L.P.R.A. sec. 2175; *Reyes Salcedo v. Policía de P.R.*, 143 D.P.R. 85 (1997); D. Fernández Quiñones, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme*, Colombia, Ed. Forum, 1993, Sec. 9.3, pág. 521. Su propósito fundamental es delimitar la discreción de los organismos administrativos y asegurar que éstos desempeñan sus funciones en conformidad con la ley.[39] Véase *Miranda v. C.E.E.*, 141 D.P.R. 775, 786 (1996): " '[l]a función central de la revisión judicial substantiva es asegurarse de que las agencias actúan dentro del marco del poder delegado y consistentes con la política legislativa.' " (Énfasis suprimido.) Citando a Fernández Quiñones, *op. cit.*, pág. 525. No obstante, reconociendo

---

[39] Esto no significa, sin embargo, que al ejercer su función revisora "los tribunales habrán de intervenir, juzgando la sabiduría de una determinación de política pública que le corresponde hacer a las Ramas Ejecutiva y Legislativa. El mecanismo adoptado por la Legislatura y el Ejecutivo para atender algún problema relacionado con intereses sociales o económicos no está sujeto a nuestra evaluación, a menos que contravenga alguna disposición de mayor jerarquía cuya aplicación estamos llamados a salvaguardar". *Misión Ind. P.R. v. J.P. y A.A.A.*, 142 D.P.R. 656, 673 (1997).

la importancia de las agencias públicas en nuestro sistema de gobierno, y debido a que éstas cuentan con la experiencia y los conocimientos especializados en los asuntos que le han sido encomendados, hemos resuelto reiteradamente que sus decisiones e interpretaciones son generalmente acreedoras de deferencia judicial.[40] Véanse: *Misión Ind. P.R. v. J.P. y A.A.A.*, supra, págs. 671–672; *Reyes Salcedo v. Policía de P.R.*, supra, pág. 94; *Miranda v. C.E.E.*, supra, pág. 787; *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993); *Monllor & Boscio v. Comisión Industrial*, 89 D.P.R. 397, 405 (1963). "Las decisiones administrativas tienen a su favor la presunción de legalidad y corrección." *Murphy Bernabe v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975). Esta presunción de regularidad y corrección "debe ser respetada mientras la parte que la impugne no produzca suficiente evidencia para derrotarla". *Henríquez v. Consejo Educación Superior*, 120 D.P.R. 194, 210 (1987). Véanse, además: *Catalytic Ind. Maint. Co. v. F.S.E.*, 121 D.P.R. 98, 101–102 (1988); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 331 (1987).

Al ejercer su función, el tribunal debe examinar primero si la actuación del organismo administrativo se ajusta al poder que le ha sido delegado, *Viajes Gallardo v. Clavell*, 131 D.P.R. 275 (1992); *Hernández Denton v. Quiñones Desdier*, 102 D.P.R. 218, 223–224 (1974), pues de lo contrario su actuación sería *ultra vires* y, como consecuencia, nula. Véanse: *Fuertes y otros v. A.R.Pᴇ.*, 134 D.P.R. 947 (1993); *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 409 (1980); *Del Rey v. J.A.C.L.*, 107 D.P.R. 348, 355 (1978); *E.L.A. v. Rivera*, 88 D.P.R. 196, 199 (1963); *Infante v. Tribl. Examinador Médicos*, 84 D.P.R. 308, 314 esc. 5 (1961).

---

[40] "Debe quedar claro[, sin embargo,] que la norma de dar deferencia a la interpretación que hace una agencia de la ley o reglamento que está bajo su administración es una de hermenéutica, que de ningún modo afecta el alcance de la facultad de revisión de los tribunales". (Énfasis suprimido.) *Com. Seguros P.R. v. Gen. Accident Ins. Co.*, 132 D.P.R. 543, 553 esc. 2 (1993).

 En relación con las determinaciones de hechos de la agencia, la Sec. 4.5 de la L.P.A.U., *supra*, preceptúa que éstas deben ser sostenidas por el tribunal revisor siempre que estén fundamentadas en "evidencia sustancial" contenida en el expediente administrativo. Véase *Metropolitana S.E. v. A.R.Pᴇ.*, supra, pág. 213. Esta disposición recoge estatutariamente la norma jurisprudencial que establece que, de ordinario, los tribunales no deben intervenir con las determinaciones de hechos de un organismo administrativo si éstas se apoyan en prueba suficiente que surja del expediente considerado en su totalidad. Véanse: *Metropolitana S.E. v. A.R.Pᴇ.*, supra, pág. 213; *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, supra, págs. 532–533; *Rodrigo v. Tribunal Superior*, 101 D.P.R. 151, 154 (1973); *López v. Junta Planificación*, 80 D.P.R. 646, 673 (1958); *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670, 686–687 (1953). El propósito de la regla de evidencia sustancial aplicable a las determinaciones de hechos es "evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor". *Reyes Salcedo v. Policía de P.R.*, supra, pág. 95. Véanse, además: *López v. Junta Planificación*, supra, pág. 673; *Ledesma, Admor. v. Tribl. de Distrito*, 73 D.P.R. 396, 401 (1952). Evidencia sustancial, según la hemos definido anteriormente, "es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". *Hilton Hotels v. Junta Salario Mínimo*, supra, pág. 687. Consecuentemente, para convencer al tribunal de que la evidencia en la cual se fundamentó la agencia para formular una determinación de hecho no es sustancial, la parte afectada debe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración.

132

Véanse: *Metropolitana S.E. v. A.R.PE.*, supra, págs. 212–213; *Hilton Hotels v. Junta Salario Mínimo*, supra, pág. 686. No obstante, el tribunal debe sostener la resolución de un conflicto probatorio por parte de la agencia, siempre que ésta se haya apoyado en una base racional. Véanse: *Hilton Hotels v. Junta Salario Mínimo*, supra, págs. 686–687 y 689; *J.R.T. v. Línea Suprema, Inc.*, 89 D.P.R. 840, 849 (1964).

▇ Las conclusiones de derecho de la agencia, distinto de las determinaciones de hechos, pueden ser revisadas "en todos sus aspectos por el tribunal", sin sujeción a norma o criterio alguno. Sec. 4.5 de la L.P.A.U., *supra*. Véase *Miranda v. C.E.E.*, supra, pág. 236 (citando a Fernández Quiñones, *op. cit.*, pág. 545). Esto no significa, sin embargo, que al ejercer su función revisora, el tribunal pueda descartar libremente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. Al contrario, hemos reiterado constantemente —antes y después de la vigencia de la L.P.A.U.— que, de ordinario, los tribunales deben deferir a las interpretaciones y conclusiones de los organismos administrativos. Véanse, *e.g.*: *Metropolitana S.E. v. A.R.PE.*, supra, pág. 213; *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, supra, pág. 532; *Fuertes v. Administración de Reglamentos y Permisos*, supra, pág. 532; *Viajes Gallardo v. Clavell*, supra, pág. 285; *Vázquez v. A.R.PE.*, 128 D.P.R. 513, 523–524 (1991); *A.R.P.E. v. J.A.C.L.*, 124 D.P.R. 858, 864 (1989); *M & V Orthodontics v. Negdo. Seg. Empleo*, 115 D.P.R. 183, 189 (1984); *Rubin Ramírez v. Trías Monge*, 111 D.P.R. 481, 484–485 (1981); *Murphy Bernabe v. Tribunal Superior*, supra, pág. 699; *Quevedo Segarra v. J.A.C.L.*, 102 D.P.R. 87, 96 (1974); *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 690 (1966); *Reyes v. Junta de Planificación*, 79 D.P.R. 620, 629 (1956); *Ledesma, Admor. v. Tribl. de Distrito*, supra, pág. 401. Esta deferencia responde al reconocimiento de que "las agencias administrativas son instru-

mentos necesarios para la interpretación de la ley". *Miranda v. C.E.E.*, supra, pág. 787.

Las conclusiones de derecho del organismo administrativo, claro está, se deben sujetar al mandato de la ley y, en la medida que lo hagan, deben ser sostenidas por el tribunal revisor. Véanse: Art. 14 del Código Civil, 31 L.P.R.A. sec. 14; *Román v. Superintendente de la Policía*, supra, págs. 686–689; *Cotto v. Depto. de Educación*, 138 D.P.R. 658 (1995); *Cía. Azucarera Toa v. Com. Serv. Público*, 71 D.P.R. 212 (1950). En los casos dudosos, la interpretación de un estatuto por la agencia encargada de velar por su cumplimiento merece deferencia sustancial, aun cuando esa interpretación no sea la única razonable. *De Jesús v. Depto. Servicios Sociales,* 123 D.P.R. 407, 418 (1989); *Vázquez v. A.R.P.E.*, supra, págs. 523–524. Véanse, además: *Álvarez v. J. Dir. Cond. Villa Caparra*, 140 D.P.R. 763 (1996); *Ríos Colón v. F.S.E.*, 139 D.P.R. 167 (1995); *Com. Seguros P.R. v. Gen. Accident Ins. Co.*, 132 D.P.R. 543 (1993); *Asoc. Médica de P.R. v. Cruz Azul*, 118 D.P.R. 669, 678 (1987); *A.R.P.E. v. Ozores Pérez*, 116 D.P.R. 816, 821 (1986); *Tormos & D.A.C.O. v. F.R. Technology*, 116 D.P.R. 153, 160–161 (1985). Esa interpretación se debe ajustar "al fundamento racional o fin esencial de la ley y la política pública que la inspira[n]".[41] (Citas omitidas.) *Ind. Cortinera Inc. v. P.R. Telephone Co.*, 132 D.P.R. 654 (1993). Véanse, además: Art. 19 del Código Civil, 31 L.P.R.A. sec. 19; *Com. Seguros P.R. v. Gen. Accident Ins. Co.*, supra, pág. 547; *Vázquez v. A.R.P.E.*, supra, pág. 523; *A.R.P.E. v. Ozores Pérez*, supra, pág. 820; *Esso Standard Oil v. A.P.P.R.*, 95 D.P.R. 772, 785 (1968); *Coll v. Picó*, 82 D.P.R. 27, 33

---

[41] Se debe tomar en cuenta, no obstante, que cuando el legislador ha legislado posteriormente en relación con el estatuto o reglamento en cuestión, "y en momento alguno ha alterado o repudiado la interpretación administrativa de dicha disposición o la aplicación de la misma hecha por los organismos administrativos ... [d]ebe presumirse que [la] ha sancionado". *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 690 (1966).

(1960); *Debién v. Junta de Contabilidad*, 76 D.P.R. 96, 105 (1954).

 El criterio de revisión que el tribunal debe aplicar es, pues, el de razonabilidad, sosteniendo las conclusiones e interpretaciones administrativas siempre que la agencia no haya actuado arbitraria o ilegalmente, o en abuso de su discreción. Véanse, *e.g.*: *Quiñones v. San Rafael Estates, S.E.*, 143 D.P.R. 756 (1997); *Misión Ind. P.R. v. J.P.*, supra; *Álvarez v. J. Dir. Cond. Villa Caparra*, supra; *Fuertes y otros v. A.R.Pe.*, supra, pág. 953; *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, supra, pág. 533; *Viajes Gallardo v. Clavell*, supra, pág. 285; *Murphy Bernabe v. Tribunal Superior*, supra, pág. 699. Al hacer esta determinación, el tribunal debe considerar, además, la experiencia y los conocimientos especializados que tenga el organismo administrativo sobre los asuntos que le hayan sido encomendados —*García Oyola v. J.C.A.*, 142 D.P.R. 532 (1997); *M & V Orthodontics v. Negdo. Seg. Empleo*, supra, pág. 189— distinguiendo entre "cuestiones de interpretación estatutaria, en las que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa". *Adorno Quiles v. Hernández*, 126 D.P.R. 191, 195 (1990), citando a *Febres v. Feijoó*, 106 D.P.R. 676 (1978). Véanse, además: *Reyes Salcedo v. Policía de P.R.*, supra; *Miranda v. C.E.E.*, supra, pág. 236.

Al revisar las interpretaciones y conclusiones administrativas, el tribunal debe hacer una evaluación independiente sobre la aplicación del derecho a los hechos que la agencia estimó pertinentes. Confrontado con un resultado distinto del obtenido por la agencia, el tribunal debe determinar si la divergencia responde a un ejercicio razonable de la discreción administrativa fundamentado, por ejemplo, en una pericia particular, en consideraciones de política pública o en la apreciación de la prueba que tuvo ante su consideración. El tribunal podrá sustituir el criterio de

la agencia por el propio sólo cuando no pueda hallar una base racional para explicar la decisión administrativa.

La revisión judicial de las decisiones administrativas está delimitada, además, por lo incluido en el expediente de la agencia o en el expediente administrativo. Así lo establece la Sec. 3.18 de la L.P.A.U., al disponer, en lo pertinente, que "[e]l expediente de la agencia constituirá la base exclusiva para la acción de la agencia en un procedimiento adjudicativo ... y para la revisión judicial ulterior". 3 L.P.R.A. sec. 2168.

Respecto al caso ante nuestra consideración, la Ley Orgánica de la Junta de Planificación de Puerto Rico establece específicamente que la revisión de las decisiones de la Junta "se limitará exclusivamente a cuestiones de derecho". Art. 32(a) de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 63d(a). Aun cuando en *Hilton Hotels v. Junta Salario Mínimo*, supra, pág. 685, expresamos que la revisión judicial de las decisiones administrativas depende "del estatuto específico envuelto en cada caso", lo cierto es que tanto la apreciación arbitraria de la prueba —por parte del organismo administrativo— como la determinación sobre si las conclusiones de hechos que sirven de base a su decisión están sostenidas por evidencia sustancial, constituyen una cuestión de derecho. Véanse: *López v. Junta Planificación*, supra, pág. 672; *Fuertes v. Junta Planificación*, 76 D.P.R. 644, 648 (1954); *Eastern Sugar Associates v. Junta Azucarera*, 77 D.P.R. 358, 386 (1954); *Acosta v. Junta de Planificación*, 71 D.P.R. 578, 581 (1950). *Cf.*, además, *Chase Manhattan v. Emmanuelli Bauzá*, 111 D.P.R. 708, 712 (1981).

La revisión de la resolución de la Junta, en la cual se aprobó el proyecto del S.A.N., se debió sujetar a los parámetros expuestos. El Tribunal de Circuito de Apelaciones, sin embargo, estimó que en este caso procedía, "como cuestión de derecho", aplicar un criterio de revisión más

estricto. Véase Sentencia, pág. 46. Al hacerlo, erró. Esto, sin embargo, no dispone del recurso de autos.

El Tribunal de Circuito de Apelaciones resolvió que aun en el supuesto de que no fuera necesaria una determinación inicial del D.R.N.A. sobre la franquicia de agua para adjudicar la consulta de ubicación, ésta debía ser revocada porque la Junta violó su propia ley orgánica y sus reglamentos al aprobar la consulta de ubicación del S.A.N. Concluyó, asimismo, que la Junta violó el debido proceso de ley de las personas que serían afectadas por su actuación y no cumplió con las disposiciones aplicables de la Ley sobre Política Pública Ambiental.

F. El Tribunal de Circuito de Apelaciones determinó que la peticionaria incumplió con los requisitos de notificación y de titularidad o autorización que establece la Sec. 4.03 del Reglamento de Adjudicación, *supra*, ya que no presentó evidencia de que hubiera notificado a algunos de los propietarios cuyos terrenos serían afectados por el proyecto, de que fuera titular de los terrenos públicos que serían utilizados o de que tuviera la autorización correspondiente de las agencias dueñas. Ambas faltas, concluyó el foro apelativo, viciaron la presentación de la consulta. Un análisis del trámite seguido, sin embargo, demuestra que no fue así.

El 20 de julio de 1995 la Junta emitió una resolución mediante la cual dejó en suspenso la consideración de la consulta de ubicación presentada por la peticionaria, hasta que ésta presentara evidencia de haber notificado a los propietarios de terrenos privados y la autorización correspondiente de los titulares de terrenos públicos.

El 1ro de diciembre siguiente la peticionaria le sometió a la Junta una lista con el número de catastro de las propiedades que serían afectadas por el proyecto, incluyendo una copia de la notificación que les había enviado el día antes a los respectivos titulares. Tanto el número de catastro como los nombres y las direcciones correspondien-

tes fueron obtenidos de los expedientes del Centro de Recaudación de Ingresos Municipales (en adelante el C.R.I.M.). La peticionaria indicó, sin embargo, que no había podido obtener el nombre y la dirección de varios de los titulares cuyas propiedades serían afectadas, ya que esta información no estaba disponible en el C.R.I.M. y tampoco la había podido obtener mediante visitas de campo. Para subsanar esta deficiencia, el 16 de diciembre de 1995 la peticionaria publicó en la prensa un aviso para informar acerca de la presentación de la consulta, en el que incluyó el número de catastro de las propiedades para las cuales no había podido obtener el nombre y la dirección del titular. Mediante este aviso notificó, además, a varios dueños a quienes había notificado anteriormente sin éxito, porque las cartas correspondientes le fueron devueltas.

Ante estas circunstancias, no nos parece que la Junta haya actuado ilegal, arbitraria o caprichosamente al concluir que la peticionaria cumplió con el requisito de notificación que establece la Sec. 4.03 del Reglamento de Adjudicación, *supra*. Por lo tanto, sostenemos su determinación.[42] Véanse, *e.g.*: *Quiñones v. San Rafael Es-*

---

[42] Nuestra determinación tal vez hubiera sido distinta si el Reglamento de Adjudicación impusiera requisitos de notificación más rigurosos, como, por ejemplo, los establecidos en el Reglamento de Zonificación de Puerto Rico, Reglamento Núm. 4 de la Junta de Planificación de 14 de diciembre de 1992 (23 R.P.R. secs. 650.1638–650.1750 (1997)) (en adelante Reglamento de Zonificación). La Sec. 4.6 de este reglamento establece los requisitos siguientes para una solicitud de rezonificación:

"6. *Requisitos para la solicitud.*—Cuando no sea por iniciativa propia, la Junta podrá considerar rezonificar a determinado sector o solar ... cuando la persona, agencia o entidad peticionaria le someta:

"(a) La evidencia de haber notificado la intención de radicar la solicitud de cambio de zonificación a los dueños de las propiedades más cercanas del área propuesta a rezonificarse. El número de propietarios a notificarse será el mayor que resulte en la aplicación de las siguientes disposiciones:

"1. Todos los dueños de aquellas propiedades que radiquen dentro de una distancia radial de sesenta (60) metros del área propuesta a rezonificarse, medida tomando los puntos más cercanos entre dicha área y cada una de las referidas propiedades.

"2. ... Cuando dentro de la distancia radial indicada en el párrafo 1 de esta cláusula (a) no existieren veinte (20) propiedades, se ampliará la misma, siempre en forma radial, hasta incluir no menos de dicho número de propiedades.

*tates, S.E.*, supra; *Álvarez v. J. Dir. Cond. Villa Caparra*, supra; *Fuertes y otros v. A.R.Pe.*, supra; *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, supra; *Viajes Gallardo v. Clavell*, supra; *Murphy Bernabe v. Tribunal Superior*, supra, pág. 699.

El Tribunal de Circuito de Apelaciones también resolvió que la notificación fue inoportuna, ya que, según interpretó, ésta se tiene que hacer simultánea o coetáneamente con la presentación de una consulta. Concluyó que la tardanza en que incurrió la peticionaria en notificar la presentación de la consulta impidió que las personas afectadas pudieran expresarse en torno a ella, lo que constituyó una violación del debido procedimiento de ley.

La Sec. 4.03 del Reglamento de Adjudicación, *supra*, dispone efectivamente que, como parte de los requisitos de presentación, la parte proponente de una consulta sobre mejora pública debe presentar evidencia de que notificó a los titulares de terrenos privados. Esta sección dispone, además, que "[t]oda persona notificada sobre la radicación de una consulta o proyecto de mejora pública podrá someter a la Junta, con copia a la parte proponente, sus puntos de vista dentro del término de diez (10) días contados a partir del recibo de la notificación". 23 R.P.R. sec. 650.231 (1997).

■ Como mencionamos anteriormente, mediante resolución de 20 de julio de 1995, la Junta dejó en suspenso la consulta presentada por la peticionaria hasta que ésta evidenciara —como lo hizo posteriormente— haber cumplido con el requisito de notificación. Determinar cuándo

---

"La evidencia consistirá de una declaración jurada y del acuse de recibo de la notificación. Deberá incluir los números de propiedades del Registro de Propiedades Tributables (Catastro) del Departamento de Hacienda y los nombres y direcciones de los dueños. Cuando alguna de las propiedades colindantes esté constituida por un condominio, éste se considerará como un sola propiedad y se procederá a notificar a la Junta de Condómines." 23 R.P.R. sec. 650.1650(6) (1997). Para un caso que resuelve una controversia sobre la notificación al amparo de esta disposición, véase *Montoto v. Lorie*, 145 D.P.R. 30 (1998).

fue, en la cronología del trámite administrativo, que la Junta dio por presentada finalmente la consulta —si antes o después de que la peticionaria le presentara las copias de las notificaciones enviadas y el aviso publicado— nos parece una tarea innecesaria. Aun cuando el Reglamento de Adjudicación le confiere a toda persona notificada de la presentación de una consulta el derecho a presentar sus comentarios dentro de los diez (10) días siguientes a la notificación, la Junta puede tramitar una consulta sin que haya transcurrido este término, "cuando el interés público ... así lo justifique". Sec. 4.03 del Reglamento de Adjudicación, *supra*. La urgencia de atender la deficiencia en el abasto de agua potable en el país ciertamente constituye un interés público suficiente para justificar la manera de proceder de la Junta en cuanto a este aspecto.

En cuanto a la presentación de la autorización de los dueños de terrenos públicos, constan en el expediente administrativo las autorizaciones de los Departamentos de Transportación y Obras Públicas, Agricultura, Recreación y Deportes, y de la Vivienda. No consta, sin embargo, la autorización expresa de la Autoridad de Tierras para la construcción de dos (2) de los elementos del S.A.N. en sus terrenos. La Junta, no obstante, tiene la facultad de "[d]ispensar del cumplimiento de uno o varios requisitos reglamentarios con el propósito de lograr la utilización óptima de los terrenos". Art. 11(7) de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62j(7). Considerando que de la resolución que aprobaba la consulta surge que la peticionaria tenía un plan para adquirir los terrenos de la Autoridad de Tierras, y considerando que esta agencia nunca ha comparecido para objetar la utilización de su propiedad para la construcción del proyecto, tampoco nos parece que la Junta haya actuado ilegal, arbitraria o caprichosamente al dar

por presentada la consulta de ubicación en cuanto a este extremo.

El Tribunal de Circuito de Apelaciones resolvió, además, que tanto la notificación de las vistas públicas para considerar la consulta como la notificación de la resolución que la aprobaba fueron defectuosas y contrarias al debido procedimiento de ley, debido a la ausencia de prueba en el expediente administrativo sobre la notificación adecuada a varios de los propietarios cuyos terrenos podrían ser afectados por la construcción del S.A.N.

█ El Reglamento de Adjudicación dispone dos (2) tipos de vistas; el primero, vistas de carácter administrativo, y el segundo, vistas de carácter público. Son "vistas administrativas" las "ordenadas por la Junta para oír a partes interesadas, identificadas de antemano, sobre un asunto en particular", y "públicas" las ordenadas "para considerar consultas de ubicación u otra acción adjudicativa de la Junta en todos los casos en que se disponga por ley o reglamentación[,] o en que la Junta lo estime pertinente". Sec. 2.00(26) y (27) del Reglamento de Adjudicación, respectivamente, 23 R.P.R. sec. 650.225(26) y (27) (1997). La celebración de vistas, tanto administrativas como públicas, es una facultad discrecional de la Junta. El ejercicio de esta discreción, sin embargo, está limitado por el debido procedimiento de ley. *López v. Junta Planificación*, supra, pág. 667.

En cuanto a la notificación de vistas, la Sec. 8.01 del Reglamento de Adjudicación, 23 R.P.R. sec. 650.236 (1997), dispone, en lo pertinente:

(1) *Notificación de vistas.*—La Junta notificará por escrito a todas las partes o a sus representantes autorizados e interventores la fecha, hora y lugar en que se celebrará la vista adjudicativa. La notificación se deberá efectuar por correo o personalmente con no menos de quince (15) días de anticipación a la fecha de la vista, excepto que por causa debidamente justificada, consignada en la notificación, sea necesario acortar dicho período, y deberá contener la siguiente información:

(a) Fecha, hora y lugar en que se celebrará la vista, así como su naturaleza y propósito.

(b) Advertencia de que las partes podrán comparecer asistidas de abogados, pero no estarán obligadas a estar así representadas, incluyendo los casos de corporaciones y sociedades.

(c) Cita de la disposición legal o reglamentaria que autoriza la celebración de vista.

(d) Referencia a las disposiciones legales o reglamentarias presuntamente infringidas, si se imputa una infracción a las mismas, y a los hechos constitutivos de tal infracción.

(e) Apercibimiento de las medidas que la agencia podrá tomar si una parte no comparece a la vista.

(f) Advertencia de que la vista no podrá ser suspendida. Si se tratare de una vista pública, la Junta publicará un aviso de prensa en un periódico de circulación general en Puerto Rico con no menos de quince (15) días de antelación a la fecha de la vista.

 Aun cuando esta sección no hace referencia a las vistas administrativas, del texto se puede interpretar —haciendo referencia también al inciso (26) de la Sec. 2.00, *supra*, el cual define "vista administrativa"— que, no obstante la caracterización de la vista, la Junta tiene la obligación de notificar previamente y de forma individual a todas las partes identificadas que tengan un interés particular en la adjudicación del asunto ante su consideración. Es decir, en el caso de autos, aun cuando la Junta caracterizó de públicas las vistas convocadas durante la consideración de la consulta de ubicación del S.A.N., su obligación era —para cumplir con el debido procedimiento de ley— notificar individualmente a los propietarios cuyos terrenos serían afectados por la construcción del proyecto. Al contrario, le podía informar al resto de la ciudadanía de la celebración de las vistas mediante la publicación de un aviso de prensa, según lo establece el último párrafo de la Sec. 8.01 del Reglamento de Adjudicación, *supra*.

En la Resolución de 20 de julio de 1995, la Junta le indicó a la peticionaria su intención de celebrar vistas públicas en relación con la consulta de ubicación presentada.

A esos efectos, la Junta le requirió a la peticionaria, entre otra, la información siguiente:

1. Lista de direcciones postales de:
a) Todos los dueños de propiedades que radican dentro de una distancia de cien (100) metros, medidos desde todos los límites del solar o parcela objeto de la consulta hasta los límites de cualquier solar o parcela que radique dentro de la distancia antes señalada.
b) Si dentro de la distancia de cien (100) metros, indicada en el apartado (a) anterior, no existieren veinte (20) propiedades, deberá ampliar la distancia de los cien (100) metros, *en todas las direcciones*, hasta incluir un mínimo de veinte (20) propiedades. No obstante, deberá incluir todas las propiedades que existen dentro de la distancia ampliada determinada.
2. Identificar, en un plano, las propiedades incluidas en el listado con el número correspondiente al mismo y marcar la distancia de cien (100) metros o la distancia ampliada determinada. (Énfasis en el original.) Apéndice, pág. 97.

La peticionaria respondió el 29 de noviembre de 1995, mediante una carta en la cual le solicitó a la Junta que la eximiera de tener que notificar individualmente a los propietarios de los terrenos ubicados dentro del radio indicado de cien (100) metros. Como mecanismo alterno, la agencia propuso la publicación de anuncios en los principales diarios del país y su difusión a través de la radio y la televisión. La Junta aprobó esta alternativa mediante su Resolución de 30 de noviembre de 1995, a la cual no se opusieron los recurridos. Los avisos se publicaron en la prensa el 2, 3 y 16 de diciembre siguientes.

El 1ro de diciembre de 1995, la Junta les notificó individualmente a los propietarios incluidos en la lista que le había provisto la peticionaria y que ésta había utilizado para notificar la presentación de la consulta. El Tribunal de Circuito de Apelaciones encontró que hubo varias personas que no fueron notificadas de forma adecuada. Los problemas que confrontó la Junta al hacer esta notificación fueron los mismos que confrontó la peticionaria al notificar la presentación de la consulta, es decir, la imposibilidad de obtener el nombre y la dirección de algunos de los titulares

debido a la ausencia de esta información en los archivos del C.R.I.M., el resultado infructuoso de las visitas de campo realizadas y la devolución de algunas de las cartas de notificación enviadas.

Nos parece que, *en las circunstancias particulares de este caso*, la peticionaria actuó con diligencia al recopilar y suministrarle a la Junta toda la información necesaria para el trámite de notificación de vistas públicas. Cualquier deficiencia en el procedimiento de notificación individual a algunos de los propietarios cuyos terrenos serían afectados por la construcción del proyecto, quedó subsanada por la notificación mediante los avisos de prensa publicados el 2, 3 y 16 de diciembre de 1995. No podemos ignorar tampoco la amplia divulgación que ha tenido este proyecto.[43]

En cuanto a la notificación de la resolución en la que se aprobó la consulta de ubicación, la Sec. 9.00 del Reglamento de Adjudicación establece que todas las resoluciones en casos adjudicativos sobre consultas de ubicación las notificará por correo la Oficina del Secretario de la Junta "a las partes cuyas direcciones obren en el expediente de la consulta". 23 R.P.R. sec. 650.237 (1997). Esto fue lo que

---

[43] Véanse, *e.g.*: DIA-F, Ap. I (política de participación pública); P. Ruz Gutiérrez, *Hearings for Superaqueduct Slated, The San Juan Star*, 3 de diciembre de 1995, pág. 8; *A mediados mes vistas Superacueducto, El Vocero de Puerto Rico*, 3 de diciembre de 1995, pág. 32; L. Randall, *Pomales, New Executive Director of ASA, Will Continue Project, The San Juan Star*, 8 de diciembre de 1995, pág. 2; C. Hawley, *Public Hearings Start today on Superaqueduct Project, The San Juan Star*, 18 de diciembre de 1995, pág. 4; G. Cordero, *A discutir el "superacueducto", El Nuevo Día*, 18 de diciembre de 1995, pág. 14; J.J. Pérez, *Llena de "lagunas" la ubicación del superacueducto, El Nuevo Día*, 19 de diciembre de 1995, pág. 7; J. Fernández Colón, *Posible firmen esta semana contrato para Superacueducto, El Nuevo Día*, 27 de diciembre de 1995, pág. 4.

Por otro lado, desde que se inició la tramitación del proyecto del S.A.N., la peticionaria realizó diversas gestiones —entre éstas, visitas a las comunidades afectadas— para divulgar los perfiles del proyecto e informar a la ciudadanía sobre sus posibles repercusiones. Transcripción de vistas públicas de 19 de diciembre de 1995, págs. 53–54 (testimonio del ciudadano Armando Montero). Por último, quedó probado incontrovertiblemente durante las vistas públicas que la peticionaria notificó a más personas de las que serían afectadas definitivamente por la construcción del proyecto. Transcripción de vistas públicas de 18 de diciembre de 1995, págs. 94–95; Transcripción de vistas públicas de 22 de diciembre de 1995, págs. 28 y 98.

hizo la Junta en el caso de autos. Debemos señalar, no obstante, que nuestra determinación en cuanto a los procedimientos de notificación en esta opinión no les impide a quienes pudieran haber sido afectados por la actuación de la Junta presentar las acciones independientes que correspondan.

G. Un asunto que el Tribunal de Circuito de Apelaciones se planteó por cuenta propia fue si la peticionaria siguió el procedimiento reglamentario de enmienda establecido para los casos sobre consultas de ubicación. Según ese foro, a pesar de que el proyecto del S.A.N. sufrió varios cambios después de que se presentó la consulta, la peticionaria nunca sometió ante la Junta una solicitud de enmienda conforme a la Sec. 7.02 del Reglamento de Adjudicación, *supra*.[44]

Según lo describió originalmente la peticionaria en el memorial explicativo que anejó a la solicitud de consulta, el S.A.N. comprendía tres (3) elementos principales: (1) una línea de transmisión de agua desde la cuenca del Río Grande de Arecibo hasta el área metropolitana, (2) una planta de filtración en Arecibo y (3) varias estaciones de bombas. En los avisos de vistas públicas, sin embargo, se consignó que el proyecto tendría dos (2) elementos adicionales: una toma de agua en el Río Grande de Arecibo y varios tanques de almacenamiento de agua. Por último, durante las vistas públicas, la peticionaria explicó que el proyecto incluiría, además, una laguna de retención en Arecibo y dos (2) líneas de transmisión eléctricas.[45] La

---

[44] Esta sección establece que cuando sea necesario hacer cambios al proyecto que alteren la consulta según fue aprobada, la parte proponente deberá presentar una solicitud de enmienda debidamente fundamentada y documentada. La Junta podrá exigir la presentación de una nueva consulta, dependiendo de la naturaleza y magnitud de los cambios propuestos en relación con la consulta original. La presentación de una solicitud de enmienda antes de que la Junta resuelva la consulta original pudiera tener el efecto de reiniciar cualquier trámite interagencial. Sec. 7.02 del Reglamento de Adjudicación, 23 R.P.R. sec. 650.235 (1997).

[45] En esta ocasión se describió el proyecto según se consigna en el primer escolio de esta opinión.

peticionaria aclaró entonces que la laguna de retención se incluyó para garantizar la disponibilidad del agua que se obtendría de la toma del Río Grande de Arecibo. Véanse: Transcripción de vistas públicas de 26 de diciembre de 1995, pág. 8; Transcripción de vistas públicas de 22 de diciembre de 1995, pág. 141; Transcripción de vistas públicas de 18 de diciembre de 1995, págs. 72–73.[46]

Si las variaciones del concepto original del proyecto hacían necesaria la presentación de una solicitud de enmienda, era una cuestión que dependía de los conocimientos especializados tanto de la peticionaria como de la Junta. La ausencia de un requerimiento a estos efectos por parte de la Junta tiene a su favor la presunción de legalidad y corrección de la que son acreedoras las decisiones administrativas. Véase *Murphy Bernabe v. Tribunal Superior*, supra, pág. 699. El Tribunal de Circuito de Apelaciones debió respetar esta presunción ante la falta de impugnación por parte de los recurridos. Véanse: *Catalytic Ind. Maint. v. F.S.E.*, supra, págs. 101–102; *Henríquez v. Consejo Educación Superior*, supra, pág. 210; *M. & B.S., Inc. v. Depto. de Agricultura*, supra, pág. 331. En cuanto a este asunto, el Tribunal de Circuito de Apelaciones no debió apartarse de la norma general de abstenerse de resolver cuestiones no planteadas por las partes. Véanse: *Trabal Morales v. Ruiz Rodríguez*, 125 D.P.R. 340, 351 (1990); *Murcelo v. H.I. Hettinger & Co.*, 92 D.P.R. 411, 426 (1965); *Garaje Rubén, Inc. v. Tribunal Superior*, 101 D.P.R. 236, 242 (1973); *Autoridad Sobre Hogares v. Sagastivelza*, 71 D.P.R. 436, 439 (1950); *Banco Territorial y Agrícola v. Vidal*, 42 D.P.R. 869, 872 (1931).

H. El Tribunal de Circuito de Apelaciones también determinó que la Junta impidió la participación efectiva de la

---

[46] Un estudio titulado "Uso de agua para la generación de energía eléctrica en la cuenca hidrográfica del Río Grande de Arecibo" de 21 de marzo de 1995, el cual constituye el Apéndice B2 de la DIA-F, la cual forma parte del expediente administrativo, corrobora esta información.

ciudadanía durante las vistas públicas al permitir que la peticionaria presentara elementos adicionales del proyecto, sin conceder tiempo suficiente para considerarlos y reaccionar a éstos. Ello, según concluyó el foro apelativo, vició el procedimiento de vistas públicas y constituyó una violación del debido procedimiento de ley.

█ Ciertamente, la Junta se debió asegurar de que en el expediente administrativo constara toda la información pertinente sobre el proyecto cuando convocó a vistas públicas, de manera que los interesados en comparecer pudieran conocer de forma adecuada los perfiles del proyecto y elaborar sus planteamientos de manera informada. Notamos, sin embargo, que esta deficiencia fue subsanada durante las vistas. En éstas, la peticionaria explicó detalladamente los cambios propuestos y ofreció la justificación para éstos. Respecto a la laguna de retención —uno de los elementos del proyecto que mayor preocupación generó durante las vistas— explicó su ubicación, construcción e impacto ambiental.[47] Transcripción de vistas públicas de 22 de diciembre de 1995, págs. 105, 125 y 127–135; Transcripción de vistas públicas de 26 de diciembre de 1995, págs. 8–18.

El oficial examinador de la Junta, por su parte, les indicó en varias ocasiones a los interesados que tenían la oportunidad de presentar por escrito las objeciones pertinentes. Transcripción de vistas públicas de 22 de diciembre de 1995, págs. 114 y 126–127. Señaló, además, una vista adicional a las convocadas, la cual se celebró el 26 de diciembre de 1995. Al concluir esta vista, el oficial examinador concedió un término de diez (10) días para so-

---

[47] Respondiendo a una pregunta del Sr. Max Vidal Vázquez, técnico adscrito al Negociado de Consulta sobre Usos de Terrenos de la Junta, sobre cuál era el propósito de la laguna de retención, Félix García, uno de los ingenieros de la peticionaria, explicó: "Si no tuviéramos esa laguna, ... necesitaríamos un flujo constante por el [R]ío [Grande de Arecibo] que fuera igual a la demanda que nosotros tenemos, que es una demanda continua." Transcripción de vistas públicas de 18 de diciembre de 1995, pág. 72.

meter por escrito cualquier planteamiento adicional antes de dar por sometido su informe.([48]) Transcripción de vistas públicas de 26 de diciembre de 1995, pág. 170. Ante estas circunstancias, nos parece que la Junta concedió a los interesados suficiente oportunidad de ser oídos.([49]) Si bien "[e]l debido proceso de ley ofrece protección contra la arbitrariedad administrativa[,] éste ... no es molde rígido que prive de flexibilidad en toda instancia de los procedimientos de administración". *Rodríguez v. Tribunal Superior*, 104 D.P.R. 335, 340 (1975).

I. El Tribunal de Circuito de Apelaciones determinó, además, que: (1) la Junta había iniciado la evaluación del proyecto —en particular, que estaba celebrando las vistas públicas correspondientes— sin que hubiera concluido el proceso de evaluación ambiental ante la Junta de Calidad Ambiental, (2) algunas de las copias de la declaración preliminar de impacto ambiental (en adelante DIA-P) contenían anejos en inglés y (3) el expediente administrativo no estuvo disponible en el lugar indicado en los avisos de prensa. Estas circunstancias, concluyó, constituyeron deficiencias en la divulgación del proyecto que coartaron la participación efectiva de la ciudadanía durante las vistas públicas.

En cuanto a la simultaneidad de los procesos de evaluación de la consulta de ubicación y ambiental, no existe disposición alguna, ni en el Reglamento de Adjudicación ni en la Ley Orgánica de la Junta de Planificación de Puerto Rico, que obligue a la Junta a posponer la consideración de una consulta de ubicación hasta que la Junta

---

([48]) Esta es una facultad discrecional del oficial examinador. Sec. 8.15 del Reglamento de Adjudicación, 23 R.P.R. sec. 650.236 (1997).

([49]) Entre los participantes, quienes durante las vistas plantearon el asunto de los cambios al proyecto, estuvo el Ing. Iván F. Elías Rodríguez, representante de la entidad recurrida Ciudadanos en Defensa del Ambiente (C.E.D.D.A.). C.E.D.D.A., sin embargo, no reiteró el planteamiento en la moción de reconsideración que presentó ante la Junta, ni en el recurso de revisión ante el Tribunal de Circuito de Apelaciones.

de Calidad Ambiental haya completado la evaluación que le corresponda hacer. Todo lo que exige la Sec. 7.01 del Reglamento de Adjudicación, *supra*, es que la Junta tome en cuenta las consideraciones ambientales del uso propuesto al evaluar la consulta de ubicación. Así lo hizo la Junta.([50])

En cuanto al problema sobre el idioma([51]) de algunas de las copias de la DIA-P disponibles, durante las vistas públicas la peticionaria aclaró que se habían impreso copias tanto en inglés como en español (Transcripción de vistas públicas de 22 de diciembre de 1995, pág. 145) y que tenía disponibles copias en español para los interesados. Transcripción de vistas públicas de 26 de diciembre de 1995, pág. 43.

█ Por último, en cuanto a la accesibilidad del expediente administrativo, el Tribunal de Circuito de Apelaciones entendió que éste no estuvo disponible en los lugares que la Junta anunció a través de la prensa. Cabe señalar, en primer lugar, que la Junta no está obligada a distribuir copias del expediente administrativo de un caso sobre una

---

([50]) Según surge de su resolución, la Junta consideró la Declaración Final de Impacto Ambiental (en adelante DIA-F) al adjudicar la consulta de ubicación. Véase, *e.g.*, Resolución, *supra*, determinación de hecho número 53(g). Hay que señalar, además, que la peticionaria convocó y celebró vistas públicas para divulgar y discutir el contenido de la DIA-P varios meses antes de que la Junta convocara a vistas públicas sobre el S.A.N. Transcripción de vistas públicas de 26 de diciembre de 1995, págs. 43–44; Vol. IV, Ap. I de la DIA-F. Desde el 19 de junio de 1995 la DIA-P estuvo disponible, entre otros lugares, en las oficinas de la peticionaria y en las bibliotecas de los recintos universitarios de los Municipios de Arecibo, Barceloneta, Bayamón, Caguas, Carolina, Cataño, Dorado, Guaynabo, Manatí, San Juan, Toa Alta, Toa Baja, Vega Alta y Vega Baja. Véase la Transcripción de vistas públicas de 22 de diciembre de 1995, pág. 145. Esta información fue divulgada en la prensa. Véanse: Transcripción de vistas públicas de 26 de diciembre de 1995, págs. 38–39 y 43; Transcripción de vistas públicas de 19 de diciembre de 1995, págs. 50–53. Ninguno de estos hechos ha sido controvertido. Además, durante las vistas públicas sobre el S.A.N., el oficial examinador indicó que la DIA-P estaba disponible en el expediente administrativo para quienes quisieran estudiarla. Transcripción de vistas públicas de 18 de diciembre de 1995, págs. 167–168.

([51]) Sobre este aspecto la Sec. 5.3.1 del Reglamento sobre Declaraciones de Impacto Ambiental, Reglamento de la Junta de Calidad Ambiental Núm. 310 de 1ro de junio de 1984 (en adelante Reglamento sobre DIAs), establece que las declaraciones de impacto ambiental se deben redactar en español.

consulta de ubicación que tenga ante su consideración. La Sec. 4.01 del Reglamento de Adjudicación establece que "[c]opia de ... [toda la documentación que se someta en la presentación de una consulta y durante su trámite] podrá ser obtenida para fines legítimos por cualquier persona interesada en la Oficina del Secretario de la Junta mediante el pago previo de los derechos correspondientes".([52]) 23 R.P.R. sec. 650.229 (1997). Según surge de la transcripción de las vistas públicas, el expediente administrativo estuvo a disposición del público en las oficinas de la Junta. Transcripción de vistas públicas de 18 de diciembre de 1995, págs. 91–92; Transcripción de vistas públicas de 26 de diciembre de 1995, pág. 36. En segundo lugar, los avisos de prensa en los cuales convocaron a vistas públicas no indican, como aseveró el Tribunal de Circuito de Apelaciones (Sentencia, pág. 107), que el expediente completo estaría disponible en distintos lugares, sino que "[l]os planos de localización y el propuesto desarrollo [sic]" estarían expuestos al público en varios lugares. Así lo hizo la Junta. Transcripción de vistas públicas de 22 de diciembre de 1995, pág. 126.

J. El Tribunal de Circuito de Apelaciones determinó que la peticionaria no demostró que el proyecto del S.A.N. estuviera conforme con la política pública expresada en los instrumentos de planificación de la Junta, según lo establece, en lo pertinente, la Sec. 4.03 del Reglamento de Adjudicación, *supra*:

> En toda mejora permanente previo a su radicación, la parte proponente verificará la política pública expresada en Planes de Usos de Terrenos, Programa de Inversiones de Cuatro Años, Plan de Desarrollo Integral de Puerto Rico, Mapas de Zonificación o de Zonas Susceptibles a Inundaciones, Planes de Ordenación Territorial adoptados por la Junta y aprobados por el Gobernador, Planes Regionales adoptados por la Junta, Regla-

---

([52]) Esto no significa, por supuesto, que el expediente no pueda ser examinado gratuitamente en la propia agencia.

mentos y demás documentos para asegurar la conformidad de lo propuesto con la política pública vigente. 23 R.P.R. sec. 650.232 (1997).

El Tribunal de Circuito de Apelaciones interpretó que esta disposición le impone a la parte proponente de una consulta de ubicación la obligación de evidenciar ante la Junta la conformidad del proyecto propuesto con los instrumentos mencionados. Erró. Primero, en el texto citado no se usa el verbo "evidenciar", sino el verbo "verificar". Cuando se requiere que la parte proponente de una consulta de ubicación presente evidencia de algún hecho, el Reglamento Adjudicación así lo expresa.[53] Segundo, el lenguaje del párrafo citado sugiere que se trata de la reiteración de la advertencia expresada en el Art. 21 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62t, acerca de que no se autorizará una mejora permanente que esté en conflicto con la política pública establecida en los instrumentos de planificación de la Junta.[54] La parte citada de la Sec. 4.03 lo que hace es anticipar los criterios de evaluación de una consulta de ubicación que se establecen posteriormente en la Sec. 7.01 del Reglamento de Adjudicación, *supra*. Compárese 23 R.P.R. sec. 650.232 (1997) con 23 R.P.R. sec. 650.234 (1997). En este sentido, la Sec. 4.03 del Reglamento de Adjudicación, *supra*, no requiere que la parte proponente haga una determinación específica, mediante la presenta-

---

[53] Véanse, por ejemplo, los párrafos segundo (evidencia de titularidad) y cuarto (evidencia de cumplimiento con la Ley sobre Política Pública Ambiental) de la Sec. 4.03 del Reglamento de Adjudicación, 23 R.P.R. sec. 650.232 (1997).

[54] El Art. 21 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62t, establece, en la parte pertinente:

"... No se autorizará, ayudará o emprenderá, ni en todo ni en parte, ninguna mejora, adquisición, venta o cambio en los usos de terrenos u otras propiedades del Gobierno del Estado Libre Asociado de Puerto Rico o de cualesquiera de sus organismos gubernamentales, o de cualquier servicio público, de propiedad pública, por ningún funcionario u organismo ejecutivo de Puerto Rico, a menos que la posición, naturaleza y extensión propuesta[s] para los mismos no esté en conflicto con lo indicado en el Plan de Desarrollo Integral, el Programa de Inversiones de Cuatro Años y los Planes de Usos de Terrenos de Puerto Rico."

ción de la evidencia correspondiente o mediante una ase-
veración en la solicitud de consulta, de que el proyecto
cumple con la política pública. Es decir, aun cuando la
parte proponente debe asegurarse de que el proyecto que
pretende realizar cumple con la reglamentación y los ins-
trumentos de planificación vigentes, no le corresponde a
ésta, sino a la Junta, adjudicar tal cumplimiento.

K. El Tribunal de Circuito de Apelaciones resolvió,
además, que la resolución que había aprobado la consulta
de ubicación era nula por carecer de determinaciones de
hechos y de conclusiones de derecho sobre los aspectos si-
guientes: (1) la escasez y calidad de agua en Arecibo; (2) el
costo y financiamiento del proyecto; (3) los posibles conflic-
tos entre el proyecto y las obras de otros organismos guber-
namentales; (4) el efecto del proyecto en las zonas arqueo-
lógicas de Vega Baja, Arecibo y Manatí; (5) el efecto del
proyecto en la canalización del Río Manatí, la represa de
Ciales y la construcción del Lago Manatí; (6) el efecto de la
laguna de retención en la canalización del Río Grande de
Arecibo; (7) la ubicación de la laguna de retención en zonas
inundables y de alta productividad agrícola, y (8) la des-
cripción de los terrenos que serían desarrollados.

 Hemos subrayado reiteradamente la importan-
cia de las determinaciones de hecho y las conclusiones de
derecho administrativas para el adecuado ejercicio de la
revisión judicial. Este requisito persigue varios objetivos:

> *Primero*, proporciona[r] a los tribunales la oportunidad de
> revisar adecuadamente la decisión administrativa ...[,]
> [*s*]*egundo*, ... fomenta[r] que la agencia adopte una decisión cui-
> dadosa y razonada dentro de los parámetros de su autoridad y
> discreción ...[, *t*]*ercero*, ayuda[r] a la parte afectada a entender
> por qué el organismo administrativo decidió como lo hizo,
> [permitiéndole decidir de manera informada si] acude al foro
> judicial o acata la determinación [de la agencia] ..., [*c*]*uarto*,
> [promover] la uniformidad intraagencial ... y, [*f*]*inalmente*, ...
> evita[r] que los tribunales nos apropiemos de funciones que
> [les] corresponden propiamente, bajo el concepto de especializa-

ción y destreza (*expertise*), a las agencias administrativas. (Citas omitidas.) *Rivera Santiago v. Srio. de Hacienda*, 119 D.P.R. 265, 276–278 (1987).

Las determinaciones de hecho "deben ser lo suficientemente definidas y ciertas para poner a las cortes en posición de revisar inteligentemente la decisión [del organismo administrativo] y determinar si los hechos tal y como [éste] los encontró probados ... ofrecen una base razonable para [su decisión]". *Godreau & Co. v. Com. Servicio Público*, 71 D.P.R. 649, 655–656 (1950). Véase, además, *López v. Junta Planificación*, supra, pág. 668. Así pues, en su decisión, la agencia debe "exponer los fundamentos de hecho, refiriéndose tanto a los hechos básicos que estimó probados, luego de resolver cualesquier conflictos en la prueba, como a las inferencias de hecho que en última instancia creyó justificadas". *López v. Junta Planificación*, supra, pág. 667. "Lo importante es que las determinaciones se refieran a los hechos básicos, sin que... [la agencia] tenga que... 'anotar' cada conclusión con la evidencia específica presentada." *Hilton Hotels v. Junta Salario Mínimo*, supra, pág. 684. En cuanto a las conclusiones de derecho, la agencia "no puede limitarse a 'recitar' o a repetir frases generales que aparecen en [sus reglamentos o en su ley orgánica] como único fundamento para su decisión". *López v. Junta Planificación*, supra, pág. 669. Las determinaciones de hecho y las conclusiones de derecho, por lo tanto, no pueden ser "pro forma". *Rivera Santiago v. Srio. de Hacienda*, supra, pág. 278.

 Esta norma, sin embargo, no es absoluta e inflexible. *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 1, 3 (1975). Un análisis de nuestra jurisprudencia demuestra que los casos, en los cuales hemos revocado una decisión administrativa por carecer de determinaciones de hecho o de conclusiones de derecho adecuadas, han sido aquellos en los cuales no existe base alguna a partir de la cual efec-

tuar una revisión inteligente.([55]) Véanse, *e.g.*: *Asoc., C.D. Octubre v. J.A.C.L.*, 116 D.P.R. 326, 335 (1985); *Vega Cruz v. Comisión Industrial*, 109 D.P.R. 290, 292 (1979); *Godreau & Co. v. Com. Servicio Público*, supra, pág. 662. Así, pues, en los casos apropiados hemos adoptado como remedio alternativo devolver el caso al foro administrativo para que formule las determinaciones de hecho y las conclusiones de derecho que fundamenten su decisión. Véase *Rivera Santiago v. Srio. de Hacienda*, supra, pág. 278. En otros hemos sancionado la alternativa de permitirle a la agencia presentar una resolución complementaria en el momento que se le notifique un recurso de revisión. Véase *P.N.P. v. Tribunal Electoral*, supra, pág. 3. A la luz de estos principios, evaluamos las deficiencias que el Tribunal de Circuito de Apelaciones le adjudicó a la Junta.

Al comentar la ausencia de determinaciones de hecho en la resolución de la Junta sobre la escasez y calidad de agua en Arecibo y sobre el efecto que el proyecto pudiera tener en las zonas arqueológicas de Vega Baja, Arecibo y Manatí, el Tribunal de Circuito de Apelaciones se refirió a la ponencia de la Senadora Norma Carranza durante la vista celebrada el 22 de diciembre de 1995 en Arecibo. En cuanto a la escasez y calidad de agua de Arecibo, notamos que se trata de un asunto sobre el cual la Senadora Carranza sugirió que se informara mejor a la ciudadanía, precisamente para aclarar que éste no debía generar preocupación.([56]) No

---

([55]) En *López v. Junta Planificación*, 80 D.P.R. 646, 668 (1958) (citando a *Prusik v. Board of Appeal of Boston*, 160 N.E. 312, 314–315 (1928), intimamos que " '[a] menos que [el organismo administrativo] cumpla con [la obligación de formular determinaciones de hecho[s] y conclusiones de derecho que fundamenten su decisión], corre el riesgo de una revocación si este Tribunal no puede determinar a base del récord que existieron razones suficientes y adecuadas para la decisión en cuestión' ".

([56]) El comentario de la Senadora Carranza es, en lo pertinente, el siguiente:

"... [D]esde que surgió esta resolución de investigación y este trabajo nos hemos movido y [le] hemos solicitado al Sr. Pomales una visita personal en nuestras oficinas[. N]os hemos movido ... también ... a las oficinas centrales, en búsqueda de contestaciones a nuestras preguntas, y una de nuestras preguntas era la transferencia y reciprocidad de agua. Anterior a estas visitas que yo he realizado y estas preguntas, pues yo me oponía tenazmente a este superacueducto. En estos momentos, todavía no he tomado una decisión[. S]in embargo, estoy prácticamente endosando el

nos parece que la Junta haya abusado de su discreción al no incluir en su resolución una determinación de hecho sobre los comentarios de la Senadora Carranza.

Por otro lado, la Junta sí consideró la calidad de las aguas de las cuales se alimentaría el sistema del S.A.N. En la Sec. 3.3 de la Declaración Final de Impacto Ambiental (en adelante DIA-F), la cual forma parte del expediente administrativo, se asevera que "[l]a calidad del agua de los principales tributarios del sistema del Río Grande de Arecibo, incluyendo el sistema de Caonillas[-]Dos Bocas[,] fue determinada como parte de las investigaciones ambientales". Se consigna, además, que "[s]e llevó a cabo una evaluación de las condiciones de la calidad del agua superficial en la cuenca hidrol[ó]gica del Río Grande de Arecibo[, y que, debido a que] la localización propuesta para la toma de agua captura las aguas provenientes del Río Grande de Arecibo antes de su confluencia con el Río Tanamá[, i]nformes históricos y pruebas específicas para el Proyecto del S[A]N han demostrado que las aguas de esta fuente son considerablemente más limpias que las aguas que están luego de la interacción con el Río Tanamá". DIA-F, Vol. II, Ap. B6 (Condiciones de la calidad del agua superficial de la cuenca hidrográfica del Río Grande de Arecibo (23 de mayo de 1995)). Esta información fue, en esencia, la misma que se consignó en la DIA-P. Véase la Sec. 3.3 de la DIA-P, pág. 3-20 (junio 1995).

El impacto del proyecto sobre los yacimientos arqueológicos es un tema que fue atendido en varias instancias. En la vista celebrada el 18 de diciembre en Bayamón, el Ing. Ferdinad Quiñones, una de las personas que trabajó en el diseño del proyecto, explicó que se había realizado "un estudio arqueológico intenso en el corredor para asegurarse

---

proyecto ... por las respuestas y recomendaciones que se me han [brindado] .... Sin embargo ... *opino que el público debe ser bien orientado*, porque al final de cuentas, habrán de ser ellos[,] o nosotros todos, lo[s] afectados positiva o negativamente por el proyecto. Esto habrá de requerir de las agencias ... públicas concerni[das], una campaña de educación al pueblo ...." (Énfasis suplido.) Transcripción de vistas públicas de 22 de diciembre de 1995, págs. 35–36.

de que si hay depósitos culturales o estructurales no se afect[en], y si se afectan ... se mitiguen. [S]e utilizaron sistemas de información geográfic[a] para asegurarse de que se analizaba correctamente toda ... [la] información". Transcripción de Evidencia, pág. 44. Respondiendo directamente a los comentarios de la Senadora Carranza sobre este asunto, el ingeniero Quiñones explicó:

> [E]l estudio I-A fue un estudio exhaustivo que incluyó básicamente toda la Zona Norte, no solamente estudiamos el corredor final, sino que se hicieron estudios de todos los depósitos conocidos y se hizo un análisis de sensitividad [sic] para ver cuáles eran las áreas menos sensitivas [sic]. En los momentos en que se esté haciendo el aliniamiento [sic] final de las líneas de transmisión, ... si se determin[a] que hay depósitos significativos, entonces lo que procede es que se haga un estudio I-B, en el cual se determina la magnitud de esos depósitos, se determina la mitigación que se requiere, si es que se fuera a pasar la línea por ese punto.
>
> ... [T]enemos un corredor que tiene hasta un área de 50 pies, un área de servidumbre, eso nos va a permitir[,] en primera instancia, hacer el aliniamiento [sic] final, de modo que se minimice, ... se evite ... el impacto en estos depósitos arqueológicos. Si no hay modo de evitarlo, porque no hay otra ruta, entonces el proceso del estudio arqueológico I-B, ... determina cuál es la mitigación y no se procede con ninguna construcción sobre esa área, hasta tanto ... el Instituto de Cultura y [la] SHPO ... [State Historical Preservation Office] apruebe ese plan de mitigación, y no se puede construir por esa zona, hasta tanto ese plan no se apruebe. Transcripción de vistas públicas de 22 de diciembre de 1995, págs. 90–91.

Los estudios a los que se hace referencia en el pasaje citado se explican tanto en la DIA-F como en la DIA-P. Véanse: DIA-F, *supra*, Vol. I, Sec. 3.6, págs. 3-32 a 3-35, Vol. II, Ap. A, Vol. III, Ap. D;[57] DIA-P, *supra*, Sec. 3.6,

---

[57] Cabe señalar, además, que varias semanas después de que la Junta emitiera la resolución para aprobar la consulta de ubicación se suscribió el *Programmatic Agreement among the United States Army Corps of Engineers, the Advisory Council on Historic Preservation, the Puerto Rico State Historic Preservation Officer, and the Institute of Puerto Rican Culture Regarding Implementation of the North Coast Superacueduct Project* de 13 de agosto de 1996. En este acuerdo se establece el procedimiento que la peticionaria debe seguir para el manejo adecuado de los recursos

págs. 3-29 a 3-30.([58]) Por último, la resolución en la que se aprobó la consulta de ubicación del S.A.N. también trata sobre este asunto. En la determinación de hecho Núm. 34 se consigna que "[s]e desarrollaron estudios arqueológicos intensos en el corredor para la protección de los yacimientos arqueológicos y culturales, y evitar que se impacten de alguna manera[;] de no ser posible se mitigarán los efectos negativos, si alguno". Resolución de la Junta de Planificación de 5 de julio de 1996 (en adelante Resolución de la Junta), pág. 8. En la determinación de hecho Núm. 36 se comenta:

Señaló la parte proponente que el posible punto crítico ambiental del proyecto podría ser si el tubo afectase los mogotes[,] por ser [é]stos recursos protegidos[,] y/o áreas de yacimientos arqueológicos. No especificó las áreas que pu[dieran] tener un posible impacto sobre los recursos arqueológicos pues no se han completado los estudios de la Fase IB, los cuales se encuentran en progreso. De todos modos[,] el Superacueducto, por contar con una servidumbre de 50 metros, tiene la virtud de poder ser relocalizado si se encontrase alg[ú]n recurso o yacimiento que no pueda ser objeto de mitigación. Resolución de la Junta, pág. 8.

---

culturales (*i.e.*, yacimientos arqueológicos, etc.) que encuentre durante la construcción del S.A.N. Este acuerdo constituye el Anejo 4 del Permiso Núm. 199507489 que el Cuerpo de Ingenieros de Estados Unidos le otorgó a la peticionaria el 3 de septiembre de 1996. En el acuerdo participó también el Consejo para la Protección del Patrimonio Arqueológico Terrestre de Puerto Rico. Este Consejo, creado en virtud de la Ley Núm. 112 de 20 de julio de 1988 (18 L.P.R.A. secs. 1551–1566), es "el organismo gubernamental responsable de proteger y custodiar ... [los] recursos arqueológicos [que existan o se encuentren en o bajo la superficie terrestre] y a la vez fomentar el intercambio científico y el estudio de estos valores arqueológicos en armonía con la política pública del Estado Libre Asociado de Puerto Rico". 18 L.P.R.A. sec. 1552.

([58]) El Programa de Arqueología del Instituto de Cultura Puertorriqueña concordó con la información consignada en esta sección de la DIA-P. Véase la Carta de Pedro A. Alvarado Zayas, Director del Programa de Arqueología del Instituto de Cultura Puertorriqueña, a Emilio Colón, Director Ejecutivo de la Autoridad de Acueductos y Alcantarillados de 6 de julio de 1995. La Oficina Estatal de Preservación Histórica, por su parte, expresó alguna preocupación con la fase I-A del estudio sobre los recursos culturales. Propuso, por lo tanto, algunas sugerencias para la realización de la fase I-B siguiente. Véase la Carta de Karen Anderson, Acting State Historic Preservation Officer de la State Historic Preservation Office, a Emilio M. Colón, Director Ejecutivo de la Autoridad de Acueductos y Alcantarillados de 7 de julio de 1995.

En el inciso (f) de la Determinación de Hecho Núm. 53 se comenta que "[e]l Instituto de Cultura Puertorriqueña aprobó la parte de la DIA-P sometida por ... [la peticionaria] que propone la realización de los estudios arqueológicos Fase IB que se requieren para todo proyecto como resultado de la Fase IA". Resolución de la Junta, pág. 13. En la Conclusión de Derecho Núm. 9 se establece que:

El proyecto no tendr[á] un efecto perjudicial sobre los depósitos o yacimientos arqueológicos por existir las alternativas de mitigación[,] ya que el corredor cuenta con una amplitud suficiente para [que pueda ser] relocaliza[do] cuando sea menester. Todo ello en cumplimiento con los Objetivos Específicos del P[lan de] D[esarrollo] I[ntegral] ....

De acuerdo con lo establecido por los proponentes se seleccionó la ruta menos sensitiva a yacimientos arqueológicos. Resolución de la Junta, pág. 16.

Por último, la resolución también dispone la posibilidad de tener que reubicar la línea de transmisión debido al hallazgo de yacimientos arqueológicos durante la construcción del proyecto y preceptúa en la Condición Núm. 2 que "[c]ualquier variación en la alineación de la tubería deberá permanecer dentro de los límites del corredor evaluado en la Declaración de Impacto Ambiental". La Junta, pues, tuvo ante sí evidencia sustancial —la cual obra en el récord administrativo— que sustenta sus determinaciones y conclusiones. Véase, *e.g.*, *Hilton Hotels v. Junta Salario Mínimo*, supra, pág. 687. Los recurridos, por su parte, no señalaron la existencia de otra prueba en el expediente que pudiera reducir o menoscabar el valor probatorio de la evidencia que tuvo ante sí la Junta, hasta el punto de que no fuera posible concluir que la determinación de la agencia fue razonable. *Cf., Metropolitana S.E. v. A.R.Pᴇ.*, supra, págs. 209; *Hilton Hotels v. Junta Salario Mínimo*, supra, pág. 686. Las determinaciones de la Junta en cuanto al impacto del proyecto sobre los recursos culturales, por lo tanto, debieron prevalecer. Véanse: *Henríquez v. Consejo*

*de Educación Superior*, supra, pág. 210; *Murphy Bernabe v. Tribunal Superior*, supra, pág. 699.

Otro asunto, que según el Tribunal de Circuito de Apelaciones recibió un tratamiento inadecuado por parte de la Junta, fue el relacionado con el costo y financiamiento del proyecto. Tanto la Ley Orgánica de la Junta de Planificación de Puerto Rico como el Reglamento de Adjudicación establecen que no se podrá autorizar una mejora pública que no esté dispuesta en el Programa de Inversiones de Cuatro Años, a menos que el Gobernador la apruebe. Art. 15 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62n; Sec. 4.03 del Reglamento de Adjudicación, 23 R.P.R. sec. 650.232 (1997).

En su resolución, la Junta consignó que el costo del proyecto sería de trescientos cinco millones de dólares ($305,000,000), (Determinación de Hecho Núm. 10) y que "[l]os gastos de adquisición de terrenos, diseño, construcción y operación del Superacueducto serían sufragados en su totalidad con fondos del Estado Libre Asociado de Puerto Rico ... y de la AAA". Íd. Determinación de Hecho Núm. 48, Resolución de la Junta, pág. 10. No hay en la resolución, sin embargo, referencia alguna a la inclusión del proyecto en el Programa de Inversiones de Cuatro Años correspondiente al cuatrienio de 1994–1995 a 1997–1998 (en adelante P.I.C.A. 1994–1998).[59] Por esta razón, el Tribunal de Circuito de Apelaciones dictaminó que aun cuando no dudaba que el S.A.N. hubiera obtenido la autorización expresa del Gobernador, "alguna expresión a estos

---

[59] Cabe señalar que el Programa de Inversiones de Cuatro Años correspondiente al cuatrienio 1994–1995 a 1997–1998 (en adelante P.I.C.A. 1994–1998) se aprobó en junio de 1994 cuando aún no se había presentado la consulta de ubicación del proyecto. El S.A.N., sin embargo, fue incluido en el Programa de Inversiones de Cuatro Años correspondiente al cuatrienio de 1997–1998 a 2000–2001, aprobado en agosto de 1996.

efectos debió incluirse en la resolución".([60]) Sentencia del Tribunal de Circuito de Apelaciones, pág. 118. Erró.

Aun cuando el S.A.N. no aparece planteado en el P.I.C.A. 1994–1998 y no hay en la resolución de la Junta una referencia a la autorización del Gobernador, encontramos que el S.A.N. sí fue debidamente considerado entre los proyectos gubernamentales que serían desarrollados a partir de 1995 con el aval del Gobernador. Véanse, *e.g.*: Oficina de Gerencia y Presupuesto del Gobierno del Estado Libre Asociado de Puerto Rico, *Presupuesto aprobado año fiscal 1995–1996*, pág. V.134; Junta de Planificación, *Proyecciones económicas a largo plazo: años fiscales 1995 al 2000*, pág. 24 (diciembre 1995); Mensaje del Gobernador Pedro Rosselló ante la quinta sesión ordinaria de la decimosegunda Asamblea Legislativa de 24 de enero de 1995, pág. 31; Mensaje del Gobernador Pedro Rosselló ante la séptima sesión ordinaria de la decimosegunda Asamblea Legislativa de 23 de enero de 1996, pág. 29. Todos estos documentos demuestran que el Gobernador había autorizado la construcción del proyecto.

Por otro lado, durante las vistas públicas sobre el pro-

---

([60]) El Tribunal de Circuito de Apelaciones también determinó que el costo del proyecto y la disponibilidad y procedencia de los fondos para sufragarlo recibieron sólo "un tratamiento superficial". Sentencia del Tribunal de Circuito de Apelaciones, pág. 119. Por lo tanto, entró a cuestionar la información ofrecida por la peticionaria durante las vistas, así como la información consignada en la resolución de la Junta y en la DIA-F, en relación con el costo y financiamiento del proyecto. Al hacerlo, el Tribunal de Circuito excedió el alcance de su facultad revisora. Ya en nuestra opinión en *Misión Ind. P.R. v. A.A.A.*, supra, págs. 687–688, habíamos indicado que "la determinación de si la construcción del S.A.N. es la mejor solución, si resolverá o no el problema de la escasez de agua, o si el dinero que entraña este proyecto podría ser mejor utilizado, son consideraciones de política pública propias de las Ramas Ejecutiva y Legislativa". Todo lo que requiere el Reglamento de Adjudicación es que la Junta considere el costo del proyecto y la procedencia de fondos al evaluar una consulta de ubicación sobre una mejora pública. Véase la Sec. 7.01 del Reglamento de Adjudicación, *supra*. La decisión de invertir en un proyecto de infraestructura como el S.A.N. es una de política pública que les corresponde tomar a las ramas políticas del Gobierno y con la cual los tribunales no deben intervenir. *Berberena v. Echegoyen*, 128 D.P.R. 864, 881–882 (1991) (los tribunales no deben evaluar la sabiduría o los beneficios públicos de una legislación, ni revisar los criterios usados por las ramas políticas del Gobierno al formular la política pública y establecer prioridades fiscales); *Misión Industrial v. Junta de Planificación*, supra, pág. 673.

yecto, la peticionaria explicó que el S.A.N. se había propuesto en sustitución de nueve (9) proyectos de mejoras permanentes, los cuales *ya habían sido presupuestados.* Explicó, además, que el S.A.N. era la mejor alternativa a estos proyectos, ya que se podía construir en un tiempo y a un costo menores y con una capacidad de distribución de agua mayor. Véanse, *e.g.*: Transcripción de vistas públicas de 18 de diciembre de 1995, págs. 11–12; Transcripción de vistas públicas de 19 de diciembre de 1995, págs. 14–16 y 21. La Junta consignó esta información en las Determinaciones de Hechos Núms. 9–11 de su resolución.[61]

El Tribunal de Circuito de Apelaciones determinó, además, que la resolución de la Junta no contiene determinaciones de hecho ni conclusiones de derecho sobre posibles conflictos entre el proyecto del S.A.N. y las obras de otros organismos gubernamentales. El tribunal se refirió específicamente a un posible conflicto entre el proyecto del S.A.N. y un proyecto turístico del gobierno municipal de Utuado en el área de los lagos Dos Bocas y Caonillas.

La Sec. 7.01 del Reglamento de Adjudicación, *supra*, establece efectivamente que la Junta debe tomar en consideración la posibilidad de conflicto entre el proyecto propuesto y las obras de otros organismos gubernamentales. Así lo reconoció la Junta en la Conclusión de Derecho

---

[61] Las Determinaciones de Hechos Núms. 9 a 11 de la Resolución de la Junta relacionan lo siguiente:

"9. El Superacueducto sustituye unos nueve proyectos que la AAA tenía programados para construirse. El más significativo de estos nueve proyectos lo era una toma de agua en el Río Grande de Manatí, un embalse, una planta de filtración y una línea de transmisión hacia la Zona Metropolitana incluyendo los municipios que se encuentren en el corredor. Este proyecto hubiera resultado muy costoso y el tiempo de construcción se estima en uno de quince a veinte años. Los otros proyectos de mejoras a los sistemas existentes conjuntamente con el de la Toma del Río Grande de Manatí costarían al erario público más de 400 millones de dólares.

"10. El Superacueducto[,] de acuerdo con las cifras finales ya negociadas[,] conllevará un costo de 305 millones de dólares y será un mejor proyecto en términos de mayor rendimiento de caudal si se compara con los proyectos sustituidos.

"11. El Superacueducto proveerá a todos los municipios del corredor agua potable hasta el 2050 a un costo menor y a relativamente corto plazo en comparación con los proyectos y programas descartados que, en adición a que no resuelven el problema de abasto, son más costosos." Resolución de la Junta, págs. 3–4.

Núm. 3 de su resolución. Esta conclusión, sin embargo, se limitó a repetir lo consignado en la Sec. 7.01 del Reglamento de Adjudicación, *supra*, contrario a la norma establecida en *López v. Junta Planificación*, supra, pág. 669. No obstante, la Junta aseveró lo siguiente:

> Esta consulta de ubicación ha sido examinada y analizada a la luz de la información suministrada por el Proponente y de las disposiciones de leyes, reglamentos y normas de planificación vigentes. También se ha dado consideración a las proyecciones poblacionales y a la disponibilidad de terrenos apropiados para la construcción de vivienda y otros usos en la zona que comprende el proyecto propuesto.
>
> Del examen y análisis hecho se desprende que es viable el desarrollo de los terrenos ... descritos para el uso propuesto .... Apéndice, pág. 344.

Luego de examinar detalladamente la resolución de la Junta, así como la transcripción de las vistas públicas, encontramos que existen razones suficientes y adecuadas para la decisión de la Junta. Aun cuando en la resolución no se consigna específicamente que el proyecto del S.A.N. no afectará el desarrollo de otras obras gubernamentales, sí se asevera que el S.A.N. no afectará desfavorablemente los lagos Dos Bocas y Caonillas.[62]

---

[62] A estos efectos, las Determinaciones de Hecho Núms. 27, 31, 32 y 37 de la resolución establecen lo siguiente:

"27. Para determinar cu[á]nta agua gana el sistema Caonillas-Dos Bocas se realizó un estudio de rendimiento seguro con el rendimiento del Río Tanamá y otros afluentes en la zona. Se analizó toda la lluvia que cae en la cuenca, se calculó el rendimiento en la salida de la presa donde la A[utoridad de] E[nergía] E[léctrica] genera electricidad y se realizó un estudio de la cantidad de agua que el acuífero descarga hacia el río.

. . . . . . .

"31. Los cambios en los niveles de Dos Bocas y Caonillas van a ser mínimos especialmente en Caonillas, el cual suple a Dos Bocas y sus niveles varían. Una vez se permita el uso de las aguas para la generación de electricidad así como la descarga de [é]stas al Superacueducto, los cambios en los niveles serán menores.

"32. Los estudios de flora y fauna a través del corredor incluyeron el análisis de los niveles de oxígeno en el estuario para no afectar el ecosistema[,] así como la posibilidad de la existencia de especies en peligro de extinción o protegidas. Se desarrolló un plan de manejo de la cuenca y reducir la sedimentación tanto en Dos Bocas como Caonillas. Se llevó a cabo un modelo hidráulico para el Río Grande de Arecibo para asegurarse de [que é]ste es capaz de suplir el agua que se necesita.

Durante las vistas públicas, por último, la peticionaria explicó que el S.A.N. no impediría el desarrollo del proyecto turístico en Utuado. Transcripción de vistas públicas de 19 de diciembre de 1995, págs. 96–99; Transcripción de vistas públicas de 22 de diciembre de 1995, págs. 156–157; Transcripción de vistas públicas de 26 de diciembre de 1995, págs. 53–54 y 162–63.

Ante estas circunstancias, la ausencia de una determinación específica sobre la ausencia de conflicto entre el S.A.N. y el proyecto turístico en Utuado no era una razón suficiente para invalidar la resolución de la Junta. *Hilton Hotels v. Junta Planificación*, supra, pág. 684.

El Tribunal de Circuito de Apelaciones consideró, además, que la Junta debió incluir en su resolución una determinación sobre "los problemas, si algunos, que el S.A.N. ocasionaría ... [en el] proyecto de canalización del Río Manatí, la represa de Ciales y la construcción del Lago Manatí". Sentencia del Tribunal de Circuito de Apelaciones, pág. 116. Erró. Estos proyectos estuvieron comprendidos entre las alternativas para atender la necesidad de agua potable consideradas y descartadas por la peticionaria (Transcripción de vistas públicas de 22 de diciembre de 1995, págs. 155–160), y se discuten específicamente en la DIA-F, la cual fue evaluada por la Junta durante el proceso de adjudicación de la consulta de ubicación. DIA-F, *supra*, Vol. I, Secs. 2.1.3.4, 2.1.3.8 y 2.1.4.3. La Determinación Núm. 9 de la resolución de la Junta consigna el hecho de la sustitución de estos proyectos. En cuanto al efecto que pudiera tener la construcción de la laguna de retención o de almacenaje que forma parte del proyecto del S.A.N. en la canalización del Río Grande de Arecibo, durante la vista celebrada el 22 de diciembre de 1995 la peticionaria explicó

---

"37. Lago Dos Bocas es casi en s[u] totalidad utilizado para la generación de electricidad (99% del caudal) para luego descargar en el mar a un ritmo promedio de 1,000 MGD. Este abasto ... es el que propone utilizar el Superacueducto sin menoscabo de la producción de energía hidroeléctrica." Resolución de la Junta, págs. 6–8.

que ambos proyectos eran independientes y que el proyecto de canalización no estaba a su cargo, sino a cargo del Cuerpo de Ingenieros de Estados Unidos. Transcripción, págs. 134–135.[63] La Junta, pues, no abusó de su discreción al no hacer una determinación sobre estos hechos en su resolución.

Cabe señalar, como fundamento adicional para confirmar la resolución de la Junta en cuanto a los problemas discutidos hasta ahora —*i.e.*, la escasez y calidad de agua en Arecibo, el costo y financiamiento del proyecto, los posibles conflictos entre el proyecto y las obras de otros organismos gubernamentales, el efecto del proyecto en las zonas arqueológicas de Vega Baja, Arecibo y Manatí, el efecto del proyecto en la canalización del Río Manatí, la represa de Ciales y la construcción del Lago Manatí y el efecto de la laguna de retención en la canalización del Río Grande de Arecibo— que ninguno fue planteado por los recurridos en su recurso de revisión ante el Tribunal de Circuito de Apelaciones.

L. El Tribunal de Circuito de Apelaciones resolvió que la Junta actuó en contravención de su ley orgánica y sus reglamentos al aprobar la ubicación de la laguna de retención en una zona inundable y de alta productividad agrícola. Tanto la Ley Orgánica de la Junta de Planificación de Puerto Rico como el Reglamento de Adjudicación le imponen a la Junta el deber de considerar la conformidad de un proyecto de mejora pública con los instrumentos de planificación vigentes en el proceso de adjudicación de la consulta de ubicación correspondiente. Véanse: Art. 21 de

---

[63] La DIA-F también atiende esta interrogante:

"El proyecto del Cuerpo de Ingenieros, el cual no será afectado por las obras del Superacueducto, está diseñado para controlar las inundaciones más altas en el río. Varias corrientes laterales de agua serán canalizadas, pero la mayoría de las ramificaciones principales permanecerá. El estudio reciente sobre la hidrología del valle inferior, escrito por Gregg Morris como un anejo del Apéndice K de esta DIA-F, provee más evidencia de que estos proyectos no configen entre sí." DIA-F, *supra*, Vol. IV, Ap. K, pág. 1–1.2.

la Ley Orgánica de la Junta de Planificación, *supra*; Sec. 7.01 del Reglamento de Adjudicación.

■■■ En cuanto al desarrollo agrícola, la Junta ha establecido, como parte de su política pública, "[r]etener exclusivamente para usos agrícolas los terrenos de alta productividad agrícola". Sólo se podrá "[d]estinar estos terrenos a otros usos ... cuando se demuestre que no existen otros terrenos alternos para la ubicación de una actividad no-agrícola que es apremiante y de importancia para el desarrollo del país". Sec. 9.01 de los Objetivos y políticas públicas del Plan de Usos de Terrenos de Puerto Rico de 31 de octubre de 1995 (23 R.P.R. sec. 650.833(1) (1997)) (en adelante Objetivos y Políticas Públicas). En cuanto al desarrollo de la infraestructura, la Junta ha establecido la política pública siguiente:

> Promover infraestructura para atender el problema de escasez relativa al agua potable y estimular el manejo eficiente de este recurso de agua para mejorar la calidad de vida y lograr:
> (1) El desarrollo de cada uno de los componentes que integran las actividades socio-económicas entre éstos: el turismo, la industria, el comercio, la construcción y la agricultura.
>
> . . . . . . . .
>
> (3) Aumentar y mejorar la infraestructura de distribución de agua potable dirigido a la interconexión de los sistemas y la integración del mismo en áreas donde sea factible. Sec. 20.000 de los Objetivos y Políticas Públicas, 23 R.P.R. sec. 650.847 (1997).

El Tribunal de Circuito de Apelaciones determinó que:

> ... No hay en la resolución una sola determinación de hecho o conclusión de derecho en cuanto al cambio de uso de los terrenos [agrícolas] afectados [por la construcción de la laguna de almacenaje]. Tampoco la hay en cuanto a la aplicación de la única excepción que reconoce la política pública, según la cual se podrá destinar estos terrenos a otros usos "sólo cuando se demuestre que no existen otros terrenos alternos" y que "la actividad noagrícola es apremiante y de importancia para el desarrollo del país".
> Si bien podría implicarse de la resolución que la Junta determinó lo segundo, no se presentó prueba ni se discutió ni se

produjo determinación alguna en cuanto a lo primero. (Cita omitida.) Sentencia, pág. 117.

Una lectura cuidadosa de la resolución de la Junta demuestra, sin embargo, que el Tribunal de Circuito de Apelaciones se equivocó en su apreciación.

La Determinaciones de Hecho Núms. 2–5 consignan la urgencia de atender la insuficiencia del abasto de agua potable en el país. Las Determinaciones de Hecho Núms. 15–21 describen detalladamente este problema y cómo el proyecto del S.A.N. contribuirá a solucionarlo. La Determinación de Hecho Núm. 12 asevera que "[e]l Superacueducto integrará las tres cuencas hidrográficas más grandes con que cuenta la isla y donde más precipitación pluvial existe durante el año". Resolución de la Junta, pág. 4. La Determinación de Hecho Núm. 26 consigna que "[c]on el proyecto ... [del S.A.N.] los abastos de agua aumentarían en 100 MGD[, permitiéndole] a la AAA hacer las mejoras necesarias en los sistemas existentes". Íd., pág. 6. A base de estas determinaciones, la Junta concluyó lo siguiente:

4. Deben armonizarse las disposiciones del P[lan de] D[esarrollo] I[ntegral] y el P[lan de] U[sos de] T[errenos] en materia de programación de obras de infraestructura. En las últimas décadas Puerto Rico ha experimentado un patrón de crecimiento que demanda un desarrollo paralelo de áreas comerciales, estacionamiento, sistemas de acueducto, plantas de tratamiento y otros. En el pasado se han construido obras de riego, plantas hidroeléctricas, sistemas de acueducto, además de sistemas viales regionales y locales. La necesidad de nuevos sistemas de abasto de agua potable a raíz de la sequía ocurrida en el país durante el año fiscal 1994–95 hizo necesaria la reestructuración de los programas de infraestructura para este servicio. El P[lan de] D[esarrollo] I[ntegral] contempla el que se utilice la programación y construcción de la infraestructura como uno de los instrumentos para ordenar y promover el desarrollo integral .... Coetáneamente con la utilización óptima del recurso agua se reconoce la necesidad de proteger los abastecimientos y su calidad .... A esos fines se protegerán los acuíferos mediante la reglamentación efectiva que se adopte. El programa de desarrollo de obras de recolección y almacena-

miento se implantará velando por la conservación de las cuencas hidrográficas.

5. Un documento fundamental de planificación, Objetivos y Políticas Públicas del Plan de Usos de Terrenos, en su Política Pública 20.00 dispone:

"Promover infraestructura para atender el problema de *escasez relativa al agua potable* y estimular el manejo eficiente de este recurso para mejorar la calidad de vida."

Con esta política pública se pretende fomentar la actividad económica, turística, industrial, comercial y agrícola. Se proyecta el incremento de los abastos de agua mediante rehabilitación y mantenimiento de los embalses existentes con las obras de rehabilitación con carácter prioritario. Conjuntamente con las obras de rehabilitación de los embalses, el P[lan de] U[sos de] T[errenos] tiene también como propósito primordial:

"*Aumentar y mejorar* la infraestructura de distribución de agua potable dirigido a la *interconexión* de los sistemas y la integración del mismo en áreas donde *sea factible*."[64]

. . . . . . . .

Examinadas en conjunto las políticas públicas de los instrumentos de planificación observamos que el proyecto es cónsono con:

a. La política pública de interconexión de los sistemas pues integra mediante un plan a corto plazo las zonas de más alta precipitación pluvial de la costa norte a los sistemas de distribución de la Zona Metropolitana.

Como se puede apreciar, la Junta, al evaluar el proyecto, concluyó que éste estaba conforme con la política pública establecida respecto al desarrollo de infraestructura —Sec. 20.00 de los Objetivos y Políticas Públicas, *supra*— y que éste contribuiría a solucionar el problema apremiante de la escasez de agua potable en el área metropolitana de San Juan. Podemos inferir razonablemente que la Junta, al hacer esta determinación, juzgó prioritario implementar esta política pública sobre la de "[r]etener exclusivamente para usos agrícolas los terrenos de alta productividad agrícola". Sec. 9.01 de los Objetivos y Políticas Públicas, *supra*. Al decidir de esta manera, pues, la Junta

---

[64] Aun cuando la Junta se refiere a este documento como el Plan de Usos de Terrenos, la cita es de *Objetivos y políticas públicas del Plan de Usos de Terrenos de Puerto Rico*.

optó, de acuerdo con su experiencia y conocimientos especializados, entre dos (2) aspectos de la política pública que ella misma ha establecido. Su determinación debió ser sostenida.

El Tribunal de Circuito de Apelaciones determinó también que la Junta actuó ilegalmente al aprobar la construcción de la laguna de retención en una zona 1 susceptible a inundaciones, sin un estudio hidrológico-hidráulico y sin considerar lo inundable de los terrenos correspondientes. Ésta, sin embargo, era una controversia que se había tornado académica antes de que el Tribunal de Circuito de Apelaciones expidiera el auto de revisión.

En virtud del Art. 7 de la Ley para el Control de Edificaciones en Zonas Susceptibles a Inundaciones, Ley Núm. 3 de 27 de septiembre de 1961, según enmendada, 23 L.P.R.A. sec. 225f, la Junta adoptó el Reglamento Núm. 13 sobre Zonas Susceptibles a Inundaciones de 15 de diciembre de 1971 (23 R.P.R. secs. 650.3351–650.3373 (1997)), cuya última versión revisada es de 3 de abril de 1992 (en adelante Reglamento de Zonas Inundables). La Sec. 2.01(53) de este reglamento define "zonas inundables" como "[a]quellos terrenos que tendrían uno (1%) por ciento de probabilidad de ser inundados en cualquier año". 23 R.P.R. sec. 650.3361(53) (1997). La Sec. 6.01(A)(1) de este reglamento establece que:

> ... [N]o se permitirá en ... zona [1]([65]) la ubicación de nuevas estructuras, relleno, mejoras sustanciales y otros desarrollos, a menos que se demuestre, mediante la realización de un estudio hidrológico-hidráulico que utilice las mejores prácticas de ingeniería, que el propuesto desarrollo no resultará en aumento en los niveles del cauce mayor([66]) durante un evento de descarga

----

([65]) La clasificación de zona 1 "[i]ncluye los terrenos que ubiquen dentro de los límites del cauce mayor". Reglamento Núm. 13 sobre Zonas Susceptibles a Inundaciones de 15 de diciembre de 1971 (en adelante Reglamento de Zonas Inundables), 23 R.P.R. sec. 650.3364(B)(1) (1997).

([66]) "Cauce mayor" se define como "[e]l lecho de un río, quebrada, arroyo o drenaje pluvial natural y aquellas porciones de terrenos adyacentes que se deben reservar para descargar la inundación base sin aumentar acumulativamente la ele-

de una inundación base.[67] Si esto probara ser posible, toda nueva construcción o mejora sustancial cumplirá con los requisitos aplicables para mitigar los efectos de las inundaciones. 23 R.P.R. sec. 650.3365(A)(1) (1997).

La Sec. 2.01(16) del Reglamento de Zonas Inundables, por su parte, define "desarrollo" como "[c]ualquier cambio hecho por el hombre a propiedades mejoradas o sin mejorar, incluyendo, pero sin limitarse a, edificios u otras estructuras, minería, dragado, relleno, nivelación, pavimentación, excavación; perforaciones o almacenaje de equipo y materiales localizadas dentro de una zona susceptible a inundaciones". 23 R.P.R. sec. 650.3361(16) (1997).

Como parte de los incidentes procesales previos a la expedición del auto de revisión, la peticionaria le sometió al Tribunal de Circuito de Apelaciones un estudio hidrológico-hidráulico que se completó luego de que la Junta adjudicara la consulta de ubicación del S.A.N. Este estudio concluyó que la construcción de la laguna de retención no aumentaría los niveles del cauce mayor dentro del parámetro de una inundación con un período de frecuencia de cien (100) años. Al contrario, según el estudio, la construcción de la laguna contribuiría a aliviar lo inundable del área baja del Río Grande de Arecibo. Véase *Hidrologic and Hydraulic Analysis*, págs. i, 17 (octubre 1996). El Tribunal de Circuito de Apelaciones, no obstante, determinó que el estudio no formaba parte del expediente administrativo. Sentencia, pág. 2.

No obstante el Tribunal de Circuito de Apelaciones se tenía que limitar a lo contenido en el expediente del caso *E.L.A. v. Mercado Carrasquillo*, 104 D.P.R. 784, 789–790

---

vación superficial de las aguas por más de 0.30 metros ... en áreas no desarrolladas o de 0.15 metros en áreas desarrolladas, según determinada por un estudio hidrológico-hidráulico". Sec. 2.01(11) del Reglamento de Zonas Inundables, 23 R.P.R. sec. 650.3361(11) (1997).

[67] "Inundación base" se define como aquella "que tiene un uno (1%) por ciento de probabilidad de ser igualada o excedida en un año dado. Se conoce como una inundación con un período de recurrencia de 100 años". Sec. 2.01(29) del Reglamento de Zonas Inundables, 23 R.P.R. sec. 650.3361(29) (1997).

(1976), la presentación del estudio hidrológico-hidráulico realizado por la peticionaria constituyó un cambio fáctico durante el trámite judicial que tornó en académica la controversia sobre la ubicación de la laguna de retención. Véase *Com. de la Mujer v. Srio. de Justicia*, supra, págs. 724–725.

Si el Tribunal de Circuito de Apelaciones tenía dudas sobre si el estudio era o no adecuado, o sobre si éste satisfacía o no las disposiciones del Reglamento de Zonas Inundables, pudo solicitarles a las partes que se expresaran al respecto por escrito o en una vista. El Tribunal de Circuito de Apelaciones erró al rehusarse a considerar el estudio y emitir una opinión sobre una controversia que, según se desprende de las conclusiones del estudio, se había tornado académica. Véase *El Vocero v. Junta Planificación*, supra, págs. 124–126.

M. El Tribunal de Circuito de Apelaciones concluyó que la resolución de la Junta carecía de validez porque en ella no se describieron específicamente los terrenos que serían usados en la construcción del S.A.N. No obstante, de la resolución surge que la Junta evaluó la ubicación de los terrenos y constató su viabilidad y conformidad con la legislación y reglamentación aplicables. Resolución de la Junta, págs. 17–18. Aun cuando la Junta no describió detalladamente los terrenos en las determinaciones de hecho de su resolución, sí hizo referencia en ésta a los mapas que anejaba —los cuales constan en el expediente administrativo— en los que se ilustran la ubicación y ruta de los componentes. Íd.

La única controversia que surgió durante la celebración de las vistas, en cuanto a la especificidad de los terrenos donde se ubicaría el proyecto, trató sobre el corredor de la línea de transmisión. Sobre este asunto, en el memorial que presentó ante la Junta conjuntamente con la solicitud de consulta del proyecto, la peticionaria explicó lo siguiente:

Se identificó la servidumbre de paso de la [carretera] PR-22 como la ruta base preferida y preseleccionada para la mayor parte de la línea. Esto fue seleccionado así debido a que muchos de los factores ambientales ya habían sido considerados al seleccionar la ruta para dicha carretera. El corredor de doscientos (200) metros paralelo a la PR-22 impacta tres (3) áreas ambientales sensitivas por lo cual se identificaron otros corredores específicos. Otros corredores paralelos y rutas potenciales de la tubería que fueron identificados durante los estudios de sensibilidad ambiental también fueron evaluados para la construcción de la misma. La evaluación sobre el potencial de construcción fue hecha tomando en consideración que para un proyecto de un acueducto de esta magnitud hay áreas donde la construcción será bien difícil debido al espacio limitado, las configuraciones topográficas, los suelos o las condiciones de las rocas, etc.

El memorial continúa describiendo cada una de las rutas alternas. En la DIA-F se consigna la misma información y se describen los estudios realizados para evaluar las rutas seleccionada y las alternas. Se ilustran, además, mediante mapas la ubicación de estas rutas y su relación con los recursos naturales y culturales en las áreas correspondientes. DIA-F, *supra*, Vol. I, Sec. 6.2.3, págs. 6-6 a 6-7, y Vol. II, figs. 1-72.([68])

La Junta, por su parte, tomó esta información en consideración al evaluar la consulta, según se desprende de las Determinaciones de Hecho Núm. 36, Resolución de la Junta, págs. 8 ("[E]l Superacueducto, por contar con una servidumbre de 50 metros, tiene la virtud de poder ser relocalizado si se encontrasen algún recurso o yacimientos arqueológicos que no puedan ser objeto de mitigación.")([69]) y 47 ("La servidumbre de paso de la tubería en la PR-22 podrá variar."). Íd., pág. 10. Además, la Junta condicionó el proyecto a que "[c]ualquier variación en la alineación de la tubería deber[á] permanecer dentro de los límites del co-

---

([68]) Parte de esta información también aparece en la DIA-P. Véase, DIA-P, *supra*, Sec. 6.2.3, pág. 6-5 y figs. 6.2-2 a la 6.2-6.

([69]) Esto también se explicó durante las vistas públicas. Véase, *e.g.*, Transcripción de vistas públicas de 18 de diciembre de 1995, págs. 77–78.

rredor evaluado en la Declaración de Impacto Ambiental".
Íd., pág. 19.

No nos parece que la Junta haya actuado de forma arbitraria ni en abuso de su discreción al tomar su decisión. Su determinación, por lo tanto, debió merecerle deferencia al Tribunal de Circuito de Apelaciones. Véanse, *e.g.*: *Quiñones v. San Rafael Estates, S.E.*, supra, pág. 759; *García Oyola v. J.C.A.*, supra, pág. 662; *Murphy Bernabe v. Tribunal Superior*, supra, pág. 699.

N. Por último, el Tribunal de Circuito de Apelaciones concluyó que la Junta actuó en forma ilegal y *ultra vires* al no resolver las controversias relacionadas con los posibles impactos ambientales del proyecto planteadas por agencias federales y estatales, y por la ciudadanía en general. Erró.

La Sec. 19 del Art. VI de la Constitución de Puerto Rico, *supra*, pág. 379, establece:

> Será política pública del Estado Libre Asociado de Puerto Rico la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad; la conservación y mantenimiento de los edificios y lugares que sean declarados de valor histórico o artístico por la Asamblea Legislativa; reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social.

Esta disposición comprende tres (3) recomendaciones de la Comisión de Disposiciones Transitorias y Asuntos Generales sobre Asuntos Generales de la Convención Constituyente —véase J. Trías Monge, *Historia Constitucional de Puerto Rico* 1ra ed., Río Piedras, Ed. Universitaria, 1982, Vol. III, pág. 235— y, como se puede apreciar, el carácter imperativo del lenguaje usado en su redacción varía en grado en cada una de las tres (3) cláusulas. La primera cláusula, relacionada con la conservación de los recursos naturales, está redactada de manera tersa e incondicional.

Al contrario, en las otras dos (2) cláusulas se condiciona el mandato general de la sección a ciertas circunstancias. En la segunda se condiciona la política pública de conservación y de mantenimiento de los edificios y lugares de valor histórico o artístico a los que hayan sido declarados como tales por la Asamblea Legislativa. En la tercera se condiciona la reglamentación de las instituciones penales para posibilitar la rehabilitación de los confinados a la disponibilidad de recursos.

En cuanto a la conservación de los recursos naturales, la Comisión de Disposiciones Transitorias y Asuntos Generales sobre Asuntos Generales consignó en su informe presentado ante la Convención Constituyente lo siguiente:

> Es nuestro propósito señalar con absoluta claridad la conveniencia y necesidad de que se conserven los recursos naturales en Puerto Rico. Siendo Puerto Rico una isla y teniendo pocos recursos naturales, debe haber una preocupación constante por parte del Estado en el uso, desarrollo, aprovechamiento y conservación de los mismos. La conservación de la tierra, los bosques, los peces, las aguas, las aves, las minas y las salinas, entre otros, debe ser una de las funciones primordiales de nuestro Gobierno. Diario de Sesiones, *supra*, Vol. 4, pág. 2622.

Sin embargo, en cuanto a la conservación y el mantenimiento de los edificios y de los lugares declarados de valor histórico o artístico, al igual que en relación con la rehabilitación de los reclusos, la Comisión consignó expresamente en su informe que sus recomendaciones constituían una "directriz de carácter general". Diario de Sesiones, *supra*, págs. 2623 y 2624.

Las recomendaciones de la Comisión comprendidas actualmente en la Sec. 19 del Art. VI de la Constitución del E.L.A., *supra*, fueron aprobadas sobre la objeción del delegado Jaime Benítez, quien solicitaba su eliminación por entender que éstas trataban sobre asuntos que eran de la competencia de la Asamblea Legislativa y a las cuales no se les debía otorgar rango constitucional por constituir sólo una exhortación. Diario de Sesiones, *supra*, Vol. 3, págs.

2114–2115. En el debate interno de la Convención, el Delegado Santiago Polanco Abréu respondió a esta objeción y aseveró: "No hay un error teórico. Estamos estructurando algo, la conservación del recurso natural. Puerto Rico es una isla. Debemos tener preocupación." Íd., pág. 2116.

Conscientes de esta preocupación, hemos expresado que la Sec. 19 del Art. VI de nuestra Constitución, *supra*, "no se reduce a un mero postulado de principios" y que, por lo tanto, su importancia "no debe ser menospreciada". *Paoli Méndez v. Rodríguez*, supra, pág. 460. Véanse, además: *Misión Ind. P.R. v. J.P. y A.A.A.*, supra, pág. 676; *Colón Ventura v. Méndez, Depto. Recursos Naturales*, supra, pág. 448. La política pública sobre los recursos naturales enunciada en esta disposición constitucional "[e]s una protección frente al Estado, la sociedad, el gobierno e incluso el hombre". *Paoli Méndez v. Rodríguez*, supra, pág. 462. La Sec. 19 del Art. VI, Const. E.L.A., *supra*, pues, establece un derecho público —común de la ciudadanía— y le impone al Estado el deber de aprovechar, desarrollar y proteger sus recursos naturales en el mayor grado y de la manera más eficaz posible, para beneficio y disfrute de todos los ciudadanos.

La citada Sec. 19 del Art. VI, sin embargo, no establece guías específicas para la implantación de la política pública sobre los recursos naturales. Por lo tanto, le corresponde implantarla a la Asamblea Legislativa mediante la aprobación de la legislación correspondiente. Con este propósito, la Legislatura aprobó, entre otras, la Ley Núm. 9, *supra*, conocida como la Ley sobre Política Pública Ambiental. La política pública enunciada en esta ley responde "claramente" al mandato de la Sec. 19 del Art. VI de nuestra Constitución, *supra*. *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716, 723 (1974) (refiriéndose al Art. 3 de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1123). Según lo ordena su Art. 4, es "en estricta conformidad" con esta política pública que se tienen que interpre-

174

tar, implantar y administrar, "al máximo grado posible[,] ... todas las leyes y cuerpos reglamentarios vigentes". 12 L.P.R.A. sec. 1124.

■■■■■■■ Para asegurar el cumplimiento de sus disposiciones, la ley le confiere a cualquier persona natural o jurídica afectada por la falta de implantación de éstas el derecho de solicitar la expedición de un auto de *mandamus* en el Tribunal de Primera Instancia.[70] Art. 20 de la Ley

(70) En *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716, 726 (1974), validamos esta acción y determinamos que la expedición de un auto de *mandamus* en los casos apropiados "no representa una intervención indebida del poder judicial en las atribuciones de otras ramas del gobierno", debido a que la Ley sobre Política Pública Ambiental "impone un claro deber público". En cuanto a los requisitos de legitimación activa que debe satisfacer la parte actora para demostrar que es una persona afectada por la falta de implantación de la ley, resolvimos que "no hay necesidad de demostrar daño económico. El daño puede basarse en consideraciones ambientales, recreativas, espirituales o aun simplemente estéticas". (Citas omitidas.) Íd., pág. 723. Aclaramos, no obstante, que esto "no quiere decir que la puerta está abierta de par en par para la consideración de cualquier caso que desee incoar cualquier ciudadano en alegada protección de ... una política pública. Debe examinarse el nexo entre el interés del ciudadano y la acción radicada". Íd., pág. 724. En *García Oyola v. J.C.A.*, 142 D.P.R. 532 (1997), nos expresamos nuevamente acerca de los requisitos de legitimación activa en relación con la Ley sobre Política Pública Ambiental. En esa ocasión reiteramos los requisitos establecidos en *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 413–414 (1982), según enunciados posteriormente en *Asoc. Maestros P.R. v. Srio. Educación*, 137 D.P.R. 528, 538 (1994): "Poseen legitimación activa aquellos que han sufrido un daño claro y palpable, no uno abstracto ni hipotético; cuando existe un nexo causal entre la causa de acción que se ejercita y el daño alegado, y ... la causa de acción surge al amparo de la Constitución o de alguna ley." *García Oyola v. J.C.A.*, supra, págs. 538–539. No hicimos referencia al requisito de "nexo entre el interés del ciudadano y la acción radicada" establecido en *Salas Soler v. Srio. de Agricultura*, supra, pág. 724. Ello, sin embargo, no modificó en forma alguna el grado probatorio de la parte peticionaria de un auto de *mandamus* según la Ley sobre Política Pública Ambiental. Esta ley limita las acciones públicas al recurso de *mandamus*. Véanse: Art. 20 de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1139; *Salas Soler v. Srio. de Agricultura*, supra, pág. 726. La parte peticionaria en este recurso sólo tiene que "demostrar que es un ciudadano y [que] como tal está interesado en la ejecución y protección del derecho público". *Salas Soler v. Srio. de Agricultura*, supra, pág. 722, citando a *Asociación de Maestros v. Pérez, Gobernador, Int.*, 67 D.P.R. 849, 851 (1947). La suficiencia de este interés para conferirle legitimación activa a la parte peticionaria está plenamente justificada cuando se trata de un recurso de *mandamus* para solicitar el cumplimiento de alguna disposición de la Ley sobre Política Pública Ambiental, debido al origen constitucional de la política pública enunciada en esta legislación. Véase *Salas Soler v. Srio. de Agricultura*, supra, págs. 722–723. El daño alegado en un caso de esta naturaleza se puede basar simplemente en la falta de implantación de la ley, aun en relación con una "cuestión procesal", íd., pág. 747, como lo es la preparación de una declaración de impacto ambiental antes de que se efectúe cualquier acción o se promulgue cualquier decisión gubernamental "que afecte significativamente la calidad del medio ambiente". Art. 4 de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124(c).

sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1139. En cuanto a las acciones de carácter privado, el Art. 20 de la ley establece que "[c]ualquier persona natural o jurídica podrá llevar acciones en daños y perjuicios en los Tribunales de Justicia contra cualquier otra persona natural o jurídica basada en daños que sufra por violaciones ... [a la ley]".([71]) Íd.

El inciso (c) del Art. 4 de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124(c), les impone a todos los departamentos, las agencias, las corporaciones públicas, los municipios y las instrumentalidades del Estado Libre Asociado y sus subdivisiones políticas la obligación de emitir una declaración de impacto ambiental "antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente". Por su parte, el Reglamento sobre Declaraciones de Impacto Ambiental Núm. 3106 de 4 de junio de 1984, Junta de Calidad Ambiental (en adelante el Reglamento sobre DIAs) y el Manual para la Preparación, la Evaluación y el Uso de las Declaraciones de Impacto Ambiental, Junta de Calidad Ambiental, 19 de diciembre de 1972 (en adelante Manual sobre DIAs), gobiernan los aspectos sustantivos y procesales relacionados con el proceso de la declaración de impacto ambiental dispuesto en el Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra*. Véanse: Sec. 1.3 del Reglamento sobre DIAs, pág. 3; Guía 1.A del Manual sobre DIAs.

La Sec. 5.1.1 del Reglamento sobre DIAs, pág. 16, establece que la agencia proponente de un proyecto o una acción será la responsable de preparar la declaración de impacto ambiental correspondiente. El Manual sobre DIAs,

---

Véase, además, *Salas Soler v. Srio. de Agricultura*, supra, pág. 720. Por supuesto, la parte peticionaria deberá cumplir con los demás requisitos aplicables de legitimación activa y justiciabilidad aplicables.

([71]) Esta acción, sin embargo, no se puede presentar contra la Junta de Calidad Ambiental. Véase Art. 20 de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1139.

pág. 2, establece asimismo que la responsabilidad de preparar una declaración de impacto ambiental "recae totalmente sobre la agencia que propone la obra o actividad que pueda afectar sustancialmente la calidad del ambiente". En este caso, la responsabilidad de preparar la declaración de impacto ambiental sobre el proyecto del S.A.N. recayó sobre la peticionaria.

La Junta de Calidad Ambiental (en adelante J.C.A.) es la agencia encargada de velar por "el fiel cumplimiento de la política pública y los requisitos procesales y sustantivos contenidos en [la Ley sobre Política Pública Ambiental] y en los reglamentos aprobados a su amparo". *García Oyola v. J.C.A.*, supra, pág. 541.([72]) Sobre ella recae "la responsabilidad de verificar que la acción contemplada por la agencia proponente representa, en balance, la alternativa con el menor impacto ambiental, a la luz de todos los factores legítimos que son pertinentes". *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908, 928 (1998). Para cumplir a cabalidad con esta responsabilidad, la J.C.A. tiene la facultad de pasar juicio sobre si una declaración de impacto ambiental "discute satisfactoriamente los posibles efectos [ambientales de la acción propuesta,] conforme lo requiere el Art. 4(c) de la Ley sobre Política Pública Ambiental ...". *García Oyola v. J.C.A.*, supra, pág. 541. "Su función ineludible es la de comprobar que se haya observado rigurosa-

---

([72]) Véanse, además: Arts. 4(c) y 11(22)–(24) de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. secs. 1124(c) y 1131(22), (23) y (24) (facultades de la Junta de Calidad Ambiental); Informe conjunto de las Comisiones de lo Jurídico Civil y de Salud y Bienestar sobre el sustitutivo de los P. del S. 258 y P. del S. 703 en XXIV (Núm. 50) Diario de Sesiones de la Asamblea Legislativa (Senado), 17 de abril de 1970, pág. 781: "Es preferible ... tener un pequeño cuerpo de tres personas, dedicadas exclusivamente a la solución de los problemas del medio ambiente, y con jerarquía suficiente para obtener la necesaria acción y coordinación entre las agencias del Gobierno y la ciudadanía en general"; Diario de Sesiones (Cámara), *supra*, pág. 1457: "El Sustitutivo de los P. del S. 258 y 703 tiene el propósito de consolidar en un solo organismo todos los poderes, deberes y facultades necesarias para proteger y conservar adecuadamente el ambiente y los recursos naturales de la isla"; Sec. 5.3.13 del Reglamento sobre DIAs: "La Junta determinará si el contenido de la DIA es adecuado en término[s] de cumplir con el espíritu y la letra del Artículo 4(C) de la ... Ley sobre Política Pública Ambiental."

mente el esquema jurídico sobre lo ambiental ....." *Misión Ind. P.R. v. J.C.A.*, supra, pág. 928.

En el caso de autos, la J.C.A. emitió una resolución el 20 de mayo de 1996, la cual notificó a las partes el 23 de mayo siguiente, en la que concluyó que la D.I.A. preparada por la peticionaria estaba conforme con la Ley sobre Política Pública Ambiental.([73]) La Junta consignó este hecho en la Determinación de Hecho Núm. 53(g) de su resolución y concluyó, como cuestión de derecho, que el proyecto no tendría un impacto perjudicial sobre el medio ambiente. Véase Conclusión de Derecho Núm. 8.

La Sec. 4.03 del Reglamento de Adjudicación, *supra*, le exige a la parte proponente de una consulta de ubicación sobre un proyecto de mejora pública "evidenciar[,] mediante certificación al efecto[,] que para dar cumplimiento a la [Ley sobre Política Pública Ambiental], ha radicado la documentación correspondiente ante la Junta de Calidad Ambiental[,] o evidencia de que el proyecto está incluido en las exclusiones categóricas de dicha agencia". 23 R.P.R. sec. 650.231 (1997). La certificación correspondiente la presentó el ex Director Ejecutivo de la Autoridad, Emilio M. Colón, el 7 de julio de 1995, poco más de una semana después de que se presentara la solicitud de una consulta de ubicación para el proyecto del S.A.N.

La Sec. 7.01 del Reglamento de Adjudicación, *supra*, le impone asimismo a la Junta, el deber de considerar el impacto ambiental del proyecto propuesto al evaluar una consulta de ubicación. La Junta, cuya determinación era la única que era objeto de revisión ante el Tribunal de Circuito de Apelaciones, cumplió con este requisito al aprobar la consulta de ubicación del S.A.N.

Luego que culminó el proceso ante la J.C.A., la Junta tenía que limitar su juicio con respecto a las consideracio-

---

([73]) Misión Industrial de Puerto Rico, Inc. solicitó la reconsideración de esta resolución, la cual fue denegada el 18 de junio de 1996 y notificada el 25 de junio siguiente. No recurrió en revisión. Dicha resolución, por lo tanto, ya era final y firme cuando la Junta emitió la resolución para aprobar la consulta de ubicación del S.A.N.

nes ambientales del proyecto del S.A.N. a la información consignada en la declaración de impacto ambiental. A base de esa información le correspondía decidir si aprobaba o no el proyecto. La Junta optó por aprobarlo y su determinación, según hemos discutido, fue conforme a derecho.

Las razones que tuvo el Tribunal de Circuito de Apelaciones para revocar la consulta de ubicación del proyecto del S.A.N. respondieron, a nuestro juicio, a las deficiencias en la legislación y la reglamentación que le correspondía aplicar. El Tribunal de Circuito de Apelaciones hizo ciertamente un esfuerzo riguroso y responsable por superar el problema. Éste, sin embargo, es un asunto que les compete a las Ramas Ejecutiva y Legislativa, y que en su día deberán atender.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Negrón García emitió una opinión concurrente (partes I y II) y de conformidad (parte III). El Juez Asociado Señor Hernández Denton emitió una opinión de conformidad con las partes I y II de la opinión del Tribunal, disidente con la parte III-A y concurrente con el resultado, a la cual se une la Juez Asociada Señora Naveira de Rodón. La Juez Asociada Señora Naveira de Rodón emitió un voto explicativo particular, al cual se une el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad en parte y disidente en parte. El Juez Asociado Señor Corrada Del Río hace constar que, aplicando al caso de autos los criterios expuestos en su opinión disidente en el caso *Rivera v. Mun. de Carolina*, 140 D.P.R. 131 (1996), el Tribunal de Circuito de Apelaciones carecía de jurisdicción para dictar la sentencia emitida el 20 de mayo de 1997, mediante la cual revocó la resolución de la Junta de Planificación de Puerto Rico de 5 de julio de 1996, en la Consulta Núm. 95-06-0682-JGE, en la que se aprobó la consulta de ubicación del sistema de acueducto conocido como el "Superacueducto de la Costa Norte" (S.A.N.). No obstante, to-

mando en consideración que la mayoría de este Tribunal ha entrado a resolver el caso en sus méritos, por entender que el Tribunal de Circuito de Apelaciones sí tenía jurisdicción para atender el recurso, expresa su conformidad con la opinión de la mayoría.

— O —

Opinión concurrente (partes I y II) y de conformidad (parte III) del Juez Asociado Señor Negrón García.

Es *inconstitucional* la ley que *ordenó* la continuación del Superacueducto de la Costa Norte —Ley Núm. 19 de 13 de junio de 1997 (22 L.P.R.A. sec. 451 *et seq.*)— pues usurpa atributos adjudicativos exclusivos del Poder Judicial e impermisiblemente vulnera el principio de la separación de poderes. *Aún así, el tiempo nos ha dado la razón.*[1] Reafirmamos la validez de la consulta de ubicación y de la construcción desde sus inicios, por ser improcedente en derecho la sentencia mayoritaria del reputado Tribunal de Circuito de Apelaciones (Hons. Jueces Fiol Matta, Rodríguez de Oronoz y Gierbolini (disidente)), erróneamente lo paralizó que el 20 de mayo de 1997. Elaboremos.

I

Con miras a evitar una alta o excesiva concentración, nuestra Constitución se apuntala en el clásico esquema tripartita de *la separación y el balance de poderes.* Reducido a su expresión más simple: *el Poder Legislativo aprueba las leyes; el Ejecutivo las pone en vigor, y el Judicial las*

---

[1] En *Misión Ind. P.R. v. J.P. y A.A.A.*, 142 D.P.R. 656 (1997), disentimos de la paralización parcial dictaminada por la opinión suscrita por la Juez Asociada Señora Naveira de Rodón, con la conformidad del Juez Presidente Señor Andréu García y los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri.

En aquel entonces, con vista a un comprensivo análisis jurídico de la prueba documental, los trámites y las leyes aplicables, concluimos que en términos de "probabilidades", Misión Industrial *et al.* no prevalecerían en los méritos.

*interpreta.* Esta distribución y ejercicio de poderes ocasionalmente genera tensiones. Tal es el asunto del Superacueducto de la Costa Norte, obra por demás sensiblemente volátil, pero *justiciable.*

*Las leyes se presumen válidas y el decreto de inconstitucionalidad, como remedio judicial más drástico, siempre es la última alternativa.* Para concederlo, la propia Constitución exige una *mayoría absoluta* "del número total de los jueces de que esté compuesto el Tribunal de acuerdo con esta Constitución o con la ley". Art. V, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 356. Como corolario, computar y cumplir con rigor matemático esta exigencia —*antesala a una intervención y votación válida para un decreto de inconstitucionalidad*— conlleva de cada miembro del Tribunal determinar previamente su criterio jurídico en torno a la existencia o no de jurisdicción en el recurso en consideración.

Aparte de los requisitos de *mayoría absoluta y de jurisdicción*, existen normas limitativas o de abstención en el ámbito de la revisión judicial. El principio rector es *la deferencia hacia la Asamblea Legislativa y el Poder Ejecutivo*, lo que implica, si posible, evitar que se entre a dilucidar los planteamientos de inconstitucionalidad y, en su lugar, resolver por otros fundamentos. Además, debe existir una *controversia justiciable*; esto es, definida y concreta respecto al derecho aplicable *ante unos hechos en particular. E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

En este sentido, *nuestra función revisora no es absoluta.* Carecemos de autoridad *inherente* para asumir jurisdicción donde no la hay y pasar juicio sobre la constitucionalidad de la Ley Núm. 19, *supra*, sin ningún recurso que le sirva de sostén. Ello significaría crear y darle vida artificial a un recurso (pleito independiente) para dirimir la cuestión en *abstracto*, sin un trasfondo procesal y fáctico real. *Se vulneraría la importante doctrina de revisión judicial sobre la legislación que afecta pleitos pendientes.* La cons-

titucionalidad y los méritos del *certiorari* ante nos *son cuestiones inseparables.* En otras palabras, la *única base* para el ejercicio apropiado de nuestra jurisdicción apelativa en torno a la validez de la Ley Núm. 19, *supra,* es *la existencia y expedición previa del "certiorari" de la Autoridad de Acueductos y Alcantarillados.*

*Como autolimitación prevalecen las doctrinas sobre academicidad,*(²) *madurez,*(³) *legitimación activa o acción legitimada*(⁴) *y cuestiones políticas.*(⁵)

Según lo indicado, la Asamblea Legislativa incuestionablemente puede legislar en cualquier momento para beneficio de sus constituyentes; *facultad que incluye convalidar una ley, subsanar sus defectos o ratificar una actuación.* Sin embargo, en cualquiera de esas circunstancias, subsiste la misión de los tribunales de interpretar y adjudicar controversias. Como tribunal de última instancia, nuestro deber es tomar en cuenta la nueva legislación(⁶) pertinente —aquí la Ley Núm. 19, *supra,* si constitucional— y aplicarla al caso *subjudice* ante nos, ya sea para *confirmar o*

---

(²) *P.P.D. v. Gobernador I,* 139 D.P.R. 643 (1995); *Noriega v. Hernández Colón,* 135 D.P.R. 406 (1994); *C.E.E. v. Depto. de Estado,* 134 D.P.R. 927 (1993); *Berberena v. Echegoyen,* 128 D.P.R. 864 (1991); *Asoc. de Periodistas v. González,* 127 D.P.R. 704 (1991); *Noriega v. Gobernador,* 122 D.P.R. 650 (1988); *El Vocero v. Junta de Planificación,* 121 D.P.R. 115 (1988).

(³) *Aguilú Delgado v. P.R. Parking System,* 122 D.P.R. 261 (1988); *Com. de la Mujer v. Srio. de Justicia,* 109 D.P.R. 715 (1980).

(⁴) *Asoc. Maestros de P.R. v. Torres,* 136 D.P.R. 742 (1994); *P.P.D. v. Gobernador I,* supra; *Noriega v. Hernández Colón,* supra; *Hernández Torres v. Hernández Colón,* 129 D.P.R. 824 (1992); *Hernández Torres v. Hernández Colón et al.,* 131 D.P.R. 593 (1991); *Col. Ópticos de P.R. v. Vani Visual Center,* 124 D.P.R. 559 (1989); *Fund. Arqueológica v. Depto. de la Vivienda,* 109 D.P.R. 387 (1980).

(⁵) *P.P.D. v. Gobernador I,* supra; *P.P.D. v. Gobernador II,* 136 D.P.R. 916 (1994); *Noriega Rodríguez v. Jarabo,* 136 D.P.R. 497 (1994); *Noriega v. Hernández Colón,* supra; *Silva v. Hernández Agosto,* 118 D.P.R. 45 (1986); *P.P.D. v. Ferré, Gobernador,* 98 D.P.R. 338 (1970).

(⁶) A tal efecto, nuestra jurisprudencia informa de legislación que ha interferido indebidamente con el Poder Judicial. *Ramírez v. Registrador,* 116 D.P.R. 541 (1985); *Torres v. Castillo Alicea,* 111 D.P.R. 792 (1981); *Vélez Ruiz v. E.L.A.,* 111 D.P.R. 752 (1981); *P.R. Tobacco Corp. v. Buscaglia, Tes.,* 62 D.P.R. 811 (1944). Por otro lado, a la luz de nuestro ordenamiento preconstitucional, hemos convalidado legislación que afectaba pleitos pendientes en *Sunland Biscuit Co. v. Junta Salario Mínimo,* 68 D.P.R. 371 (1948) (en reconsideración), y *Suárez v. Tugwell, Gobernador,* 67 D.P.R. 180 (1947).

*revocar* el dictamen del Tribunal de Circuito de Apelaciones.

Igual enfoque subsiste en la jurisdicción federal. Desde *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 102 (1801), la doctrina sobre la nueva legislación aplicable a casos pendientes exige a los tribunales tomarla en cuenta al adjudicar.[7] En esa tarea, es crucial determinar las consecuencias de la legislación. *United States v. Klein*, 80 U.S. 128 (1871), resolvió que el Congreso no puede *ordenar* al Poder Judicial cómo decidir los casos pendientes. Está vedado legislar su solución en los méritos e imponer o requerir determinaciones de hecho y conclusiones de derecho. Ciertamente, este tipo de *interferencia directa* con casos sub júdice son fáciles de detectar, ya que los cuerpos legislativos carecen de atributos judiciales adjudicativos. Ahora bien, el análisis se torna más difícil cuando el estatuto en cuestión puede afectar *indirectamente* el resultado de un caso, sobre todo si la legislación es retroactiva. *United States v. The Schooner Peggy*, supra.

Ante el amplio abanico de posibilidades —aunque no existe consenso— los tribunales federales han desarrollado unas excepciones al principio esbozado en *United States v. The Schooner Peggy*, supra. Podemos resumir la doctrina así: *es inconstitucional la legislación que prescriba una norma o un principio decisorio a un caso pendiente de adjudicar (sub júdice), si no cambia el derecho subyacente (excepción del derecho subyacente) y/o impone determina-*

---

(7) Anotación, *Supreme Court's Views as to Whether Enactment, Amendment or Repeal of Statute Pending Appeal Applies to such Appeal*, 108 L.Ed.2d 1061 (1988); E.H. Schopler, *What Circumstances Render Civil Case, or Issues Arising Therein, Moot as to Preclude Supreme Court's Consideration of their Merits*, 44 L.Ed.2d 719 (1975) (según suplementada); J.E. Fisch, *Retroactivity and Legal Change: An Equilibrium Approach*, 110 Harv. L. Rev. 1055 (1997); H.J. Krent, *The Puzzling Boundary Between Criminal and Civil Retroactive Law Making*, 84 Geo. L.J. 2143 (1996).

*Robertson v. Seattle Audubon Soc.*, 503 U.S. 429 (1992); Department of the Interior and Related Agencies Appropriations Act de 1990, Pub.L. No. 101–121; 103 Stat. 745 sec. 318(b)(6)(A); M.A. Lazarus, *Life after Lampf: The Constitutionality of New Section 27A of the Securities and Exchange Act of 1934*, 68 Tul. L. Rev. 975 (1994).

*ciones de hecho o conclusiones de derecho (excepción de re-
querimiento de hechos y conclusiones de derecho); y/o or-
dena un resultado particular en sus méritos o priva de
jurisdicción, impidiendo una decisión en los méritos.*(⁸)

*Este tipo de actuación legislativa pone en jaque la vigen-
cia del principio de la separación de poderes.* Si el Poder
Legislativo no altera el derecho procesal o sustantivo (*ex-
cepción del derecho subyacente*) que gobierna el asunto en
controversia, no puede obligar al Poder Judicial con su in-
terpretación de ese ordenamiento en un caso en particular.
Véase L.H. Tribe, *American Constitutional Law*, 2da ed.,
Nueva York, The Foundation Press, 1988, Sec. 3-5, pág. 50.

Como sucede a menudo, es más fácil la exposición teó-
rica que su aplicación práctica.(⁹) En este extremo, para
comprender satisfactoriamente el alcance de esta doctrina,
es elemental tener en mente que *derecho subyacente* signi-

---

(⁸) J.R. Doidge, *Is Purely Retroactive Legislation Limited by the Separation of
Powers?: Rethinking United States v. Klein*, 79 Cornell L. Rev. 910 (1994); J.D. Mc-
Nally, *Did Congress Overreach in its Reaction to Lampf?*, 16 W. New Eng. L. Rev. 397
(1994); A.D. Rooner, *Judicial Self-Demise: The Test of when Congress Impermissibly
Intrudes on Judicial Power after Robertson v. Seattle Audubon Society and the Fe-
deral Appellate Court's Rejection of the Separation of Powers Challenges to the New
Section of the Securities Exchange Act of 1934*, 35 Ariz. L. Rev. 1037 (1993); Lazarus,
*supra*.

Es necesario anotar que el Tribunal Supremo federal se ha negado a clarificar
definitivamente los alcances de la doctrina. En *Plaut v. Spendthrift Farm, Inc.*, 514
U.S. 211, 221 (1995), los demandantes afectados por las enmiendas a la Sec. 27A del
*Securities Exchange Act* alegaron que el Congreso no podía constitucionalmente re-
querirle a los tribunales actuar *inconstitucionalmente*; esto es, legislar contrario a
*United States v. Klein*, 80 U.S. 128 (1871), con el solo propósito de afectar los resul-
tados de los casos pendientes y perturbar decretos judiciales finales y firmes. El
Tribunal Supremo federal decidió que el Congreso está impedido de reabrir casos
resueltos, pero rehusó pronunciarse sobre los otros planteamientos.

En *Robertson v. Seattle Audubon Soc.* supra, también se abstuvo de dictaminar
si en efecto *United States v. Klein*, supra, limita los poderes del Congreso, vedando la
legislación que afecta un caso pendiente, sin alterar el derecho subyacente. Se limitó
a resolver que había errado el tribunal apelativo al concluir que la legislación no
alteraba el derecho subyacente.

(⁹) Al amparo de la doctrina de la *excepción de la ley subyacente*, personas razo-
nables pueden arribar a resultados distintos. Doidge, *supra*, pág. 912 esc. 4; H.S.
Goldstein, *When the Supreme Court Shuts its Doors, May Congress Re-open Them?:
Separation of Powers Challenges to Sec. 27A of the Securities and Exchange Act*, 34
B.C.L. Rev. 853 (1993); C.W. Palm, *The Constitutionality of Section 27A of the Secu-
rities Exchange Act: Is Congress Rubbing Lampf the Wrong Way?*, 37 Vill. L. Rev.
1213, 1294 *et seq.* (1992).

fica todo el trasfondo del ordenamiento estatutario, procesal y reglamentario vigente, pertinente al momento en que surge la controversia judicial pendiente; no es la *interpretación judicial sub júdice*. Sería un contrasentido que, en un caso pendiente, la interpretación en controversia de un tribunal formara parte del *derecho subyacente. Cuando la Legislatura cambia o modifica esa interpretación, no cabe invocar la excepción del derecho subyacente; su constitucionalidad se examinará al amparo de la excepción de requerimiento de hecho o conclusiones de derecho.*

*Un análisis reflexivo de las virtudes y los defectos de la doctrina nos lleva a adoptar la norma de que, si bien en nuestro ordenamiento constitucional la Asamblea Legislativa está facultada para legislar remedialmente, no puede directa o indirectamente afectar casos pendientes sin enmendar el derecho subyacente (derecho positivo, sustantivo y procesal). Tampoco puede imponer determinaciones de hecho o conclusiones de derecho que afecten sus méritos o priven de jurisdicción. Si lo hace, trasciende su poder constitucional y se inmiscuye en una zona reservada por la Constitución al Poder Judicial; en particular a este Tribunal Supremo, foro de última instancia.*

A través de este prisma doctrinario, examinemos la Ley Núm. 19, *supra.*

## II

Su propósito surge prístinamente del propio título:

> ... *ordenar* a la Autoridad de Acueductos y Alcantarillados *a continuar con la construcción del Proyecto del Superacueducto de la Costa Norte; eximirla* del cumplimiento de la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como "Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico"; *establecer el procedimiento a seguir, los requisitos para la autorización del Proyecto; y proveer para la revisión judicial.* (Énfasis suplido.) 1997 Leyes de Puerto Rico 50.

La *Exposición de Motivos* —que según el Art. 1 de la Ley

Núm. 19, *supra*, 1997 Leyes de Puerto Rico 55, "constituye la expresión exclusiva de la *intención* de la misma, *a los fines de su interpretación*"— *valida todo el trámite administrativo relacionado con la consulta de ubicación aprobada por la Junta de Planificación, eje de la controversia central sub júdice ante este Tribunal. Al respecto, resuelve (adjudica) que "[l]a tramitación de este proyecto en su fase administrativa fue correcta, habiéndose cumplido cabalmente con la política pública, las leyes y los reglamentos vigentes".* (Énfasis suplido.)

El Art. 2 de la Ley Núm. 19, Leyes de Puerto Rico, *supra*, pág. 55, *repite la misma conclusión absoluta y retroactiva de corrección legal de todo el trámite administrativo que precedió la consulta de ubicación.* Declara que el Superacueducto es "la alternativa real, rápida y eficiente" de menor impacto ambiental y costo. Además, *decreta su validez bajo la cláusula constitucional ambiental de conservar los recursos naturales.* Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1.

El Art. 3 de la citada ley, Leyes de Puerto Rico, *supra*, pág. 56, *ordena* a la Autoridad de Acueductos y Alcantarillados reiniciar su construcción con sólo presentar unos permisos y documentos([10]) que la propia ley fija en el Art. 4, íd., e instruye a la Administración de Reglamentos y Permisos (en adelante A.R.Pe.) *ministerialmente* emitir la *autorización de obra. Con esta nueva nomenclatura, implícitamente exonera a la Autoridad de Acueductos y Alcantarillados de cumplir con el requisito principal que es objeto de la revisión judicial, a saber, la consulta de ubicación.*

---

([10]) Los documentos en cuestión son el *permiso del Cuerpo de Ingenieros federal*, a tenor de la Sec. 404 del *Clean Water Act*, que recoge los comentarios de agencias federales y estatales relativos al cumplimiento con otras leyes ambientales federales; el *certificado de calidad de agua* de la Junta de Calidad Ambiental; la *certificación* de cumplimiento con el Art. 4(C) de Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124(c), y el *permiso de construcción* de la toma de agua emitido por el Departamento de Recursos Naturales el 18 de septiembre de 1996, conforme a la Ley de Aguas, "independientemente de que éste no sea final y firme".

*Manda* al Departamento de Recursos Naturales y Ambientales continuar el trámite administrativo sobre la franquicia de agua y verificar "el cumplimiento con los términos y condiciones del permiso de construcción otorgado". Art. 5 de la Ley Núm. 19, Leyes de Puerto Rico, *supra*, pág. 57. *Decreta* que los documentos aludidos "están en armonía con la conservación y protección de los recursos naturales y el medio ambiente", íd., *y exime* al Superacueducto, con carácter prospectivo, de cumplir con la Ley Núm. 170 de 12 de agosto de 1988 (Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2101 *et seq.*). *Declara expresamente vigente la consulta de ubicación como parte de*

> ... [t]odos aquellos permisos, endosos, certificaciones, contratos, subastas y *los procedimientos administrativos, incluyendo los de notificación, consultas* públicas y *de ubicación* que hayan sido obtenidas o realizados administrativamente para el desarrollo del Superacueducto de la Costa Norte *con anterioridad a la vigencia* de esta ley, [los cuales] se *entenderán vigentes y conformes a la política pública* por la presente aceptada, por la urgente necesidad de agua potable en aras de garantizar la vida, la salud y el bienestar general. (Énfasis suplido.) Art. 6 de la Ley Núm. 19, Leyes de Puerto Rico, *supra*, pág. 58.

*Sustituye* la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico por una revisión judicial ante este Tribunal Supremo sobre los documentos antes enumerados, dentro de treinta (30) días jurisdiccionales, a partir de que A.R.Pe. notifique la expedición de la *autorización de obra* a través de avisos en dos (2) periódicos de circulación general, o desde que se notifique y archive en autos una copia de la decisión sobre el permiso de construcción o la franquicia oficial de agua. Con carácter jurisdiccional, en igual tiempo, deberá notificarse a la agencia recurrida y a las demás partes interesadas.

Art. 7 de la Ley Núm. 19, Leyes de Puerto Rico, *supra*, pág. 58.([11])

Finalmente, los Arts. 8 al 11 de la Ley Núm. 19, Leyes de Puerto Rico, *supra*, pág. 59,. contienen las cláusulas típicas de casi toda legislación: prevalencia sobre cualquiera otra ley incompatible; *separabilidad*; publicación, y vigencia inmediata.

## III

*Más allá de una tenue apariencia de derecho sustantivo y procesal distinto y nuevo, su texto revela dramáticamente que estamos ante una legislación que directa e indirectamente penetra peligrosamente la zona que separa el Poder Legislativo del Judicial. La Ley Núm. 19, supra, vulnera nuestra prerrogativa adjudicativa al determinar un resultado específico y sustantivo en este recurso. Es inconstitucional, pues interviene y ordena el efecto que va a tener sin realmente enmendar, modificar o anular sustantivamente las leyes existentes que regulaban y regulan la situación en controversia. De su faz, sus disposiciones trascienden la simple enunciación de trámites y de normas nuevas de derecho e impermisiblemente adjudican específicamente los méritos de la controversia principal pendiente ante nos.*

*Si acatáramos la Ley Núm. 19, supra, tendríamos que resolver que el recurso de "certiorari" es académico.* Estaríamos privados de jurisdicción para atender los méritos de

---

([11]) Sobre la revisión judicial de estos permisos *directamente* ante este Tribunal, exige al recurrente probar que una solicitud de paralización es indispensable para proteger nuestra jurisdicción; tiene una gran probabilidad de prevalecer en los méritos; no causará un daño sustancial a las demás partes; no perjudicará el interés público; no existe una alternativa razonable para evitar los alegados daños, y el daño no podrá compensarse monetariamente u otro remedio adecuado en derecho, según el Código de Enjuiciamiento Civil de 1933, enmendado. Art. 7 de la Ley Núm. 19, Leyes de Puerto Rico, *supra*, pág. 58.

También dispone que no procederá ningún otro tipo de demanda, acción, procedimiento o recurso en ningún tribunal que no sea alguno de los antes dispuestos, excepto reclamos por daños y perjuicios conforme a la Ley Núm. 104 de 29 de julio de 1955, según enmendada, conocida como "Ley de Pleitos contra el Estado", o procedimientos de expropiación forzosa. Art. 7 de la Ley Núm. 19, *supra*.

este *certiorari*. No habría necesidad alguna de decidir si, en efecto, la *consulta de ubicación* se otorgó conforme a derecho, pues ya la Asamblea Legislativa decidió que todos los permisos y, en particular, la *consulta de ubicación* están *vigentes*. Para todo efecto, éste sería resuelto a base de un mandato *legislativo* que adjudicó *validez* a dicha *consulta de ubicación*.

Ciertamente *no estamos ante un nuevo esquema legal*, sino frente a unas "interpretaciones legislativas" preordenadas del entonces derecho vigente, que no son otra cosa que *adjudicaciones (conclusiones) de derecho*. De *vigencia inmediata*, su texto nos menciona su razón de ser: variar *directamente* el trámite administrativo referente al permiso para la concesión del Superacueducto de la Costa Norte e, *indirectamente*, afectar la disposición del caso judicial, ahora pendiente ante nos, y que había paralizado su construcción. *Si algo refleja el debate legislativo es la insatisfacción de una mayoría de los legisladores con esa decisión judicial, que incluso llevó a algunos a formular recriminaciones de que la misma respondió a motivaciones espurias político-partidistas.*

Sobre el particular es menester aclarar que la citada Ley Núm. 19 no es inconstitucional simplemente porque validó los mismos permisos que el Tribunal de Circuito de Apelaciones anuló. Para fines del análisis constitucional correcto, resultaría irrelevante que la Asamblea Legislativa hubiese aceptado o rechazado el dictamen del Tribunal de Circuito de Apelaciones. Aún ante un escenario completamente distinto —que el Tribunal de Circuito de Apelaciones hubiese adjudicado positivamente la validez de los permisos y que la Legislatura hubiese aprobado la Ley Núm. 19, *supra*, con la intención de asegurar igual resultado ante este Foro— *continuaría adoleciendo de los mismos vicios: prescribir un curso decisorio sin realmente establecer un ordenamiento positivo ni reglamentario distinto (excepción del derecho subyacente) y mandar cómo decidir este*

*caso pendiente (excepción de requerimiento de hecho y con-* *clusiones de derecho).* Preocupa, pues, la lógica del argumento de Misión Industrial *et al.*, que presume que es *temporeramente* válido lo resuelto por el Tribunal de Circuito de Apelaciones.

La *interpretación* del Tribunal de Circuito de Apelaciones y sus pronunciamientos, por no tener color de *firmeza*, no constituyen un *derecho subyacente*; menos, la *Ley del Caso*. El *derecho subyacente* contra el cual debemos analizar y confrontar la aplicabilidad de la Ley Núm. 19, *supra*, no es la interpretación *equivocada* (pudo ser la correcta) del Tribunal de Circuito de Apelaciones, simultáneamente revocada en la misma sentencia de hoy, sino todo el derecho positivo y la reglamentación dimanante de la Ley de la Junta de Planificación de Puerto Rico, Ley de Aguas de Puerto Rico, Ley sobre Política Pública Ambiental y otros estatutos pertinentes. *Sería una paradoja anular la referida Ley Núm. 19 por solo ésta requerir unos permisos erróneamente invalidados por el Tribunal de Circuito de Apelaciones.*

Por último, *procede decretar la inconstitucionalidad total de la Ley Núm. 19, supra.* No podemos activar y honrar la *cláusula de separabilidad*; todas sus disposiciones están inextricablemente atadas entre sí. *Con el escalpelo judicial es imposible extirpar algunas de sus disposiciones sin afectar mortalmente las otras.*

## IV

*Retomada la ruta decisoria original, de entrada notamos que la metodología adjudicativa del Tribunal de Circuito de Apelaciones no fue correcta. Al juzgar la revisión, incidió al adoptar el escrutinio severo ("hard look") en lugar de la evidencia sustancial reconocida para la revisión de adjudicaciones administrativas.*

La *falla medular* del reputado foro intermedio —que se

manifiesta en toda su documentada sentencia— es que el *escrutinio severo (hard look)* es apropiado para evaluar acciones administrativas según el poder de reglamentación, *no de adjudicación.*([12]) Aún así, dicho foro razonó que si se utiliza en situaciones en que tradicionalmente hay más deferencia judicial, debería aplicarse a quienes requieran un análisis menos deferente. *No hemos encontrado apoyo a esta teoría.* La doctrina del *escrutinio severo (hard look)* en el derecho norteamericano administrativo surgió como respuesta a la deferencia tradicional que *automáticamente* se otorgaba a las decisiones administrativas al amparo del poder de reglamentación.([13])

Algunos no consideran el *escrutinio severo (hard look)* —a veces denominado *encuesta sustancial (substantial inquiry)* o *escrutinio estrecho (close scrutiny)*— una doctrina legal, sino una *forma de expresión* de ciertos jueces de cómo entienden que los tribunales deben revisar las determinaciones administrativas. Aún así, sus proponentes reconocen que la responsabilidad de establecer la política pública recae en la agencia, no en los tribunales. K.W. Marcel, *The Role of the Courts in a Legislative and Administrative Legal System—The Use of Hard Look Review in Federal Environmental Litigation*, 62 Or. L. Rev. 403, 411 (1983). Con razón se ha señalado que algunos jueces la han aplicado indebidamente para interferir con la política pública

---

([12]) Se ha usado para analizar procedimientos de reglamentación formal e informal. K.W. Marcel, *The Role of the Courts in a Legislative and Administrative Legal System—The Use of Hard Look Review in Federal Environmental Litigation*, 62 Or. L. Rev. 403 (1983).

([13]) El término tuvo su génesis en la pluma del Juez del Circuito del Distrito de Columbia, Harold Leventhal. Lo acuñó en *Pikes Peak Broadcasting Company v. F.C.C.*, 422 F.2d 671, 682 (D.C. Cir. 1969), para describir el procedimiento ante la agencia, requiriéndole a ésta que tomara en consideración las preocupaciones presentadas por los opositores a un sistema de televisión.

La revisión judicial se limitó a si era razonable el rechazo de la información y de las predicciones sometidas. Véanse: *Wait Radio v. F.C.C.*, 418 F.2d 1153 (D.C. Cir. 1969); *Women Strike for Peace v. Hickel*, 420 F.2d 597 (D.C. Cir. 1969); *Cities of Statesville, et al. v. Atomic Energy Commission*, 441 F.2d 962 (D.C. Cir. 1969), opinión concurrente. Posteriormente, el Juez Leventhal utilizó el término en una situación ambiental.

gubernamental. "Para un Juez no simpatizante (*unsympathetic judge*), según la doctrina del *escrutinio severo (hard look)* es relativamente fácil justificar la devolución a la agencia". (Traducción nuestra.) T.O. McGarity, *The Courts and the Ossification of Rulemaking: A Response to Professor Seidenfeld*, 75 Tex. L. Rev. 525, 558 (1997).

La doctrina de *escrutinio severo (hard look)* propone una revisión completa, penetrante y profunda (*thorough, probing, in depth review); no puede darse un tizaso a la decisión administrativa*. Hay que asegurar que la agencia consideró y ponderó todos los aspectos pertinentes y las alternativas razonables, sin que ello conlleve fomentar el antagonismo entre las agencias y los tribunales. Ambos tienen que trabajar juntos para adelantar el interés público. Los tribunales se limitan a supervisar las agencias; no tienen la capacidad para imponer su propio juicio sobre política (*policy*), sustituyendo el de una legislatura o agencia. J.A. Stein *et al., Administrative Law*, Sec. 51.01(2), págs. 51-63 y 51-66 (1997).

Muchos comentaristas reconocen que un *escrutinio severo (hard look)* interfiere con la discreción de la agencia y, aunque criticado,[14] lo justifican, pues: (1) provee una revisión efectiva que disminuye la percepción negativa que se tiene sobre las delegaciones de poderes a las agencias; (2) disminuye el peligro de que la revisión judicial se con-

---

[14] M.B. Garland, *Deregulation and Judicial Review*, 98 Harv. L. Rev. 507, 556 *et seq.* (1985). Se critica el *escrutinio severo* judicial (*hard look*), pues sus resultados no están sujetos a la participación política ni responden al electorado. K.R. Johnson, *A "Hard Look" at the Executive Branch's Asylum Decisions*, 1991 Utah L. Rev. 279, 323 (1991). Ha sido responsable por paralizar la reglamentación administrativa. M. Seidenfeld, *Demystifying Deossification: Rethinking Recent Proposals to Modify Judicial Review of Notice and Comment Rulemaking*, 75 Tex. L. Rev. 483 (1997); T.O. McGarity, *The Courts and the Ossification of Rulemaking: A Response to Professor Seidenfeld*, 75 Tex. L. Rev. 528 (1997); J. Rossi, *Redeeming Judicial Review: The Hard Look Doctrine and Federal Regulatory Efforts to Restructure the Electric Utility Industry*, 1994 Wis. L. Rev. 763, 766, 804, 827 y 835 (1994); Marcel, *supra*, pág. 441. Algunos grupos adquieren tanta protección con este escrutinio que otros grupos, incluyendo las entidades gubernamentales y políticas, se ven afectadas. Finalmente, se aduce que los tribunales podrían imponer requisitos imposibles que no responden a la realidad. H.H. Buff, *Legislative Formality, Administrative Rationality*, 63 Tex. L. Rev. 207, 243–244 (1984).

vierta en una mera formalidad y las agencias sobrepasen sus ámbitos; (3) promueve que las agencias tomen decisiones ponderadas; (4) fomenta el respeto público al requerir que las agencias expliquen una alternativa sobre otra, y (5) subsana el hecho de que los tribunales no tienen la capacidad de suplementar el razonamiento de la agencia ni la documentación fáctica. Marcel, *supra*, págs. 412–413. Otros tratadistas defienden el *escrutinio severo* (*hard look*) utilizado correctamente. M. Seidenfeld, *Hard Look Review in a World of Techno-Bureaucratic Decisionmaking: A Reply to Professor McGarity*, 75 Tex. L. Rev. 559 *et seq.* (1997). *En nuestro ordenamiento administrativo, el requisito de evidencia sustancial para revisar adjudicaciones administrativas satisface a cabalidad estas preocupaciones.*

El Tribunal de Circuito de Apelaciones concluyó también, *sin fundamento*, que el *escrutinio severo* (*hard look*) se nutre, no del tipo de procedimiento administrativo revisado, sino de la naturaleza del asunto que se examina; en este caso, unos efectos ambientales. *Otra vez erró.* El problema con este enfoque radica en que el *escrutinio severo ("hard look") no es para describir el examen de un tribunal ante una decisión administrativa que afecte el medio ambiente*, sino el análisis que tiene que *hacer la agencia* que *propone* llevar a cabo una acción (legislación, licencia o proyecto)[15] —*aquí la Autoridad de Acueductos y Alcantarillados*— que afecte sustancialmente el medio ambiente. Este escrutinio de la agencia se fundamenta en la NEPA, legislación federal que, al igual que la Ley sobre Política Pública Ambiental de Puerto Rico, regula la necesidad y preparación de una Declaración de Impacto Ambiental (D.I.A.) antes de poder actuar en forma que afecte sustancialmente el medio ambiente. T.O. McGarity, *Beyond the*

---

[15] Una determinación adjudicativa que afecta el medio ambiente le correspondería a una agencia encargada de controlar la contaminación ambiental. Estas determinaciones adjudicativas se revisan para ver si la adjudicación está apoyada por la prueba. W.E. Aiken, Jr. *et al., Pollution Control*, 61A Am.Jur.2d Sec. 6, págs. 429–430 (1981).

*Hard Look: A New Standard for Judicial Review?*, 1986 (Vol. 2, Núm. 2) Nat. Resources & Env't. J. 32 (1986); *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 833–834 (D.C. Cir. 1972), Juez Leventhal. Véase *Kleppe v. Sierra Club*, 427 U.S. 390, 410 esc. 21 (1976).[16]

*Las revisiones administrativas en áreas que afectan el medio ambiente son delicadas, pues están íntimamente relacionadas con la salud y seguridad públicas. Usualmente, quienes cuestionan a las agencias son grupos o personas de escasos recursos económicos que reclaman remedios rápidos y acusan al sistema de estar influenciado por intereses especiales, afectado por las corrientes políticas o paralizado por la mediocridad de las agencias. Por otro lado, las determinaciones administrativas en esta área están sumergidas en consideraciones técnicas y científicas que afectan la sociedad en general y requieren que se interpreten en forma consistente, uniforme y abarcadora. Los tribunales no tienen el conocimiento pericial necesario para establecer una política ambiental. Ello genera una gran deferencia judicial.* W.H. Rodgers, *Handbook on Environmental Law*, St. Paul, Ed. West Pub. Co., 1977, pág. 40 *et seq. Ante esta situación, algunos tribunales han optado por dar gran deferencia a las determinaciones sustantivas de las agencias en aspectos ambientales, pero analizan ponderadamente el procedimiento utilizado.* Marcel, *supra*, págs. 424–425.[17]

En resumen, en el área del derecho ambiental nos encontramos con el *escrutinio severo* (*hard look*) para revisar

---

[16] En el *escrutinio severo* (*hard look*) no se va a presumir la racionalidad de las determinaciones administrativas; se analiza el procedimiento racional de la agencia para detectar si se han considerado los problemas sociales, técnicos y legales visualizados en los estatutos. Marcel, *supra*, págs. 412–413.

[17] Aun reconociendo la importancia que algunos tribunales le han dado al medio ambiente, el Tribunal Supremo federal —a pesar de existir la doctrina del *escrutinio severo* (*hard look*)— utiliza un escrutinio tradicional para revisar las determinaciones administrativas con impacto ambiental. Los tribunales no pueden imponer su criterio y reemplazar el de la agencia especializada. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375–376 (1989); *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).

las acciones de las agencias según el *poder de reglamentación* (no adjudicativo), o describir el análisis que se les requiere cuando están considerando los efectos ambientales de sus acciones. *Incidió al aplicarlo el Tribunal de Circuito de Apelaciones al revisar la validez de la consulta de ubicación.*

## V

En los *méritos*, poco tenemos que añadir a los fundamentos expuestos en nuestra disidencia del año pasado, en que sostuvimos *prima facie* la validez de la referida *consulta de ubicación*, ahora esencialmente incorporados en la opinión del Juez Presidente Señor Andréu García (parte III), y su análisis más abarcador para también atender y adjudicar los planteamientos sobre la suficiencia de notificación, enmiendas al proyecto y otros, *razón por la cual en este extremo estamos conformes.*

Por lo demás, basta reproducir:

En una sociedad pluralista, proyectos de la envergadura del *Superacueducto* inevitablemente generan posiciones *legítimas*, en favor y en contra. Distintos sectores de nuestra ciudadanía, políticos, ambientalistas y otros, debatieron (y continúan cuestionando) su costo, funcionalidad, efectos positivos y negativos, alternativas y, a la luz de aquellos valores o intereses que estiman que deben proteger y adelantar, tienen sus propias ideas y soluciones. Se trata de un asunto sobre el cual —*al igual que en muchas áreas del quehacer público— personas razonables pueden razonablemente discrepar.*

Aún así, existe consenso en la necesidad de la presente y las futuras generaciones de asegurar, aprovechar y usar al máximo el abasto de agua y su prelación para el consumo humano y doméstico, con el menor impacto ambiental.

En lo que concierne a los tribunales, no nos corresponde pasar juicio sobre la *sabiduría* de construir el *Superacueducto*; si su costo original presupuestado, o el final, *es excesivo o una mala inversión de fondos públicos.* Tampoco es una *asignatura judicial* la revisión de si éste suplirá determinada cantidad estimada de millones (100,80 o menos) de galones diarios del pre-

ciado líquido, o si —efectivamente— solucionará o aliviará su escasez en épocas normales o de sequía a las demandas de una población en continuo crecimiento en toda el área norte. *El enjuiciamiento final de estos y otros factores pertenece al pueblo: verdadero juez supremo de las decisiones y los actos —correctos o equivocados— de los Poderes Ejecutivo, Legislativo y Administrativo.*

No contamos con la experiencia, el conocimiento especializado y los recursos técnicos para dilucidar juiciosamente, y en todas sus dimensiones y extensión, un asunto tan complejo de la cosa pública, el cual compete a las ramas políticas y administrativas y que, más bien, dispone sobre el adecuado uso de los recursos naturales y el abasto doméstico e industrial de agua potable.

Si nos apropiamos de esa prerrogativa y nos involucráramos en la *intríngulis decisoria* con respecto a las diversas opciones para suplir la deficiencia de abasto de agua, y escogemos una solución, *este Tribunal tendría también que aceptar la delicada y seria responsabilidad de proveer, de alguna forma alterna, una seguirdad y garantía al Gobierno y a la ciudadanía de que su juicio y solución son los correctos; papel para el cual no se diseñó el esquema de revisión judicial.*

. . . . . . . .

Desde la psicodinámica judicial estamos persuadidos de que el fenómeno histórico, cultural, económico, social, ambiental y laboral que resume la complejidad del Superacueducto, podemos expresarlo del modo siguiente: para quienes defienden el ambiente, una medida inútil y costosa para resolver el problema de abastos de agua, que conlleva grave daño ecológico a la zona norte de la isla; para el pescador, un cambio dramático en su entorno natural; para los suplidores y el constructor, un reto técnico a la par que un gran beneficio económico; para el obrero, su trabajo y fuente de ingresos; para la Autoridad, una forma de resolver el gran problema de abasto de aguas; para el Primer Ejecutivo, la solución a los reclamos de la ciudadanía, y para el ciudadano común que carece de agua potable, la esperanza de que finalmente tendrá disponible el preciado líquido, elemento vital.

*El Tribunal de Circuito de Apelaciones erró al decretar la paralización de su construcción.* (Énfasis en el original suprimido y énfasis suplido.) *Misión Ind. P.R. v. J.P. y A.A.A.*, 142 D.P.R. 656, 713–759 (1997), opinión concurrente y disidente.

— O —

Opinión de conformidad con las partes I y II de la opinión del Tribunal, disidente con la parte III-A y concurrente con el resultado emitida por el Juez Asociado Señor Hernández Denton, a la cual se une la Juez Asociada Señora Naveira de Rodón.

I

La Autoridad de Acueductos y Alcantarillados (en adelante A.A.A.) acudió ante nos mediante un recurso de *certiorari* en el cual nos solicitó que revisemos una sentencia del Tribunal de Circuito de Apelaciones, que revocó una consulta de ubicación concedida por la Junta de Planificación de Puerto Rico y ordenó, a su vez, la paralización de la construcción del Superacueducto de la Costa Norte (en adelante Superacueducto). Estando el referido recurso en trámite de perfeccionamiento, la Asamblea Legislativa aprobó la Ley Núm. 19 de 12 de junio de 1997 (en adelante Ley Núm. 19), 22 L.P.R.A. sec. 451 *et seq.*, para autorizar y ordenar a la A.A.A. a que "continúe de forma ininterrumpida y diligente con el diseño y la construcción del [Superacueducto] hasta la culminación de la obra". Art. 3 de la Ley Núm. 19, *supra*, 22 L.P.R.A. sec. 451. Así, mientras por un lado existía una decisión judicial que ordenaba la inmediata paralización de la construcción del Superacueducto, por otro lado, las ramas políticas habían promulgado una ley que autorizaba y ordenaba lo contrario. Ante ello la recurrida, Misión Industrial, cuestionó ante nos la validez constitucional de la referida actuación mediante una moción en auxilio de jurisdicción.

Al examinar una controversia que sea sometida ante nuestra consideración, los tribunales tenemos la obligación de ser custodios de nuestra propia jurisdicción. *Gobernador de P.R. v. Alcalde de Juncos*, 121 D.P.R. 522 (1988);

*López Rivera v. Autoridad Fuentes Fluviales*, 89 D.P.R. 414 (1963). Esto significa que, previo a considerar los méritos de un caso, los tribunales debemos examinar si tenemos facultad para ello. Así, la correcta adjudicación de una controversia requiere que los tribunales consideremos, como cuestión de umbral, si la ley avala el ejercicio de nuestra jurisdicción.

En el caso de autos, la consideración de los méritos de los señalamientos de error de la A.A.A. está subordinada a que la Ley Núm. 19, *supra*, no nos haya privado de jurisdicción sobre el asunto por haber tornado en no justiciables las controversias planteadas ante nos. Así, el examen de la validez del ejercicio de nuestra jurisdicción en el caso de autos parte del examen del efecto sobre nuestra jurisdicción de esa expresión legislativa, asunto que fue traído oportunamente ante nuestra consideración por Misión Industrial.

Hoy este Tribunal correctamente decreta la inconstitucionalidad de la referida ley al resolver que ésta "pretende ejercer [nuestra] función revisora determinando indirectamente que la sentencia recurrida es incorrecta, y dictando así el resultado del caso ante nuestra consideración, sin modificar en forma alguna el derecho aplicable". Estamos conformes con esta determinación.

Como se sabe, según nuestro esquema jurídico-político, cada una de las ramas de gobierno posee unas funciones que le son privativas. Si bien su relación es funcionalmente dinámica e interactiva, nuestra Constitución proscribe que una rama ursurpe el poder o ámbito de autonomía de otra rama de gobierno. Este equilibrio funcional es la piedra angular del sistema de frenos y de contrapesos que en los sistemas republicanos de gobierno impide que una rama de gobierno se allegue a sí misma facultades o poderes conferidos por la Constitución a otras ramas.

Al "legislar" que la sentencia cuestionada ante nos en revisión judicial es incorrecta, la Ley Núm. 19, *supra*, con-

traviene estos principios. Su inconstitucionalidad, por lo tanto, es evidente. Corresponde a la Rama Judicial el poder de revisar una sentencia y la facultad de decidir si una actuación gubernamental fue realizada conforme a derecho. Además, le corresponde al Tribunal Supremo, como tribunal constitucional de última instancia, el poder de revisar las decisiones de los foros adjudicativos de menor jerarquía. La flexibilidad que en el pasado hemos reconocido a la interacción entre las diferentes ramas de gobierno —véanse: *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994), opinión de conformidad; *Banco Popular, Liquidador v. Corte*, 63 D.P.R. 66 (1944)— no significa que la facultad última de interpretar las leyes y para revisar decisiones judiciales de foros de inferior jerarquía pueda ser ejercida por las ramas políticas mediante leyes u órdenes ejecutivas promulgadas a través de sus propios procedimientos.

Coincidimos con la determinación final a la que llega este Tribunal de que es inconstitucional la referida expresión legislativa por constituir una atentado contra el principio de la separación de poderes que dimana de la Sec. 2 del Art. I de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Por ello, estamos conformes con las partes I y II de la opinión del Tribunal.

Así pues, siendo inconstitucional la Ley Núm. 19, *supra*, la controversia traída ante nos por la A.A.A. no es académica. Al respecto, coincidimos con la Juez Asociada Señora Naveira de Rodón en su voto explicativo, pág. 214, cuando afirma que "[e]sta conclusión lleva como corolario que el caso ante nuestra consideración no se haya convertido en académico. La situación que prevalece es la que existía antes de aprobarse la ley". Corresponde, entonces, examinar los méritos del recurso traído ante nuestra consideración por la A.A.A.

## II

Este Tribunal no sólo tiene la obligación de examinar si tenemos jurisdicción para considerar un recurso ante nuestra consideración. También tiene la ineludible obligación de examinar si el foro recurrido asumió correctamente su jurisdicción. Véase *Vázquez v. A.R.Pe.*, 128 D.P.R. 513, 537 (1991). Es sobre este aspecto donde nos vemos imposibilitados de refrendar la parte de la opinión del Tribunal que entra a considerar los méritos de los señalamientos de error planteados por la A.A.A., ya que estimamos que el Tribunal de Circuito de Apelaciones actuó sobre éste sin jurisdicción.

Para evadir el ataque jurisdiccional, la opinión del Tribunal adopta una interpretación que fue intimada mediante sentencia en *Rivera v. Mun. de Carolina*, 140 D.P.R. 131 (1996), y que en aquella ocasión no suscribimos por estimar que atentaba contra el esquema administrativo diseñado por la Asamblea Legislativa para tramitar las mociones de reconsideración en procedimientos administrativos. Reafirmamos la posición que esbozamos en aquella ocasión en torno a la controversia jurisdiccional. Por ello, revocaríamos la decisión recurrida y desestimaríamos el referido recurso de revisión por este sólo fundamento. Elaboremos.

A. La Sec. 3.15 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (en adelante L.P.A.U.), 3 L.P.R.A. sec. 2165, dispone que las agencias administrativas deberán considerar las mociones de reconsideración dentro del término de quince (15) días de haber sido presentadas. Dispone, además, que: "[s]i [la agencia] la rechazare de plano o no actuare dentro de los quince (15) días, el término para solicitar revisión comenzará a correr nuevamente desde que se notifique dicha denegatoria o desde que expiren esos quince (15) días, se-

gún sea el caso".(¹) Íd. Por su parte, la Sec. 4.2 de la L.P.A.U., 3 L.P.R.A. sec. 2172, dispone que cuando se presenta una moción de reconsideración ante una agencia, las partes podrán instar un recurso de revisión judicial en el Tribunal de Circuito de Apelaciones dentro del término de treinta (30) días, contado a partir de las fechas establecidas en la citada Sec. 3.15.(²)

En *Rivera v. Mun. de Carolina*, supra, este Tribunal tuvo ante su consideración la controversia específica en torno a cuándo comienza a transcurrir el término para revisar judicialmente una decisión administrativa luego de que una parte solicita la reconsideración de la decisión final de la agencia, pero la agencia notifica su determinación

---

(¹) El texto completo de la sección vigente dispone:

"La parte adversamente afectada por la resolución, u orden parcial o final podrá, dentro del término de veinte (20) días desde la fecha de archivo en autos de la notificación de la resolución u orden, presentar una moción de reconsideración de la resolución u orden. La agencia dentro de los quince (15) días de haberse presentado dicha moción deberá considerarla. Si la rechazare de plano o no actuare dentro de los quince (15) días, el término para solicitar revisión comenzará a correr nuevamente desde que se notifique dicha denegatoria o desde que expiren esos quince (15) días, según sea el caso. Si se tomare alguna determinación en su consideración, el término para solicitar revisión empezará a contarse desde la fecha en que se archive en autos una copia de la notificación de la resolución de la agencia resolviendo definitivamente la moción de reconsideración. Tal resolución deberá ser emitida y archivada en autos dentro de los noventa (90) días siguientes a la radicación de la moción de reconsideración. Si la agencia acoge la moción de reconsideración pero deja de tomar alguna acción con relación a la moción dentro de los noventa (90) días de ésta haber sido radicada, perderá jurisdicción sobre la misma y el término para solicitar la revisión judicial empezará a contarse a partir de la expiración de dicho término de noventa (90) días salvo que la agencia, por justa causa y dentro de esos noventa (90) días, prorrogue el término para resolver por un período que no excederá de treinta (30) días adicionales. 3 L.P.R.A. sec. 2165.

(²) La Sec. 4.2 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (en adelante L.P.A.U.) dispone textualmente, en lo pertinente:

"Una parte adversamente afectada por una orden o resolución final de una agencia y que haya agotado todos los remedios provistos por la agencia o por el organismo administrativo apelativo correspondiente podrá presentar una solicitud de revisión ante el Tribunal de Circuito de Apelaciones, dentro de un término de treinta (30) días contados a partir de la fecha del archivo en autos de la copia de la notificación de la orden o resolución final de la agencia o a partir de la fecha aplicable de las dispuestas en la sec. 2165 de este título, cuando el término para solicitar la revis[ió]n judicial haya sido interrumpido mediante la presentación oportuna de una moción de reconsideración. La parte notificará la presentación de la solicitud de revisión a la agencia y a todas las partes dentro del término para solicitar dicha revisión. La notificación podrá hacerse por correo." 3 L.P.R.A. sec. 2172.

al respecto luego de transcurridos los quince (15) días de haber sido presentada la moción de reconsideración.(³) En esa ocasión, la Junta de Apelaciones del Sistema de Administración de Personal (en adelante J.A.S.A.P.) había emitido una decisión final. La parte afectada por ella presentó una moción de reconsideración, la cual fue resuelta por la J.A.S.A.P. dentro del término de los quince (15) días que establece la Sec. 3.15 de la L.P.A.U., *supra*, pero fue notificada a las partes luego de transcurrido dicho término. La parte promovente instó un recurso de revisión judicial dentro del término de treinta (30) días *contados a partir de la notificación de la decisión administrativa en torno a la moción de reconsideración, pero expirados los treinta (30) días si se inicia el cómputo a partir del vencimiento del término que la agencia tenía para considerarla.*

Una mayoría de este Tribunal, mediante sentencia y, por ende, sin darle efecto de precedente judicial, resolvió que los efectos de la presentación de una moción de reconsideración en el foro administrativo al amparo de la Sec. 3.15 de la L.P.A.U., *supra,* son distintos que los efectos de la presentación de una moción de reconsideración en un pleito civil al amparo de la Regla 47 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Por ello concluyó que el término para solicitar la revisión judicial de una decisión administrativa comienza a transcurrir desde el momento en que se notifica la determinación de la agencia en torno a la moción de reconsideración.

En esa ocasión disentimos del criterio mayoritario. Al analizar la referida sección expresamos lo siguiente:

De acuerdo con el procedimiento dispuesto en la Sec. 3.15, *supra*, al recibir una moción de reconsideración la agencia

---

(³) Al resolver *Rivera v. Mun. de Carolina*, 140 D.P.R. 131 (1996), no habían entrado en vigor las enmiendas incorporadas a la L.P.A.U. en diciembre de 1995. Véase la Ley Núm. 247 de 25 de diciembre de 1995 (3 L.P.R.A. secs. 2127, 2134, 2158, 2165, 2171–2172, 2177 y 2193). Sin embargo, el texto vigente de la Sec. 3.15 de la L.P.A.U., *supra*, quedó inalterado en cuanto a la controversia jurisdiccional que tenemos hoy ante nuestra consideración.

puede acogerla, denegarla de plano o no actuar sobre ella dentro de ese término. Conforme a los términos claros del estatuto, la agencia tiene jurisdicción para considerar la moción solamente cuando actúa dentro del plazo de quince (15) días. Si no actúa dentro de ese plazo se entiende denegada la reconsideración y la agencia pierde jurisdicción.

Si la agencia no toma acción alguna dentro de esos quince (15) días, la Sec. 3.15, *supra*, establece que el plazo de revisión judicial comienza a correr automáticamente al expirar el término de quince (15) días. Por otro lado, si dentro de dicho plazo la agencia resuelve la moción y la declara sin lugar *de plano*, el término para solicitar la revisión judicial comienza a contar antes de esos quince (15) días desde que se notifique dicha denegación. (Énfasis en el original.) *Rivera v. Mun. de Carolina*, supra, págs. 137–138, opinión disidente.

Añadimos que "[b]ajo este esquema procesal, el término para solicitar revisión sólo se interrumpe si la agencia tomó alguna acción sobre la moción de reconsideración dentro de los quince (15) días que concede dicho estatuto y archiva en autos dicha decisión dentro de ese mismo plazo". *Rivera v. Mun. de Carolina*, supra, pág. 138, opinión disidente.

Como consecuencia de lo anterior, si la parte promovente de una moción de reconsideración no recibe notificación alguna en torno a ésta dentro de los quince (15) días posteriores a su presentación, debe entender que fue rechazada y que el término para instar el recurso de revisión judicial no queda prorrogado, por lo que expira a los treinta (30) días del vencimiento del término que la agencia tenía para considerar la moción de reconsideración. En consecuencia, a nuestro juicio, la única forma en que se puede prorrogar el término para solicitar la revisión judicial de una decisión final de una agencia administrativa es si dentro de los quince (15) días de haber sido presentada, la agencia la acoge y notifica su determinación al respecto. Véase, además, *Pérez Rodríguez v. P.R. Parking Systems, Inc.*, 119 D.P.R. 634 (1987).

Al establecer unos plazos cortos, la L.P.A.U. pretendió acabar con la demora en la adjudicación administrativa,

pues obliga a las agencias a resolver rápidamente las controversias que tienen ante sí. De hecho, la eliminación en 1996 del requisito jurisdiccional de presentar una moción de reconsideración para instar un recurso de revisión judicial se enmarca en los propósitos del estatuto de agilizar el trámite administrativo. Contrario a este objetivo, la posición mayoritaria en *Rivera v. Mun. de Carolina*, supra, tiene el efecto de prorrogar los términos para acudir mediante revisión judicial cuando por error o negligencia del personal secretarial de las agencias se notifica la determinación en torno a la moción de reconsideración fuera del plazo de quince (15) días que la agencia tiene para considerarla.

De hecho, según la posición esbozada en *Rivera v. Mun. de Carolina*, supra, las partes tienen una segunda oportunidad para revisar judicialmente una decisión administrativa si por error o negligencia se notifica la determinación en torno a la moción de reconsideración, aun luego de transcurridos los treinta (30) días desde que finaliza el período que la agencia tenía para considerar la moción de reconsideración. Dicho de otro modo, en teoría, la interpretación mayoritaria puede llevar al absurdo de permitir que una parte inste un recurso de revisión judicial aun cuando la parte promovente entendió que su moción de reconsideración fue rechazada e, incluso, deliberadamente optó por permitir que venciera el término para instar un recurso de revisión judicial.

No hay duda de que si una agencia actúa en torno a una moción de reconsideración fuera del término de quince (15) días que tiene para considerarla, dicha actuación sería *ultra vires*. Si la agencia no puede extender deliberadamente el plazo en que puede considerar una moción de reconsideración, tampoco puede considerarse que el plazo para instar la revisión judicial se prolonga como consecuencia de la dilación de la propia agencia al notificar su decisión. Como afirmamos en nuestro disenso en *Rivera v. Mun. de Caro-*

*lina,* supra, pág.: "[r]esolver de otra manera significaría que las secretarías de las agencias tienen más tiempo para notificar una decisión que lo que el propio funcionario que decide tiene para emitir su dictamen. Esta interpretación produciría inestabilidad, incertidumbre y confusión en la práctica administrativa y dilataría excesivamente las adjudicaciones administrativas". *Rivera v. Mun. de Carolina,* supra, pág. 139.

B. En el caso de epígrafe los eventos procesales son esencialmente similares a los que tuvimos en *Rivera v. Mun. de Carolina,* supra. La determinación final de la Junta de Planificación, en la cual aprobaba la consulta de ubicación del Superacueducto, fue emitida el 5 de julio de 1996. El archivo en autos de la copia de la notificación de esta determinación ocurrió el 18 de julio de 1996. Misión Industrial solicitó la reconsideración el 7 de agosto de 1996, esto es, dentro de los veinte (20) días del archivo en autos de una copia de la notificación de la decisión administrativa.

En consecuencia, el 8 de agosto de 1996 comenzó a transcurrir el término de quince (15) días que tenía la Junta de Planificación para considerarla. Este plazo venció el 22 de agosto. En esa fecha, la Junta de Planificación no se había expresado en torno a la moción de reconsideración de Misión Industrial, por lo que ésta debió entender que fue rechazada. El plazo para acudir al Tribunal de Circuito de Apelaciones venció el 21 de septiembre de 1996, que por ser sábado se prorrogó hasta el próximo día laborable; en este caso, el lunes 23 de septiembre. Misión Industrial presentó su recurso de revisión judicial en el Tribunal de Circuito de Apelaciones el 27 de septiembre de 1996. Claramente actuó fuera del término que tenía para ello y, por ende, el foro apelativo carecía de jurisdicción para considerar el recurso.

A pesar de que a lo largo del proceso de revisión judicial el recurso ante nos ha generado varios incidentes procesa-

les, incluso ante este Foro —véase *Misión Ind. P.R. v. J.P. y A.A.A. II*, 143 D.P.R 811 (1997)— *en ninguna de las etapas previas las partes plantearon el aspecto jurisdiccional.* De hecho, este es un aspecto que la sentencia recurrida no aborda. Ello, sin embargo, no es un impedimento para que en esta etapa de los procedimientos este Tribunal considere este planteamiento; pues, como se sabe, los tribunales no tienen discreción para asumir jurisdicción donde la ley no la confiere. *Maldonado v. Pichardo*, 104 D.P.R. 778 (1976).

Por ello, luego de un ponderado análisis, estimamos que la interpretación que la opinión del Tribunal adopta en el caso de autos y que fue intimada mediante sentencia en *Rivera v. Mun. de Carolina*, supra, es incorrecta. No constituye una interpretación adecuada de la Sec. 3.15 de la L.P.A.U., *supra*, y de los intereses que dicho estatuto pretende proteger en el ámbito administrativo. El foro apelativo recurrido no tenía jurisdicción para revisar la consulta de ubicación en torno al Superacueducto aprobada por la Junta de Planificación. En consecuencia, y aunque las partes no lo plantearon hasta esta etapa de los procedimientos, tenemos la obligación de resolver que ese foro actuó sin jurisdicción y que procede revocar la decisión recurrida sin ulterior pronunciamiento.

Por lo anterior disentimos de la parte III-A de la opinión del Tribunal; revocaríamos la sentencia recurrida, y desestimaríamos el recurso de autos. Como este Tribunal llega al mismo resultado por otros fundamentos, concurrimos con el resultado de la opinión del Tribunal.

— O —

Opinión de conformidad en parte y disidente en parte emitida por el Juez Asociado Señor Fuster Berlingeri.

... the power vested in the American courts of justice, of pronouncing a statute to be unconstitutional, forms one of the

most powerful barriers which has ever been devised against the *tyranny* of political assemblies."

A. De Tocqueville
*Democracy in America*

Estoy conforme con las partes I y II de la opinión emitida por el Juez Presidente Señor Andréu García. Por las razones expuestas allí, no cabe duda de que la Ley Núm. 19 de 12 de junio de 1997 (22 L.P.R.A. sec. 451 et seq.) es inconstitucional, en cuanto viola el fundamental principio de la separación de poderes que está previsto en la Sec. 2 del Art. I de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

Es menester resaltar que el grave asunto ante nos va más allá de la importante controversia de si son válidas las decisiones sobre la construcción del superacueducto que se han impugnado ante nos. Nos enfrentamos aquí a una cuestión preeminente sobre la integridad de nuestro sistema de gobierno, que reviste una importancia cardinal para la convivencia democrática en Puerto Rico. Tenemos ante nos un intento deliberado de suprimir, con respecto al asunto del superacueducto, las facultades constitucionales de la Rama Judicial; un atentado político contra el principio jurídico de la separación de poderes. Se trata de un reto que este Foro no puede rehuir.

Para constatar la gravedad del asunto referido, conviene hacer memoria del origen y la razón de ser del fundamental precepto jurídico que aquí nos concierne. El principio de la separación de poderes, que es uno de los rasgos esenciales de nuestro sistema constitucional, es producto de vetustas luchas en la cultura occidental contra el absolutismo del poder monárquico. Representa uno de los triunfos del constitucionalismo sobre la concepción, prevaleciente en la primera etapa de la formación de los estados modernos, del rey como autoridad suprema. En nuestros días, constituye una de las piedras angulares de nuestro sistema de vida democrático; una de las vallas insalvables

de nuestro régimen de derecho contra la tiranía del gobernante políticamente poderoso.

En el sistema de gobierno de Estados Unidos, de donde procede mayormente nuestro propio ordenamiento constitucional, la característica distintiva del principio de la separación de poderes es la primacía de la autoridad judicial para interpretar y aplicar las normas jurídicas del país. B. Schwartz, *Constitutional Law: A Textbook*, 2da ed., Nueva York, Ed. Macmillan, 1979, pág. 2. Se trata de lo que se conoce como la *revisión judicial*, que incluye la facultad de interpretar con finalidad el significado de la Constitución y, por ende, la de declarar inválidas las acciones o decisiones de las ramas políticas del Gobierno que sean contrarias a la Ley Fundamental. En la propia jurisprudencia de Puerto Rico nos hemos referido antes al origen de ésta. Así en *E.L.A. v. Aguayo*, 80 D.P.R. 552, 595 (1958):

> Por sabido no debemos olvidar que la *revisión judicial* es la característica distintiva de nuestro orden político. Circunstancias históricas y el genio creador de John Marshall propiciaron su génesis y desarrollo en la alborada de la nación norteamericana a principios del siglo XIX. (Énfasis suplido.)

Esta *revisión judicial* es una de las joyas del constitucionalismo norteamericano, y ha alcanzado en Estados Unidos un desarrollo y una autoridad como en ningún otro país del mundo. Véanse: E.V. Rostow, *The Democratic Character of Judicial Review*, 66 Harv. L. Rev. 193 (1963); L.C. Sachica, *Exposición y glosa del constitucionalismo moderno*, Bogotá, Ed. Temis, 1976, págs. 10–11, M. Cappelletti y W. Cohen, *Comparative Constitutional Law*, Indianápolis, Ed. Bobbs-Merrill, 1979, págs. 12–16, citados en R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. I, págs. 23 y 55. La hemos adoptado plenamente en nuestro propio ordenamiento constitucional, y debemos defenderla con absoluto celo y determinación porque es el antídoto jurídico contra actitudes retrógradas que aún per-

sisten en Puerto Rico entre los iletrados; actitudes que en épocas pasadas se expresaron en las conocidas pero ya anacrónicas nociones de que *the king can do no wrong* o de que *L'Etat c'est moi*.

La Ley Núm. 19, *supra*, en cuestión constituye una clara intromisión de las ramas políticas del Gobierno con el ejercicio de la función judicial. Interfiere, en efecto, con la facultad de revisión de los tribunales. Pretende dictar el resultado específico y sustantivo en una cuestión que está pendiente de adjudicación ante este Foro. No puede prevalecer sin socavar a la vez la autoridad propia de la Rama Judicial y el principio de la separación de poderes.

Por ello, estoy de acuerdo con la decisión *unánime* de este Tribunal de que dicha ley es inconstitucional.

## I

Con lo que no estoy de acuerdo es con la postura de una mayoría de los Jueces de este Foro de que fue improcedente el dictamen del Tribunal de Circuito de Apelaciones, mediante el cual éste revocó por incorrecta la resolución emitida por la Junta de Planificación de Puerto Rico para aprobar la consulta de ubicación del Superacueducto. Esta es la postura de una mayoría del Tribunal, aunque está fundamentada en razones muy diferentes entre sí. Unos Jueces estiman *ahora* que el foro apelativo no tenía jurisdicción para considerar la validez de la resolución de la Junta de Planificación. Nada de eso señalaron el 21 de marzo de 1997 cuando una mayoría de este Tribunal confirmó el dictamen del Tribunal de Circuito de Apelaciones en el cual expidió el auto para revisar la referida decisión de la Junta de Planificación. Véase *Misión Ind. P.R. v. J.P. y A.A.A.*, 142 D.P.R. 656 (1997). Nada de eso señalaron tampoco cuando este Tribunal decidió revisar la decisión aludida del foro apelativo el 30 de junio de 1997. Véase

*Misión Ind. P.R. v. J.P. y A.A.A. I*, 143 D.P.R. 804 (1997). Además, dicho fundamento ya fue rechazado por este Tribunal en *Rivera v. Mun. de Carolina*, 140 D.P.R. 131 (1996). Por todo ello, estimo muy frágil la postura particular de los Jueces referidos.

Otros Jueces de la mayoría estiman que el foro apelativo sí tenía jurisdicción para considerar la validez de la resolución en cuestión de la Junta de Planificación, pero estiman que el foro apelativo erró substantivamente al revocarla. Consideran que la decisión de la Junta de Planificación fue conforme a derecho, por lo que el foro apelativo se excedió al revocarla. De estos otros Jueces, sólo dos (2) expresaron tal criterio hace más de un (1) año, cuando este Tribunal confirmó el dictamen del Tribunal de Circuito de Apelaciones en el que expidió el auto de revisión para revocar la decisión de la Junta de Planificación. Los demás que integran este otro grupo de Jueces *ahora* sostienen la postura aludida, de la cual se han convencido recientemente.

En mi criterio, la postura aludida en el párrafo anterior es frágil también, independientemente de si los Jueces que la suscriben ahora lo habían hecho antes o no. Para mí el problema radica en que la Junta de Planificación actuó festinadamente al aprobar la consulta de ubicación del Superacueducto. El obvio interés de esa agencia en darle el visto bueno al proyecto la llevó a considerar a la ligera y muy apresuradamente las cuestiones medulares que debía sopesar con cuidado, en vista de la magnitud del proyecto en cuestión.

Cuando se examinan *en conjunto* la totalidad de las objeciones identificadas por el foro apelativo en su fundamentada Sentencia de 20 de mayo de 1997, es difícil concluir que la Junta de Planificación actuó correctamente al aprobar la consulta de ubicación. Reconozco que la función judicial al revisar las determinaciones de los organismos ad-

ministrativos es limitada. Pero la misma normativa que restringe nuestra revisión en estos casos nos obliga a considerar el expediente administrativo *en su totalidad.* Véase *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.,* 133 D.P.R. 521 (1993). Visto de esa manera, en todos los numerosos e importantes aspectos pertinentes, no puedo en conciencia afirmar que la decisión de la Junta de Planificación fue fundamentada y razonable, de modo tal que mereciese la deferencia del foro apelativo y la nuestra.

En particular, no debe avalarse el proceder irregular de la Junta de Planificación de aprobar la consulta de ubicación aludida sin contar *de manera fidedigna* con información técnica indispensable sobre varios aspectos medulares del proyecto, tales como los relativos a los abastos y el aprovechamiento de los recursos de agua y los relativos a muchos de los terrenos específicos que se afectarían por la construcción del superacueducto. Esta falla, a su vez, resultó de otra falta seria en el proceso decisional de la Junta de Planificación, que aprobó la consulta sin contar con la participación propia de otras agencias gubernamentales concernidas y de los dueños de terrenos, tanto públicos como privados. Esta falta tampoco debe avalarse. Por todo ello disiento de la postura de la mayoría del Tribunal de revocar el dictamen del Tribunal de Circuito de Apelaciones, que correctamente invalidó la decisión en cuestión de la Junta de Planificación.

## II

Para concluir, debo señalar que reconocer *en este momento* que el dictamen del foro apelativo fue correcto, *no apareja inevitablemente* la conclusión de que debe *destruirse* lo que se ha construido del Superacueducto sin la debida autorización. Como hemos señalado antes, los tribunales "[t]enemos el deber de hacer que el Derecho sirva propósitos útiles sociales, no esquemas teóricos abstractos

que arrojan resultados prácticos absurdos". *Passalacqua v. Mun. de San Juan*, 116 D.P.R. 618, 632 (1985). En este caso, se debió paralizar las obras del Superacueducto cuando este Tribunal decidió revisar la legalidad de su construcción.[1] Esto hubiese permitido considerar las graves cuestiones de este caso con plena libertad y raciocinio, y hubiese evitado ahora unas frágiles decisiones que parecen racionalizaciones más que fundamentos jurídicos válidos. Sin embargo, como ello no se hizo entonces, ahora no podría ordenarse la destrucción de lo construido ilegalmente, porque tal dictamen representaría la pérdida insensata de los cientos de millones de dólares que ya se han invertido en la obra. No podríamos ordenar un resultado tan absurdo, más irrazonable que la propia construcción del Superacueducto sin debida autorización.

Podemos, pues, declarar no sólo la inconstitucionalidad de la Ley Núm. 19, *supra*, sino también la invalidez de la decisión de la Junta de Planificación, sin tener que ordenar el remedio absurdo de destruir lo ya construido. Me parece que resolver de este modo constituiría un proceder más franco y aleccionador que el que ha seguido la mayoría, con respecto al segundo asunto central de este caso. A estas alturas, resolver que el foro apelativo actuó sin jurisdicción o erróneamente me parece una lamentable y tortuosa evasión, que no ayuda siquiera a esclarecer bien lo que ha sido impropio en el proceder gubernamental con respecto al asunto ante nos.

---

[1] Véase mi voto disidente en *Misión Ind. P.R. v. J.P. y A.A.A. I*, 143 D.P.R. 804, 807 (1997).

— o —

Voto explicativo particular emitido por la Juez Asociada Señora Naveira de Rodón, al cual se une el Juez Asociado Señor Hernández Denton.

El recurso de autos ha tenido un trámite procesal complejo, del que han surgido varias controversias. En primer lugar, se plantea la corrección de la Sentencia del Tribunal de Circuito de Apelaciones (en adelante el Tribunal de Circuito) de 20 de mayo de 1997, en la cual se revocó la resolución emitida por la Junta de Planificación de Puerto Rico (en adelante la Junta) el 5 de julio de 1996 en la Consulta Núm. 95-06-0682-JGE. Esta última resolución aprobó la consulta de ubicación del sistema de acueducto conocido como el Superacueducto de la Costa Norte (en adelante S.A.N.). Por medio de su sentencia, el Tribunal de Circuito paralizó su construcción.

Como consecuencia de esta decisión, la Legislatura de Puerto Rico aprobó la Ley Núm. 19 de 12 de junio de 1997 (22 L.P.R.A. sec. 451 *et seq.*), en la que se le ordenaba a la Autoridad de Acueductos y Alcantarillados (en adelante la A.A.A.) que continuara con la construcción del S.A.N., entre otras cosas. Posteriormente, tanto la Junta como la A.A.A. presentaron ante nos sendos recursos de *certiorari* para que revocásemos la sentencia emitida por el Tribunal de Circuito. Por otro lado, la parte recurrida, Misión Industrial de Puerto Rico, Inc. y otros (en adelante Misión Industrial), presentó una moción en auxilio de jurisdicción para solicitar la paralización de la construcción del S.A.N. Solicitó, además, que nos expresáramos, antes de entrar a ver los méritos del recurso, sobre la constitucionalidad de la Ley Núm. 19, *supra*, y los efectos que ésta pudiera tener sobre las controversias ante nos. En esencia, señala que mediante esta legislación se pretende despojar al Tribunal Supremo de su jurisdicción para entender en los méritos de la controversia que se ha planteado.

La postura procesal en que se encuentra el caso ante nuestra consideración requiere, pues, que comencemos determinando qué efecto, si alguno, ha tenido la aprobación de la Ley Núm. 19, *supra*, sobre nuestra jurisdicción. Luego de resolver este problema de umbral y antes de entrar a los méritos de la controversia, debemos determinar si el Tribunal de Circuito tenía a su vez jurisdicción para acoger la apelación de la resolución de la Junta, concediendo la consulta de ubicación. Lo anterior requiere, como acertadamente hace la mayoría, que se comience analizando la constitucionalidad de la Ley Núm. 19, *supra*, y su efecto sobre la justiciabilidad de la controversia.

La academicidad constituye "una de las manifestaciones concretas del concepto de justiciabilidad, que a su vez acota los límites de la función judicial". *Pueblo v. Ramos Santos*, 138 D.P.R. 810, 824 (1995). Está basada en las limitaciones constitucionales relativas a "casos y controversias". R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 122.

Sobre este particular, en *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927, 935–936 (1993), resolvimos que:

> Los tribunales pierden su jurisdicción sobre un caso por academicidad cuando ocurren cambios durante el trámite judicial de una controversia particular que hacen que ésta pierda su actualidad, de modo que el remedio que pueda dictar el tribunal no ha de llegar a tener efecto real alguno en cuanto a esa controversia. Con esta limitación sobre el poder de los tribunales, se persigue evitar el uso innecesario de los recursos judiciales y obviar pronunciamientos autoritativos de los tribunales que resulten superfluos.[1]

Al entrar a ejercer su función adjudicativa, todo tribunal tiene que determinar inicialmente si las controversias

---

[1] Además, véanse: *Pueblo v. Ramos Santos*, 138 D.P.R. 810 (1995); *El Vocero v. Junta de Planificación*, 121 D.P.R. 115, 123–126 (1988); *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 724–725 (1980).

que se le presentan son justiciables, ya que si el caso fuera académico, no justiciable, habría que desestimarlo.

Este Tribunal, luego de un extenso y minucioso análisis, unánimemente ha determinado que la Ley Núm. 19, *supra*, es inconstitucional. Esta conclusión lleva como corolario que el caso ante nuestra consideración no se haya convertido en académico. La situación que prevalece es la que existía antes de aprobarse la ley. Además, una mayoría de los Jueces han suscrito los fundamentos esbozados por el Juez Presidente Señor Andréu García sobre este particular.

Ahora bien, una vez determinado que el caso no es académico y que podemos ejercer nuestra jurisdicción apelativa sin mayores problemas, procede, antes de entrar a los méritos del recurso, que auscultemos si el Tribunal de Circuito efectivamente tenía jurisdicción para entender en el recurso de revisión que le fue presentado. Si el Tribunal de Circuito carecía de jurisdicción, lo que procede es revocar la sentencia recurrida sin más. No se podrían considerar los méritos del recurso. Esto es así, ya que el Tribunal de Circuito simplemente no tendría autoridad ni poder para revocar la decisión administrativa que concede la consulta de ubicación.

Sobre la jurisdicción del Tribunal de Circuito en el caso de autos, estamos de acuerdo con la opinión concurrente del Juez Asociado Señor Hernández Denton en cuanto a que en ésta se expresa que el foro apelativo no tenía jurisdicción para revisar la consulta de ubicación del S.A.N., ya que el recurso de revisión judicial ante el Tribunal de Circuito fue presentado fuera del plazo jurisdiccional dispuesto para ello.[2] Al no acogerse y notificarse por la agencia administrativa —la Junta— la moción de reconsideración presentada dentro de los quince (15) días si-

---

[2] Véase la opinión disidente del Juez Asociado Señor Hernández Denton en *Rivera v. Mun. de Carolina*, 140 D.P.R. 131, 135 (1996).

guientes a su presentación, el término para presentar la revisión comenzó a decursar el 23 de agosto de 1996. Por lo tanto, éste vencía el 23 de septiembre, ya que el 21 de septiembre (fecha cuando se cumplían los treinta (30) días) era sábado. El recurso fue presentado tardíamente el 27 de septiembre.

Por las razones antes expuestas, estamos conformes con las partes I y II de la opinión del Tribunal, disentimos de la parte III-A, por lo que no es necesario expresarnos sobre la parte III-B, y nos unimos a la opinión concurrente del Juez Asociado Señor Hernández Denton en cuanto a que el Tribunal de Circuito actuó sin jurisdicción sobre este caso. Por la conclusión a la cual llegamos, reiteramos que no es necesario expresarnos sobre los méritos de éste.